**ROBINSON BROG LEINWAND GREENE**
  **GENOVESE & GLUCK P.C.**
875 Third Avenue
New York, New York 10022
A. Mitchell Greene
Steven B. Eichel
*Proposed Attorneys for the Debtor and Debtor in*
*Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

In re:                                                            Chapter 11

**ARTISANAL 2015, LLC,**                      Case No:  17-12319-jlg

                                        Debtor.
--------------------------------------------------------X

### DECLARATION OF SARID DRORY IN SUPPORT OF DEBTOR'S MOTION OBJECTING TO AC PENGUIN PRESTIGE CORP.'S MECHANIC'S LIEN

        SARID DRORY, hereby declares under penalty of perjury as follows:

        1.        I am the Managing Member of Artisanal 2015 LLC (the "Debtor" or "Artisanal").

I submit this declaration based on my personal knowledge in support of the Debtor's Motion

Objecting to AC Penguin Prestige Corp.'s Mechanic's Lien.

        2.        The Debtor is the lessee of a lease dated October 5, 2015 (the "Lease") with 387

Park South L.L.C. ("387 Park") for premises located at 387 Park Avenue South, New York,

New York (the "Premises").

        3.        Pursuant to section 5.4 of the Lease, if a mechanic's lien is filed against 387 Park,

"[the Debtor] shall . . . have such lien . . . removed by bonding, payment or otherwise within

thirty days after [the Debtor] receives notice of the filing [of a mechanic's lien]."  A copy of

the Lease is attached hereto as **Exhibit A**.

        4.        On September 13, 2017, the Debtor received a copy of a Mechanic's Lien dated

and filed on September 11, 2017 (the "Sept. 11 Mechanic's Lien") in the County of New York against the Premises. A copy of the Sept. 11 Mechanic's Lien is attached hereto as **Exhibit B**. The Sept. 11 Mechanic's Lien was for services and materials purportedly provided to 2015 Artisanal LLC[1] in building out an HVAC system for the Debtor's leased Premises.

5.    The Sept. 11 Mechanic's Lien claims that Penguin provided services in the amount of $220,500 for installing an HVAC system on the Premises, starting May 4, 2017 and ending July 21, 2017, on behalf of the Debtor. Penguin previously filed a mechanic's lien against the Premises on May 10, 2017 (the "May 10 Mechanic's Lien").[2] A copy of the May 10 Mechanic's Lien is attached hereto as **Exhibit C**. The May 10 Mechanic's Lien asserted that Debtor owed Penguin $104,520 on account of services performed from May 4, 2017 through May 9, 2017. Upon receipt of the May 10 Mechanic's Lien, Artisanal moved by order to show cause to discharge the May 10 Mechanic's Lien. In Artisanal's Application to Discharge the May 10 Mechanic's Lien (the "Discharge Application"), Artisanal asserted that the May 10 Mechanic's Lien should be discharged because, among other things:

- Debtor affirmatively told Penguin that Penguin was not going to be hired by Debtor;

- No final designs, engineering specifications or drawings for the HVAC system were every prepared by Penguin;

- Debtor never signed a contract with Penguin;

- Debtor never ordered anything from Penguin to be manufactured;

---

[1] The Debtor submits that Penguin erroneously asserted the Sept. 11 Mechanic's Lien against 2015 Artisanal LLC. Rather the Sept. 11 Mechanic's Lien should be against the Debtor as the lessee of the Lease.
[2] The May 10 Mechanic's Lien also asserts 2015 Artisanal LLC as the employer.

- Debtor never agreed on a price for any labor to be performed or materials to be supplied;

- Debtor never approved of Penguin to perform any work;

- Penguin never installed an HVAC system on the Premises;

- Penguin never demanded payment from Debtor;

- Building permits and insurance were never provided by Penguin to 387 Park; and

- Ultimately, Penguin did not do any work on behalf of Debtor.

A copy of the Discharge Application is attached hereto as **Exhibit D**.

6.     Despite the Debtor's assertions that Penguin does not have any claim, let alone a claim that would give rise to mechanic's lien, Artisanal opted to pay Penguin $10,000 to have the May 10 Mechanic's Lien removed in order to avoid a default under section 5.4 of the Lease.  The May 10 Mechanic's Lien was released and discharged without satisfaction and with leave to renew.  A copy of the Stipulation of Settlement is attached hereto as **Exhibit E**.

7.     On September 11, 2017, Penguin file the Sept. 11 Mechanic's Lien in the amount of $220,500 for work performed May 4, 2017 and ending July 21, 2017.  Essentially, this is the same as the May 10 Mechanic's lien, except, Penguin is alleging they performed additional services and materials from May 9, 2017 through July 21, 2017 at a cost of an additional $116,000.  For the same reasons set forth in the Discharge Application and herein, the Debtor submits that Penguin again provided no services that warrant a claim against the Debtor, let alone one that would give rise to a mechanic's lien.

8.     The timing of the Sept. 11 Mechanic's Lien is also suspect.  While the May 10 Mechanic's Lien was withdrawn on June 26, 2017, Penguin re-filed the Sept. 11 Mechanic's Lien on September 11, only 21 days after the Petition Date and 11 days after the filing of 387

Park's Motion to Dismiss, in an amount that is double the previous mechanic's lien. There is an issue as to whether the Sept. 11 Mechanic's Lien was filed for the sole purpose of causing a postpetition default of the Lease to aid 387 Park in dismissing the Debtor's chapter 11 case.

9.     The Debtor has reviewed the Sept. 11 Mechanic's Lien and determined that based on a review of the Debtor's books and records, the Debtor bears no liability to Penguin. Additionally, the Debtor has served a Demand Pursuant to Section 38 of the Lien Law (the "Section 38 Demand") to Penguin demanding a verified statement setting forth the items of labor and/or material and the value thereof which makes up the amount asserted in the Sept. 11 Mechanic's Lien. A copy of the Section 38 Demand is attached hereto as **Exhibit F**.

I declare under penalty of perjury under the laws of the United States, pursuant to 28 U.S.C. §1746, that the foregoing is true and correct.


Dated:     New York, New York
           September 26, 2017


                                   /s/ Sarid Drory
                                   Sarid Drory

# EXHIBIT A

<u>Retail Lease</u>

**387 PARK SOUTH L.L.C.,**

Landlord

and

**ARTISANAL2015, LLC, D/B/A ARTISANAL FROMAGERIE & BISTRO**
Tenant

Premises: 387 Park Avenue South
New York, New York 10016

Date: October 5 , 2015

# TABLE OF CONTENTS

ARTICLE 1: BASIC TERMS AND DEFINITIONS.................................................................... 1

   1.1    Additional Rent.......................................................................................... 1

   1.2    Authority or Authorities............................................................................ 1

   1.3    Broker ........................................................................................................ 1

   1.4    Building...................................................................................................... 1

   1.5    Commencement Date................................................................................. 1

   1.6    Expiration Date ......................................................................................... 1

   1.7    Extension Option ...................................................................................... 1

   1.8    Fixed Rent.................................................................................................. 1

   1.9    Fixed Rent Commencement Date ............................................................. 1

   1.10   Guarantor .................................................................................................. 1

   1.11   Landlord's Work ....................................................................................... 1

   1.12   Laws........................................................................................................... 1

   1.13   Lease Year ................................................................................................. 2

   1.14   Mortgagee/Mortgages ............................................................................. 2

   1.15   Notice Address.......................................................................................... 2

   1.16   Opening Date ............................................................................................ 2

   1.17   Permitted Use............................................................................................ 3

   1.18   Premises .................................................................................................... 3

   1.19   Proportionate Share.................................................................................. 3

   1.20   Real Property ............................................................................................ 3

   1.21   Rent............................................................................................................ 3

   1.22   Security ...................................................................................................... 3

   1.23   Superior Landlord/Superior Lease .......................................................... 3

   1.24   Tenant Improvement Allowance.............................................................. 3

   1.25   Tenant Initial Work Cost .......................................................................... 3

   1.26   Tax Base Year............................................................................................ 3

   1.27   Tenant's Property ...................................................................................... 3

   1.28   Tenant's Work ........................................................................................... 3

   1.29   Tenant's Work Commencement Date ...................................................... 3

   1.30   Tenant's Work Completion Date.............................................................. 4

1.31    Term ................................................................................................................. 4

1.32    Certain Definitions ......................................................................................... 4

1.33    Trade Name .................................................................................................... 4

ARTICLE 2:  DEMISE; RENT; VAULT AREA ................................................................ 4

2.1    Demise ................................................................................................................ 4

2.2    Rent Payment; Percentage Rent .................................................................... 5

2.3    Third Party Tender of Rent ............................................................................ 5

2.4    Fixed Rent Commencement ........................................................................... 5

2.5    Payment of Additional Rent ........................................................................... 5

2.6    Determination ................................................................................................... 5

2.7    Possession ........................................................................................................ 6

2.8    Agreement on Dates ........................................................................................ 7

2.9    Vault Area .......................................................................................................... 7

ARTICLE 3:  USE; RULES AND REGULATIONS; TENANTS OPERATIONS; SIGNS ........ 7

3.1    Use ...................................................................................................................... 7

3.2    Certificate of Occupancy ................................................................................ 8

3.3    Rules ................................................................................................................... 8

3.4    Continuous Operation ..................................................................................... 8

3.5    Operation Requirements ................................................................................. 9

3.6    Operation Prohibitions .................................................................................... 9

3.7    Community Concerns .................................................................................... 10

3.8    Signs ................................................................................................................ 10

3.9    Tenant's Exclusive ......................................................................................... 11

ARTICLE 4:  CONDITION OF THE PREMISES; LANDLORD'S WORK ........................... 11

4.1    "AS IS" Condition of the Premises ............................................................ 11

4.2    Landlord's Work ............................................................................................. 11

ARTICLE 5:  TENANT'S WORK ..................................................................................... 11

5.1    Tenant's Work ................................................................................................ 11

5.2    Commencement and Completion; Tenant's Plans .................................... 12

5.3    Reimbursement; Sign-Off ............................................................................ 13

5.4    Liens ................................................................................................................ 14

1

| | | |
|---|---|---|
| 5.5 | Tenant's Contractors | 14 |
| 5.6 | Intentionally Deleted | 14 |
| 5.7 | Co-Operation | 14 |
| 5.8 | Floor Load | 15 |
| 5.9 | Damage | 15 |
| 5.10 | Removal of Tenant's Work; Tenant's Property | 15 |
| 5.11 | Tenant Improvement Allowance | 15 |

**ARTICLE 6: TAX PAYMENTS** ... 16

| | | |
|---|---|---|
| 6.1 | Real Estate Taxes | 16 |
| 6.2 | Tax Year; Comparison Tax Year | 17 |
| 6.3 | Tax Payment | 17 |
| 6.4 | Other Taxes | 17 |
| 6.5 | No Exemption | 18 |
| 6.6 | Certiorari Proceedings | 18 |
| 6.7 | After Term | 18 |
| 6.8 | Creation of Condominium | 18 |

**ARTICLE 7: UTILITIES; SERVICES** ... 19

| | | |
|---|---|---|
| 7.1 | Utilities | 19 |
| 7.2 | No Overburdening of Systems | 19 |
| 7.3 | No Services Provided by Landlord | 19 |
| 7.4 | Interruption | 19 |
| 7.5 | Trash Removal | 20 |
| 7.6 | Interruption Of Utilities Or Other Service | 20 |

**ARTICLE 8: REPAIRS AND MAINTENANCE** ... 20

| | | |
|---|---|---|
| 8.1 | Structural Repair | 20 |
| 8.2 | Sprinklers | 20 |
| 8.3 | Premises Repair; HVAC | 20 |
| 8.4 | HVAC Repair Contract | 21 |
| 8.5 | Damage | 21 |
| 8.6 | Landlord Repair | 21 |

**ARTICLE 9: LAWS; HAZARDOUS SUBSTANCES** ... 21

| | 9.1 | Laws | 21 |
|---|---|---|---|
| | 9.2 | Hazardous Substances | 22 |
| | 9.3 | Remediation | 23 |
| | 9.4 | Indemnification | 23 |
| | 9.5 | Permits for Auction, Fire Sale, etc. | 23 |
| | 9.6 | Licenses and Permits | 23 |
| | 9.7 | Compliance Challenge | 23 |
| ARTICLE 10: | | SUBORDINATION; ESTOPPEL CERTIFICATES | 24 |
| | 10.1 | Subordination | 24 |
| | 10.2 | Attornment | 24 |
| | 10.3 | Modification | 25 |
| | 10.4 | Consent | 25 |
| | 10.5 | Estoppel Certificates | 25 |
| ARTICLE 11: | | INSURANCE | 25 |
| | 11.1 | Insurance | 25 |
| | 11.2 | Delivery | 26 |
| | 11.3 | Prohibited Actions | 26 |
| | 11.4 | Waiver of Subrogation | 26 |
| | 11.5 | Subtenant, Occupant Compliance | 27 |
| ARTICLE 12: | | CASUALTY | 27 |
| | 12.1 | Damage; Repair; Abatement | 27 |
| | 12.2 | Termination | 27 |
| | 12.3 | Express Agreement | 27 |
| ARTICLE 13: | | CONDEMNATION | 28 |
| | 13.1 | Taking; Claims | 28 |
| ARTICLE 14: | | ASSIGNMENT AND SUBLETTING | 28 |
| | 14.1 | No Assignment or Sublease | 28 |
| | 14.2 | Recapture | 28 |
| | 14.3 | Permitted Transactions | 29 |
| | 14.4 | Conditions | 30 |

3

14.5    Increased Fixed Rent; Profit ...................................................... 31

14.6    Liability Continued ................................................................. 32

14.7    Future Transactions ................................................................ 32

14.8    Acceptance of Rent ................................................................ 32

ARTICLE 15: ACCESS; CHANGES IN BUILDING AND REAL PROPERTY ................... 32

15.1    Access ................................................................................. 32

15.2    Changes .............................................................................. 33

15.3    Excavation .......................................................................... 33

15.4    Scaffolds ............................................................................. 33

15.5    Minimize Interference ............................................................ 34

ARTICLE 16: DEFAULT ................................................................. 34

16.1    Default ............................................................................... 34

16.2    Conditional Limitation ........................................................... 34

16.3    Application of Payments ......................................................... 35

ARTICLE 17: REMEDIES ................................................................ 35

17.1    Remedies ............................................................................ 35

17.2    Waiver; Re-Entry; Remedies Cumulative; No Preclusion ................. 36

17.3    Jury Trial ........................................................................... 37

17.4    Landlord Right to Cure ........................................................... 37

17.5    Reimbursement ..................................................................... 37

17.6    No Waiver ........................................................................... 37

17.7    Late Fees ............................................................................ 38

17.8    New York Law ...................................................................... 38

ARTICLE 18: SECURITY ................................................................ 38

18.1    Cash .................................................................................. 38

18.2    Letter of Credit after Cash ...................................................... 39

ARTICLE 19: BROKER .................................................................. 40

19.1    Broker ............................................................................... 40

ARTICLE 20: NOTICES; CONSENTS AND APPROVALS .............................. 40

4

20.1   Notices ................................................................................................................... 40

20.2   Effectiveness ......................................................................................................... 40

20.3   Consent in Writing ............................................................................................... 40

20.4   Notice Given by Landlord .................................................................................... 40

20.5   Multiple Entities Comprising Tenant ................................................................. 41

ARTICLE 21: NO REPRESENTATIONS; LIABILITY; TENANT INDEMNITY .................. 41

21.1   No Representations ............................................................................................... 41

21.2   Employees .............................................................................................................. 41

21.3   No Liability ............................................................................................................ 41

21.4   Building/Superior Lease Transfer ...................................................................... 41

21.5   No Personal Liability; No Consequential Damages ........................................... 41

21.6   Specific Performance or Injunction ................................................................... 42

21.7   Obligations Separate ........................................................................................... 42

21.8   Landlord's Force Majeure ................................................................................... 42

21.9   Indemnification ..................................................................................................... 42

ARTICLE 22: END OF TERM ....................................................................................... 43

22.1   Premises Condition .............................................................................................. 43

22.2   Hold-Over .............................................................................................................. 43

22.3   Intentionally Omitted .......................................................................................... 43

22.4   After Expiration Date .......................................................................................... 43

ARTICLE 23: MISCELLANEOUS ................................................................................. 43

23.1   Guaranty ................................................................................................................ 43

23.2   Patriot Act ............................................................................................................. 43

23.3   Financial Statements ........................................................................................... 44

23.4   General ................................................................................................................... 44

ARTICLE 24: RIGHT OF FIRST OFFER ....................................................................... 45

24.1   Right of First Offer .............................................................................................. 45

**EXHIBITS**

Exhibit A    Fixed Rent
Exhibit B    Landlord's Work and Work Letter
Exhibit C    Premises
Exhibit C-1 Outdoor Seating Area
Exhibit D    Commencement Date Agreement
Exhibit E    Rules
Exhibit E-1 Additional Rules
Exhibit F    Good Guy Guaranty
Exhibit G    Principals
Exhibit H    List of Approved Contractors and Subcontractors

Extension Option Rider

Food Use Rider

Percentage Rent Rider

Form of Letter of Credit

**Retail Lease**

Lease dated October 5, 2015, between **387 PARK SOUTH L.L.C.**, a New York limited liability company ("Landlord"), and **ARTISANAL 2015, LLC, D/B/A ARTISANAL FROMAGERIE & BISTRO**, a New York limited liability company ("Tenant").

**Article 1. Basic Terms and Definitions**

**Section 1.1** Additional Rent. All sums, other than the Fixed Rent, payable by Tenant to Landlord under this lease, including the payment of deficiencies and increases in the Security, if any.

**Section 1.2** Authority or Authorities. As defined in Section 9.1.

**Section 1.3** Broker. Winick Realty Group LLC and Savills Studley, Inc.

**Section 1.4** Building. The building and improvements located at 387 Park Avenue South, New York, New York.

**Section 1.5** Commencement Date. The date upon which possession of the Premises is delivered to Tenant, with all of Landlord's Work (as defined herein) Substantially Completed (as defined herein), subject to the provisions of Section 2.7 hereof, provided that Landlord shall have delivered not less than five (5) days' prior notice to Tenant informing Tenant that Landlord's Work is Substantially Completed and the Premises are available to Tenant for possession.

**Section 1.6** Expiration Date. The date that is fifteen (15) years following the last day of the calendar month immediately preceding the calendar month in which the Fixed Rent Commencement Date occurs.

**Section 1.7** Extension Option. A single five (5) year extension option, more particularly described in the Extension Option Rider attached hereto and made a part of this lease.

**Section 1.8** Fixed Rent. The Fixed Rent is shown on Exhibit A to this lease.

**Section 1.9** Fixed Rent Commencement Date. The date that is 330 days following the Commencement Date.

**Section 1.10** Guarantor. The persons executing the Guaranty annexed hereto as Exhibit F, whose liability shall be joint and several.

**Section 1.11** Landlord's Work. The work to be performed by Landlord as described in Exhibit B to this lease.

**Section 1.12** Laws. As defined in Section 9.1.

1

**Section 1.13**   Lease Year.   A period of twelve (12) consecutive months during the Term commencing on the Fixed Rent Commencement Date, provided that (a) if the Fixed Rent Commencement Date is not the first day of a calendar month, the first Lease Year shall commence on the Fixed Rent Commencement Date and end one year from the last day of the month immediately preceding the month in which the Fixed Rent Commencement Date shall occur and (b) the final Lease Year shall end on the Expiration Date. The second Lease Year shall begin on the first day of the month following the end of the first Lease Year and each subsequent Lease Year shall begin on the year anniversary of the commencement of the prior Lease Year.

**Section 1.14**   Mortgagee/Mortgages.   As defined in Section 10.1.

**Section 1.15**   Notice Address.

(a)      Landlord.   c/o TF Cornerstone Inc., 387 Park Avenue South, 7th Floor, New York, New York 10016 Attention: Vice President Retail Leasing.

(b)      Tenant.

> Artisanal 2015, LLC
> 387 Park Avenue South
> New York, New York 10016
> Attn: Sarid Drory

with a copy to:

> Artisanal 2015, LLC
> 240 Park Avenue South
> Apartment 2D
> New York, New York 10003
> Attn: Sarid Drory

with an additional copy to:

> Pryor Cashman LLP
> 7 Times Square
> New York, New York 10036
> Attention: Richard S. Frazer, Esq.

**Section 1.16**   Opening Date.   The date that is 365 days after the Commencement Date, subject to extension due to delays resulting solely from (a) factors beyond Tenant's reasonable control (excluding unavailability of funds) or (b) delays caused by acts or omissions (where Landlord is required to act under this lease) of Landlord or its agents, contractors or employees which delay Tenant's construction of any improvements in the Premises and/or Tenant's opening of the Premises for business to the public, provided, however, in any circumstance under (a) or (b), that Tenant notifies Landlord of the reason for any such delay within two (2) business days after it becomes aware of it and uses commercially reasonable efforts to limit the duration of any such delay. No extension of the Opening Date shall be deemed to extend the Fixed Rent Commencement Date.

2

**Section 1.17** Permitted Use. Operation of a first class, upscale French bistro and lounge operating under the Trade Name (as defined herein) offering full bar and liquor, and as a retail store offering gourmet kosher and other cheeses, kosher and other wines, coffee and related Artisanal products, and any incidental and ancillary uses thereto (including, without limitation, (a) storage, (b) office space and restrooms, (c) private event space, (d) sale of Tenant's proprietary merchandise, (e) operation of a full restaurant kitchen and/or bakery, (f) lounge area and DJ booth, and (g) sidewalk café on the Outdoor Seating Area (as defined in and subject to the terms and conditions of Section 2.1 hereof), subject to the terms of this lease, and for no other purpose.

**Section 1.18** Premises. The portion of the ground floor shown hatched and the portion of the basement of the Building shown cross-hatched on Exhibit C to this lease.

**Section 1.19** Proportionate Share: 5%.

**Section 1.20** Real Property. The Building and the land on which it is located.

**Section 1.21** Rent. The Fixed Rent and all Additional Rent.

**Section 1.22** Security. $541,666.67, subject to increase or reduction as provided in Article 18.

**Section 1.23** Superior Landlord/Superior Lease. As defined in Section 10.1.

**Section 1.24** Tenant Improvement Allowance. An amount not to exceed $235,000.00, in the aggregate, to reimburse Tenant for (a) the costs paid by Tenant for labor and materials for permanent leasehold improvements that are affixed to the realty (collectively, "Hard Costs") and (b) filing, architectural, engineering and attorneys' fees incurred in connection Tenant's Work (collectively, "Soft Costs"), provided that the aggregate amount of Soft Costs for which the Tenant Improvement Allowance will be paid shall not exceed $23,500.00.

**Section 1.25** Tenant's Initial Work Cost. $3,500,000.00, that is the aggregate amount that must be spent by Tenant for portions of the Hard Costs of Tenant's Work.

**Section 1.26** Tax Base Year. The fiscal year July 1, 2015 to June 30, 2016.

**Section 1.27** Tenant's Property. As defined in Section 5.10.

**Section 1.28** Tenant's Work. As defined in Section 5.1.

**Section 1.29** Tenant's Work Commencement Date. The date by which Tenant shall have commenced Tenant's Initial Work (as defined in Section 5.1) which shall be no later than 180 days after the Commencement Date, subject to extension due to delays resulting solely from (a) factors beyond Tenant's reasonable control (excluding unavailability of funds) or (b) delays caused by acts or omissions (where Landlord is required to act under this lease) of Landlord or its agents, contractors or employees which delay Tenant's construction of any improvements in the Premises, provided, however, in any circumstance under (a) or (b), that Tenant notifies Landlord of the reason for any such delay within two (2) business days after it becomes aware of it and uses commercially reasonable efforts to limit the duration of any such

3

delay. No extension of the Tenant's Work Commencement Date shall be deemed to extend the Fixed Rent Commencement Date

**Section 1.30**   Tenant's Work Completion Date.   The date by which Tenant shall have substantially completed (subject to punch-list items) Tenant's Initial Work which shall be no later than 365 days after the Commencement Date, subject to extension due to delays resulting solely from (a) factors beyond Tenant's reasonable control (excluding unavailability of funds) or (b) delays caused by acts or omissions (where Landlord is required to act under this lease) of Landlord /or its agents, contractors or employees which delay Tenant's construction of any improvements in the Premises, provided, however, in any circumstance under (a) or (b), that Tenant notifies Landlord of the reason for any such delay within two (2) business days after it becomes aware of it and uses commercially reasonable efforts to limit the duration of any such delay. No extension of the Tenant's Work Completion Date shall be deemed to extend the Fixed Rent Commencement Date.

**Section 1.31**   Term.   The period commencing on the Commencement Date and ending on the Expiration Date, subject to earlier termination or extension of this lease pursuant to the terms hereof.

**Section 1.32**   Certain Definitions.   Any reference in this lease to (a) "legal action", includes any suit, proceeding or other legal, arbitration or administrative process, and any appellate proceedings in connection therewith, (b) "person" includes any individual or entity, (c) "this lease" includes the Rules (as defined in Section 3.3) and the other Exhibits and Riders to this lease, and (d) "including" means "including without limitation".

**Section 1.33**   Trade Name.   "Artisanal Fromagerie & Bistro" or any trade name used by any successor of Tenant, provided that such Trade Name includes the word "Artisanal".

### Article 2.  Demise; Rent; Vault Area

**Section 2.1**   **Demise**. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord, the Premises, for the Term, at the Rent and on the other terms of this lease. The Premises shall not include the faces of exterior walls, the space above the hung ceiling and below the underside of the floor slab, stairs, corridors, landings and roofs adjacent to the Premises, and all space in or adjacent to the Premises used for shafts, stacks, pipes, conduits and duct work that are not exclusively used by Tenant. Tenant shall have the right to use the portions of the sidewalk on Park Avenue and on 27th Street designated as "Outdoor Seating Area" on **Exhibit C-1** annexed hereto (and referred to in this lease in such manner) for table service of food and beverages for patrons of its restaurant, subject, however, to (a) Landlord's approval of Tenant's Plans for the use of such Area and (b) Tenant obtaining and maintaining in full force and effect at all times any and all required permits, approvals, licenses and consents required under any applicable Laws (as hereinafter defined). All of the provisions of this lease pertaining to Tenant's obligations and liabilities with respect to the Premises shall apply in all respects to the use of the Outdoor Seating Area. Notwithstanding anything to the contrary set forth in this lease, in no event may Tenant permit any music, entertainment or other activities to be performed in or around the Outdoor Seating Area, other than table service of food and beverages for patrons of its restaurant.

4

**Section 2.2    Rent Payment; Percentage Rent**. Tenant shall pay Landlord the Rent, without notice, abatement, deduction or offset (except as expressly provided in this lease), in lawful money of the United States of America, by Tenant's check or another method approved by Landlord, at Landlord's Notice Address or another address Landlord designates, and as provided in this lease. Commencing on the Fixed Rent Commencement Date, the Fixed Rent shall be paid in equal monthly installments, in advance, on the first day of each calendar month during the Term, except that the installment of the Fixed Rent for the month in which the Fixed Rent Commencement Date shall occur shall be paid on the Fixed Rent Commencement Date. The Rent shall be pro-rated for any partial month according to the number of days in the month occurring during the Term. Landlord's delay in rendering, or failure to render, any statement required to be rendered by Landlord for any of the Rent for any period shall not waive Landlord's right to render a statement or to collect the Rent for that or any subsequent period. The rendering of an incorrect statement shall not waive Landlord's right to render a corrected statement for the period covered by the incorrect statement and collect the correct amount of the Rent, which Tenant shall pay within thirty (30) days after its receipt of the corrected statement.

In addition to the foregoing, Tenant shall pay Percentage Rent to Landlord in accordance with the Percentage Rent Rider annexed hereto.

**Section 2.3    Third Party Tender of Rent**. All checks or other payments tendered to Landlord from anyone other than Tenant as and for the Rent may, at Landlord's discretion, be deemed to be payments for the account of Tenant. Acceptance by Landlord, in its discretion, of Rent from anyone other than Tenant shall not be deemed: (a) to create or recognize an attornment by such payor to Landlord; (b) to be a consent by Landlord to any relationship between such payor and Tenant, including that of assignor/assignee or sublandlord/subtenant; (c) to be an acknowledgment or agreement by Landlord that such payer has any right to possess or otherwise use or occupy any portion of the Premises; (d) to be a modification of any provisions of this lease; and, (e) to waive Landlord's right to refuse to accept future payments from anyone other than Tenant.

**Section 2.4    Fixed Rent Commencement**. If a Fixed Rent Commencement Date is specified in <u>Article 1</u> of this lease: (a) Tenant is not required to pay Fixed Rent until the Fixed Rent Commencement Date provided Tenant does not default in performing its obligations under this lease beyond any applicable cure period (if such default occurs, Fixed Rent for the period from the Commencement Date through the date of such default shall be due at the rate set forth for Lease Year 1 on Exhibit A annexed hereto); and (b) if the Fixed Rent Commencement Date is not the first day of a month, the Fixed Rent for the month in which the Fixed Rent Commencement Date occurs shall be apportioned according to the number of days in that month and shall be paid on or before the Fixed Rent Commencement Date.

**Section 2.5    Payment of Additional Rent**. Unless otherwise specified in this lease, all Additional Rent shall be due and payable by Tenant within thirty (30) days of Tenant's receipt of Landlord's invoices therefor.

**Section 2.6    Determination**. Except as otherwise specifically provided in this lease, Landlord's calculation, determination, or estimate of any Fixed Rent adjustment, any Additional Rent, any Additional Rent adjustment, or any refund (if this lease provides for one) (a "Determination") shall bind Tenant unless: (a)  Tenant gives Landlord Notice of Tenant's

objection (with all reasonable grounds for such objection) within one hundred eighty (180) calendar days after receiving Landlord's first invoice based on such Determination, and (b) Tenant timely pays the invoiced amount (without prejudice to Tenant's right to object as provided in this Section).

**Section 2.7      Possession.** If for any reason Landlord is unable to deliver vacant possession of the Premises on the date of this lease, with Landlord's Work Substantially Completed (as hereinafter defined), this lease shall not be void or voidable nor shall Landlord be liable to Tenant therefor, monetarily or otherwise, but the Commencement Date shall be delayed until the date on which Landlord delivers vacant possession of the Premises to Tenant with Landlord's Work, if any, Substantially Completed. This Section constitutes an express provision to the contrary pursuant to Section 223-a of the New York Real Property Law (or any similar Laws), which is inapplicable to this lease (and Tenant hereby waives any right to damages or to rescind this lease which Tenant might otherwise have thereunder). Notwithstanding the foregoing, however, if Landlord, for reasons other than (a) factors beyond Landlord's reasonable control (excluding unavailability of funds) or (b) delay caused by acts or omissions of Tenant (where Tenant is required to act under this lease) or its agents, employees or contractors, fails to deliver possession of the Premises to Tenant on or before December 15, 2015, the Fixed Rent Commencement Date shall be extended one day for each day from and after December 15, 2015 (the "Anticipated Delivery Date") until the date that Landlord delivers (or, but for such delays caused by Tenant or its employees, agents or contractors, would have delivered) possession of the Premises to Tenant with Landlord's Work Substantially Completed, provided, however, that in no event shall the Fixed Rent Commencement Date be extended for longer than ninety (90) days. If possession in such condition is not delivered to Tenant by March 1, 2016, Tenant and Landlord each shall have the right to terminate this lease on notice to the other at any time thereafter, in which event, on the date that this lease terminates, the first month's Fixed Rent and Security shall be paid to Tenant, provided that if Tenant sends such termination notice and if Landlord delivers possession of the Premises to Tenant with Landlord's Work Substantially Completed within thirty (30) days after its receipt of such notice, this lease shall remain in full force and effect and Tenant's termination notice shall be null and void. Landlord shall use commercially reasonable efforts to deliver possession of the Premises, with Landlord's Work substantially completed, by the Anticipated Delivery Date and shall promptly notify Tenant in the event that Landlord has actual knowledge of factors that would cause the Commencement Date to be delayed beyond the Anticipated Delivery Date and shall, upon Tenant's request, provide Tenant with updates on the status of Landlord's efforts to deliver possession of the Premises with Landlord's Work Substantially Completed. Notwithstanding the foregoing, if Landlord sends Tenant notice of termination of this lease under this Section and if Tenant sends notice to Landlord within seven (7) days thereafter that it desires to cooperate in seeking to resolve any issues that have prevented Landlord from delivering possession of the Premises to Tenant by March 1, 2016 (the "Cooperation Notice"), Landlord or its representatives shall consult with the consultant designated by Tenant for such purpose in order to seek to resolve any such issues. Landlord shall not be required to follow the advice or recommendations of any such consultant but shall, in good faith, consider any such advice or recommendations. If Tenant sends the Cooperation Notice in accordance with the preceding sentence and if, for any reason whatsoever, the Commencement Date shall not have occurred within ninety (90) days after Landlord sent its notice of termination, this lease shall terminate upon expiration of such ninety (90) day period. If Tenant fails to send the Cooperation Notice within such seven (7) day period, this lease shall terminate upon expiration of such seven (7) day period. Under all circumstances,

Tenant shall have no other rights or remedies and Landlord shall have no other obligations or liabilities arising in the event that possession of the Premises is not delivered to Tenant by the Anticipated Delivery Date or at any time thereafter except as expressly set forth in this Section. For purposes of this Lease, "Substantially Completed" and "Substantial Completion" shall mean the date when Landlord's Work then remaining to be done, if any, consists of minor "punch list items" and shall have reached that stage of completion such that Tenant could either use or occupy the Premises for the uses permitted hereunder without substantial interference by reason of those items still required to complete Landlord's Work. Landlord hereby confirms that there is presently no other lease in effect for the Premises. Landlord agrees that, if and only if (a) this lease is in full force and effect, (b) Landlord shall not have sent any notice under Article 16 of this lease and (c) no Default (as hereinafter defined) shall have occurred or shall be occurring, Landlord shall not, prior to the date that Landlord delivers possession of the Premises to Tenant, enter into any other lease for the Premises that would grant occupancy rights to any tenant while this lease is in effect; provided, however, (i) that this sentence shall be of no force or effect and there shall be no restriction on Landlord's right to enter into any other lease for the Premises from and after the date that Landlord or Tenant sends any notice of termination of this lease under this Section or any other provision of this lease and (ii) nothing herein shall be deemed to limit any of Landlord's rights or remedies arising from any Default (as hereinafter defined).

    **Section 2.8 Agreement on Dates.** Landlord and Tenant shall execute an agreement setting forth the Commencement Date, the Fixed Rent Commencement Date and the Expiration Date in the form attached hereto as <u>Exhibit D</u> within ten (10) days after Landlord sends the form to Tenant, but Landlord's failure to send the form or Landlord's or Tenant's failure to execute it shall not affect the actual dates.

    **Section 2.9 Vault Area.** Any vaults, vault space or other space outside the boundaries of the Real Property, notwithstanding anything contained in this lease to the contrary or indicated on any sketch, blueprint or plan, are not included in the Premises. Landlord makes no representation as to the location of the boundaries of the Real Property. All vaults and vault space and all other space outside the boundaries of the Real Property which Tenant may be permitted to use or occupy is to be used or occupied under a revocable license, and if any such license shall be revoked, or if the amount of such space shall be diminished or required by any Authority (as hereinafter defined) or by any public utility company, such revocation, diminution or requisition shall not constitute an actual or constructive eviction, in whole or in part, or entitle Tenant to any abatement or diminution of the Rent, or relieve Tenant from any of its obligations under this lease, or impose any liability upon Landlord. Any fee, tax or charge imposed by any Authority for any such vaults, vault space or other space used or occupied by Tenant or any subtenant shall be paid by Tenant.

## Article 3. Use; Rules and Regulations; Tenant Operations; Signs

    **Section 3.1 Use.** Tenant shall use the Premises only for the Permitted Use, subject, however, to the provisions of this lease. Tenant, at its sole cost and expense, shall acquire any and all permits, licenses, certificates and approvals required by Laws for the Permitted Use and the conduct of Tenant's operations in the Premises. Upon Tenant's request, Landlord shall cooperate with Tenant in all reasonable respects, at Tenant's sole cost and expense, in connection with Tenant's efforts to obtain any permits, licenses, certificates or approvals required by Laws for the Permitted Use and/or the conduct of Tenant's operations in

the Premises. Landlord shall sign properly completed applications for any such permits, licenses, certificates or approvals within three (3) business days after submission of any such application to Landlord, provided that (a) prior to any such request, Landlord shall have approved any plans for any alterations referred to therein in accordance with Article 5 of this lease, (b) Landlord shall not be required to sign any such application that requires it to make any statements or confirm any facts of which it has no sufficient knowledge to state or confirm and (c) Tenant, in making such request, shall indicate in bold, twelve point or greater font that Landlord is required to sign such application within such three (3) business day period in accordance with this Section 3.1.

Section 3.2    Certificate of Occupancy.  Notwithstanding anything herein to the contrary, Tenant shall not use the Premises, or any part thereof, in violation of the certificate of occupancy, if any, for the Premises or the Building. Landlord agrees that it shall not amend the certificate of occupancy so as to prohibit Tenant's Permitted Use.

Section 3.3    Rules.  Tenant shall, and shall cause its employees, contractors, and invitees to, comply with the rules and regulations annexed hereto as Exhibit E and the additional rules annexed hereto as Exhibit E-1, and such reasonable changes to such rules and regulations or additional rules (whether by modification, restatement, elimination or addition) as Landlord may make at any time or times hereafter upon not less than thirty (30) days' notice to Tenant (the rules and regulations annexed as Exhibit E and the additional rules annexed as Exhibit E-1 are collectively, the "Rules"), provided that any modifications or additions to the Rules shall not materially or unreasonably interfere with Tenant's conduct of its business or Tenant's use or enjoyment of the Premises, and shall not require payment of Additional Rent or the incurring of any other costs and expenses). Landlord shall enforce the Rules against Tenant and all other retail tenants of the Premises in a non-discriminatory manner. Landlord shall not be liable to Tenant for any violation of the Rules by another tenant or occupant or any of their employees, contractors or invitees.  Subject to the foregoing provisions of this Section, Landlord's failure to enforce the Rules against Tenant or any other occupant of the Building shall not be considered a waiver of the Rules.

Section 3.4    Continuous Operation.  The continuous operation of Tenant's business in the Premises is of material importance to Landlord because of the adverse impact on the Building of vacant retail space.  Except as otherwise provided herein, from and after the Opening Date, Tenant shall cause its business to be fully stocked and staffed, and open continuously for business at the Premises at least 8 hours a day, and 6 days a week excluding days observed as holidays by the State of New York or Federal government.  For each day after the Opening Date that Tenant is not in compliance with this Section, Tenant shall pay to Landlord $100.00 per day until the date on which Tenant is in compliance with this Section. Notwithstanding the foregoing, and without giving effect to the immediately preceding sentence, Tenant may be closed for a Temporary Cessation Event. For purposes of this lease, a Temporary Cessation Event shall mean such reasonable period of time as may be required for any of the following: (i) to permit Tenant to inventory its merchandise; (ii) a permitted remodeling, alteration or repair to the Premises; (iii) a strike, fire or other casualty, "snow day" or other event beyond Tenant's reasonable control (other than availability of funds) that prevents Tenant from opening for business, provided that Tenant promptly notifies Landlord of the factor giving rise to such cause; (iv) a condemnation; (v) private functions; and (vi) for up to ten (10) days in any

8

twelve (12) month period. Tenant shall not be deemed to have abandoned or vacated the Premises as a result of any closure contemplated by the preceding sentence.

        **Section 3.5**    **Operation Requirements**. Tenant shall, at its expense: (a) keep the inside and outside of all glass in the doors and windows of the Premises clean and keep all exterior store surfaces of the Premises clean; (b) replace promptly any cracked or broken glass of the Premises with glass of like color, grade, and quality, except to the extent that any such replacements are necessitated by the act or negligence of Landlord and/or its agents, employers and/or contractors; (c) maintain the Premises in a clean, orderly and sanitary condition and use its commercially reasonable efforts in accordance with good restaurant operations or practices to keep the Premises free of insects, rodents, vermin and other pests; in all events, Tenant shall arrange for extermination in the Premises at regular intervals, not less frequently than monthly and more often as is reasonably necessary; (d) keep any garbage, trash, rubbish or other refuse in vermin-proof containers within the interior of the Premises that are kept closed until removed; (e) bag and deposit such garbage, trash, rubbish and refuse, on a daily basis, in receptacles provided or required by the carter engaged by Tenant pursuant to the terms of this lease; (f) remove from the Premises all rubbish resulting from and/or remaining after any fire or other similar casualty in the Premises; (g) keep all mechanical apparatus and equipment free of vibration and noise which may be transmitted beyond the Premises; (h) keep in the Premises and maintain in good working order one or more dry chemical fire extinguishers; (i) conduct its business at the Premises in a dignified manner in accordance with high standards of restaurant and retail operation; (j) operate its business at the Premises under the Trade Name; (k) prevent any odors, fumes or noise from emanating beyond the Premises; and (l) comply with all the terms of the Food Use Rider annexed hereto.

        **Section 3.6**    **Operation Prohibitions**. Tenant shall not (a) place or maintain any merchandise, show cases, tables for service, trash, refuse or other items in any vestibule or entry of the Premises, or on the walkways, sidewalks or elsewhere outside the Premises, except for the Outdoor Seating Area, subject to the terms of this lease; (b) obstruct, or permit its employees, contractors, or invitees to obstruct, any walkway or sidewalk; (c) use or permit the use of any advertising medium such as, without limitation, loudspeakers, public address systems, sound amplifiers which is in any manner audible outside of the Premises; (d) permit undue accumulations of or burn garbage, trash, rubbish or other refuse within or outside the Premises; (e) cause or permit odors or fumes to emanate from the Premises; (f) solicit business in any other portion of the Building, including without limitation through distribution of handbills or other advertising matter or the display of any merchandise; (g) conduct or permit to be conducted any auction, fire sale (except to liquidate inventory in response to an actual fire and only if such sale is not conducted for more than forty-five (45) days), going out of business sale (except, one time only, to liquidate inventory at the end of the term of this lease and only if such sale is not conducted for more than forty-five (45) days), bankruptcy sale (unless directed by court order), or other similar type sale in or connected with the Premises (but this provision is not intended to limit Tenant's freedom in setting its own selling prices); (h) use the Premises for any activity that is not generally considered appropriate for retail businesses conducted in accordance with good and generally accepted standards of operation, particularly taking into account that the Premises are located in a residential and retail building; (i) use the Premises for any hazardous activity or in such manner as to constitute a nuisance of any kind (public or private); (j) cause waste; (k) do anything which, in Landlord's reasonable judgment, disturbs other occupants of the

Building; or (l) permit its employees, invitees, deliverymen, or contractors to loiter immediately outside the Premises or in any other portion of the Building.

    **Section 3.7  Community Concerns.** Accordingly, Tenant shall not use the Premises for any immoral or disreputable use or activity; and Tenant shall not sell, distribute, display, advertise or offer for sale at the Premises any item or service which, in Landlord's good faith judgment, may tend to injure or detract from the image of the Building within such community or that results in any picketing or protests. Without limiting the generality of the foregoing, Tenant shall not sell, distribute, display or offer for sale (a) any drug paraphernalia, (b) any pornographic, lewd, suggestive, or "adult" newspaper, book, magazine, film, picture, recording, representation or merchandise of any kind, (c) any counterfeit goods or (d) any gun(s).

    **Section 3.8  Signs.** The term "Sign" includes all signs, designs, monuments, logos, banners, projected images, exterior lighting (and lighting that is visible outside the Premises, and the type, intensity and hours of illumination), awnings, canopies, pennants, decals, advertisements, pictures, notices, lettering, numerals, graphics, and decorations. Without Landlord's prior consent, which consent shall not be unreasonably withheld, conditioned or delayed, no Sign shall be exhibited, installed, inscribed, painted or affixed, that is inside the Premises, is located more than 3 feet from the storefront and is visible from outside the Premises, or on any part of the outside of the Building or on the windows or doors of the Premises, provided, however, that Tenant may not install any: neon Signs; blinking or flashing Signs; Signs advertising distress sale, foreclosure sale, receiver's or sheriff's sale, lost lease sale, or Signs of similar import (unless expressly otherwise permitted in this lease) (collectively, "Prohibited Signs"). If a diagram or exhibit relating to Signs is attached to this lease, it shall signify Landlord's consent to the conceptual design of such Signs; Landlord's full consent to Tenant's Signs shall not be deemed to be given until Landlord has reviewed and approved Tenant's detailed shop drawings for such Signs (which approval shall not be unreasonably withheld, delayed or conditioned, except for any Prohibited Signs), including descriptions of the material for the Signs and the manner and method of installation. Tenant shall, at its own expense, obtain all required licenses, permits and approvals for any and all Signs including, without limitation, any such approvals required by the Landmark Preservation Commission, and renew them as required by applicable Laws. Upon Tenant's request, Landlord, at Tenant's sole cost and expense, shall cooperate with Tenant in all reasonable respects in Tenant obtaining any permits, licenses, certificates or approvals required by Laws for any of Tenant's Signs permitted under this lease. All Sign(s) shall be installed and removed in a good and workerlike manner, without damaging the Premises and the other Real Property, and in compliance with all applicable Laws and the applicable provisions of this lease. Prior to installing any permitted Sign, Tenant shall deliver to Landlord any permits or approvals required by applicable Laws in connection with such installation. Tenant shall maintain any permitted Signs in good, clean, neat and safe condition, and at the expiration or sooner termination of this lease, Tenant shall cause such Signs to be removed and cause the cancellation of any issued licenses or permits. Tenant shall not change or alter any Sign approved by Landlord in any respect whatsoever, without first obtaining Landlord's prior consent to such change or alteration, which consent, other than for Prohibited Signs, shall not be unreasonably withheld, delayed or conditioned. Landlord may Landlord may, after five (5) days' prior notice to Tenant, remove any Sign(s) installed or maintained in violation of this Article, and Tenant shall reimburse Landlord for all reasonable costs incurred by Landlord in so removing any such Sign promptly after being billed therefor. In addition, Landlord may, from time to time, temporarily remove any Sign in connection with any repairs,

improvements, alterations, additions or replacements being made to the Real Property. If Landlord removes any Sign in accordance with the preceding sentence, it shall, at its sole cost and expense, upon Tenant's request, install temporary signage in a location reasonably determined by Landlord, solely identifying the business conducted at the Premises, subject to obtaining Landlord's prior consent with respect to such temporary signage, which consent shall not be unreasonably withheld, delayed or conditioned.

**Section 3.9    Tenant's Exclusive.**  So long as this lease is in full force and effect and Tenant is open and operating within the Premises for the Permitted Use and no Default is occurring, Landlord shall not enter into any lease for the retail premises located immediately contiguous to the Premises on the first floor of the Building that permits the tenant thereunder to use such premises as a French bistro, a liquor store selling liquor for off-premises consumption only or as a store whose primary use is the sale of cheeses for off-premises consumption only. Except as expressly set forth in the immediately preceding sentence, Landlord may lease or permit such adjacent premises to be used for any purpose whatsoever.

## Article 4. <u>Condition of the Premises; Landlord's Work</u>

**Section 4.1    "AS IS" Condition of the Premises.**  Tenant has examined the Premises and, subject to Landlord performing and effectuating the Substantial Completion of Landlord's Work, (a) Tenant shall accept possession of the Premises on the date that possession is delivered to Tenant, in its "AS IS" condition on the date of this lease, subject to normal wear and tear and the removal of substantially all of the existing occupant's personal property, if any, and subject to Section 9.1 of this lease (b) Landlord has no obligation to perform any work, supply any materials, incur any expenses or make any installations to prepare the Premises for Tenant's occupancy. Notwithstanding anything to the contrary contained herein, Landlord shall deliver possession of the Premises to Tenant in "broom-clean" condition, vacant and free of all tenancies. Tenant shall have the right, subject to and in accordance with the terms of this lease, to use any or all existing improvements and systems in the Premises including, without limitation, the plumbing, mechanical, life safety, electrical and HVAC systems and equipment, storefront and air handling unit(s).

**Section 4.2    Landlord's Work.**  If any Landlord's Work is specified in Article 1 and the Exhibit referred to therein, Landlord shall, at its sole cost and expense, perform Landlord's Work, in accordance with, and subject to, the applicable provisions of this lease. Tenant shall not impede, delay, obstruct or interfere with, Landlord's performance of any and all of Landlord's Work.

## Article 5. <u>Tenant's Work</u>

**Section 5.1    Tenant's Work.**

Except as may be expressly provided in this lease, Tenant shall not replace any fixtures in the Premises (unless such fixtures are replaced with fixtures of comparable value) or make any changes, improvements, alterations or additions (collectively, "<u>Tenant's Work</u>"), to the Premises, the Real Property, the Building systems, or any part thereof, without Landlord's prior consent.  Landlord's consent shall not be unreasonably withheld, delayed or conditioned if Tenant's Work (a) is nonstructural, and (b) does not (i) affect any part of the Real Property outside the Premises (including the Building roof) or the exterior of the Premises, (ii) affect any

structural element of the Building, (iii) adversely affect any Building system, or (iv) require an amendment of the certificate of occupancy for the Premises or the Building. Landlord's consent shall not be required with respect to such of Tenant's Work as are cosmetic alterations (such as interior design, painting the interior of the Premises, carpeting, and installation of shelving and display cases) inside the Premises that do not require a permit from any Authority under applicable Laws ("Cosmetic Alterations"), provided that Tenant complies with the other applicable provisions of this lease. Tenant's Work shall be performed, at Tenant's expense, with diligence when started so as to promptly complete it in a good and worker-like manner without causing any labor dispute with other workers at the Real Property, using materials of first class quality and in compliance with this lease, all Laws and Tenant's Plans (as defined in Section 5.2) as approved by Landlord. As part of Tenant's Work prior to opening for business, ("Tenant's Initial Work"), Tenant shall sound proof the Premises and install appropriate ventilation, so that Tenant's use of the Premises shall not result in noise and/or odors being transmitted outside the Premises, and Tenant shall perform the work and complete the installations required to be performed or completed by Tenant pursuant to the annexed Work Letter. Tenant shall also comply with all of Tenant's other obligations under the annexed Work Letter, whether pertaining to the Tenant's Initial Work or otherwise. Tenant's Work (which shall mean, for all purposes under this lease, Tenant's Initial Work and any other Tenant's Work) shall be fully paid for by Tenant when payment is due and shall not be financed with any conditional sales or title retention agreements or by the granting of any security interests, liens, encumbrances or financing statements, provided that Tenant shall be permitted to grant security interests in and liens upon its personal property and trade fixtures and equipment that are not affixed to the realty, provided that in no event may any such security interests or liens be indexed or filed against the Real Property. Tenant's Work shall be deemed to be improvements and betterments that become the property of Landlord at the expiration of the Term (or the sooner termination of this lease in accordance with its provisions), and shall remain upon and be surrendered with the Premises, unless Landlord notifies Tenant, at the time of its approval of any of Tenant's Plans, in accordance with the provisions of this Article that Landlord relinquishes its rights thereto, in which case Tenant shall be obligated to remove such Tenant's Work, and provided further that Tenant shall have the right to remove its unattached trade fixtures, provided that it repairs any damage resulting from such removal but shall not be required to remove any staircase that it installs within the Premises in accordance with the terms of this lease.

Section 5.2 **Commencement and Completion; Tenant's Plans.** Tenant shall commence the Tenant's Initial Work (i.e., the work required to construct a first class, upscale French sit down restaurant as permitted under Section 1.17, substantially similar in quality and design to Balthazar located at 80 Spring Street, New York, New York as of the date of this lease) on or before Tenant's Work Commencement Date and shall complete it on or before Tenant's Work Completion Date. For each day after, respectively, Tenant's Work Commencement Date and Tenant's Work Completion Date that Tenant is not in compliance with the preceding sentence, Tenant shall pay to Landlord $100.00 per day until the respective date on which Tenant is in compliance with the preceding sentence. This is not intended as a penalty; it is the agreed upon reasonable compensation to Landlord for its increased administrative costs attributable to the delay. Tenant agrees to spend no less than $3,500,000.00 to perform and complete the Tenant's Initial Work. Prior to commencing any Tenant's Work which requires Landlord's consent, Tenant shall, at Tenant's expense, deliver to Landlord at least three (3) full sets of detailed plans and specifications, for Tenant's Work (unless Tenant's Work consists solely of Cosmetic Alterations), in form reasonably satisfactory to Landlord, prepared, certified and sealed

by an architect or engineer licensed to practice in the State of New York, and suitable for filing with the applicable Authority, if filing is required by applicable Laws (such plans and specifications together with revisions thereto, collectively, "Tenant's Plans"), and obtain Landlord's approval of Tenant's Plans. Landlord shall grant or deny its approval of Tenant's Plans within ten (10) business days of its receipt of Tenant's request for approval thereof. If Landlord fails to respond within such ten (10) business days' period and such failure continues for five (5) days after Landlord's receipt of a notice of such failure to respond to Tenant (which notice expressly states, in bold, 12-point or larger font, that if Landlord fails to respond to such request within such five (5) day period, Tenant's Plans shall be deemed approved) then, after expiration of such five (5) day period, Tenant's Plans shall be deemed approved. Before commencing Tenant's Work, Tenant shall (a) obtain (and deliver to Landlord copies of) all required permits and authorizations of any Authority for such Tenant's Work, and (b) deliver to Landlord copies of all of the fully executed contracts for Tenant's Work (structural and non-structural), whether between Tenant and its contractors or Tenant's general contractor and its subcontractors; (c) deliver to Landlord any additional documents or materials related to Tenant's Work as required by Landlord or Landlord's insurance carrier and (d) deliver to Landlord certificates (in form and substance reasonably acceptable to Landlord) evidencing the following insurance coverages from each contractor and subcontractor: (i) worker's compensation insurance covering all persons to be employed in the performance of any Tenant's Work, and (ii) commercial general liability insurance on a primary and non-contributory basis with a limit of liability approved by Landlord, and with contractual liability coverage, naming Landlord, Landlord's managing agent, if any, any Superior Landlord and any Mortgagee as additional insureds, and (iii) comprehensive automobile liability insurance (covering all owned, non-owned and/or hired motor vehicles to be used in connection with Tenant's Work) with a limit of liability approved by Landlord, and (iv) builders risk insurance for the full value of the portion of Tenant's Work to be performed by such contractor and subcontractor. If requested by Landlord, Tenant shall retain the services of a consultant designated by Landlord, (commonly known as an "expediter"), to file the applications to the Authority(ies) for the permits needed to perform Tenant's Work and to close the application(s) when Tenant's Work is completed, provided that the cost of such services is commercially reasonable.

        **Section 5.3    Reimbursement; Sign-Off.**   Tenant shall reimburse Landlord, within fifteen (15) days of being billed therefor, for any actual and reasonable out-of-pocket expenses incurred by Landlord in connection with Landlord's review of Tenant's Plans and inspection of Tenant's Work, including outside experts retained by Landlord for that purpose. Landlord's consent to Tenant's Work and Landlord's approval of Tenant's Plans shall be without liability to or recourse against Landlord, shall not release Tenant from its obligations to comply strictly with the provisions of this lease, and shall not constitute any representation or warranty by Landlord regarding the adequacy for any purpose of Tenant's Work or Tenant's Plans or their compliance with Laws, and shall not relieve Tenant from obtaining Landlord's express approval to revisions thereto. Promptly after substantial completion of Tenant's Work, but in no event later than five hundred forty-five (545) days after the Commencement Date, Tenant shall, at Tenant's expense, obtain and deliver to Landlord copies of all sign-offs, letters of completion, approvals and certificates of any Authority required upon the completion of Tenant's Work (including any required amendments to the certificate of occupancy for the Premises and/or Building) and "as-built" plans and specifications for Tenant's Work prepared as reasonably required by Landlord, provided that such 545-day period shall be extended for the duration of any inordinate delays by the Department of Buildings or other Authority in issuing any such

13

sign-off, letter of completion, approval or certificate, provided that Tenant promptly notifies Landlord of such delay and uses commercially reasonable efforts to limit the duration thereof. For each day after such 545th day that Tenant is not in compliance with the preceding sentence, Tenant shall pay to Landlord $100.00 per day until the respective date on which Tenant is in compliance with the preceding sentence. This is not intended as a penalty; it is the agreed upon reasonable compensation to Landlord for its increased administrative costs attributable to the delay.

**Section 5.4    Liens.** If, in connection with Tenant's Work or any other act or omission of Tenant or Tenant's subtenants, or any of their respective, licensees, employees, agents or contractors, a mechanic's lien, financing statement or other lien or violation of any Laws, is filed against Landlord or all or any part of the Real Property, Tenant shall, at Tenant's expense, have such lien or violation removed by bonding, payment or otherwise within thirty (30) days after Tenant receives notice of the filing. Nothing contained in this Section 5.4 limits Tenant's right to challenge the claim that is made by the person that files a lien, provided that Tenant discharges such lien of record as aforesaid, or (ii) obligates Tenant to discharge of record any mechanic's lien that derives from Landlord's and/or its agents', employees' or contractors' acts or omissions.

**Section 5.5    Tenant's Contractors.** All construction managers, contractors and subcontractors performing work for which a license is required by applicable Laws, shall be licensed by the appropriate Authorities and approved by Landlord, which approval shall not be unreasonably withheld or delayed or conditioned. Notwithstanding anything to the contrary contained herein, the construction managers, contractors and subcontractors listed on Exhibit H attached hereto and made a part hereof shall be deemed to be construction managers, contractors and subcontractors approved by Landlord. Landlord's approval of such construction managers, contractors and subcontractors shall be without liability to or recourse against Landlord, shall not release Tenant from its obligations to comply strictly with the provisions of this lease, shall not constitute any warranty by Landlord regarding the adequacy, professionalism, competence or experience of the approved construction manager, contractor, or subcontractor, and shall not relieve Tenant from obtaining Landlord's express prior approval if Tenant seeks to employ any other or additional construction manager, contractor or subcontractor. Promptly following substantial completion of Tenant's Work, but in no event later than ninety (90) days after the Substantial Completion of such Work, Tenant shall furnish to Landlord lien waivers and releases, in form reasonably satisfactory to Landlord, from all construction managers, contractors, subcontractors, and materialmen furnishing work, services or materials in connection with Tenant's Work.

**Section 5.6    Intentionally Deleted**

**Section 5.7    Co-Operation.** At Tenant's request, Landlord shall join in any properly prepared applications for any authorizations required from any Authority in connection with Tenant's Work to which Landlord has consented, and otherwise reasonably cooperate with Tenant in connection with Tenant's Work, but Landlord shall not be obligated to incur any expense, obligation or liability in connection with any such applications or cooperation or sign any application that would require Landlord to make any representation with respect to the cost of Tenant's Work.

14

**Section 5.8    Floor Load**. Tenant shall not place a load on any floor of the Premises exceeding the floor load per square foot which the floor was designed to carry and which is allowed by any Laws.

**Section 5.9    Damage**. Tenant shall be liable for any damage caused to any part of the Building, including its fixtures and equipment, arising from, or as a result of, Tenant's Work and/or its installation and/or removal of its Signs unless caused by the negligence or willful misconduct of Landlord or its agents, employees or contractors, and subject to Section 11.4 hereof. Landlord may, at its option, after fifteen (15) days' prior notice to Tenant (except in an emergency, in which event no such notice shall be required) repair (including any replacement) such damage, and bill Tenant the cost of such repair or replacement, or require Tenant to effect such repair or replacement at Tenant's sole cost and expense. If Tenant performs, with Landlord's approval, any work on the roof of the Building (for example, in connection with repair, maintenance, or installation of any air conditioning system), Tenant shall use only a contractor reasonably approved by Landlord for such work and shall not do or cause anything to be done which would invalidate any then effective roof guaranty for the Building.

**Section 5.10    Removal of Tenant's Work; Tenant's Property**. On or before the Expiration Date or sooner termination of this lease, if applicable, Tenant shall, at Tenant's expense, except as otherwise set forth in the last sentence of Section 5.1 of this lease, remove from the Building (a) all Tenant's Work which Landlord designates for removal in a notice given by Landlord to Tenant at the time of Landlord's approval of any of Tenant's Plans and (b) Tenant's trade fixtures, equipment and personal property which are removable without material damage to the Premises or the Building ("Tenant's Property"). Tenant shall repair any damage to the Premises, and/or the Real Property, caused by the installation or removal of Tenant's Property, Signs or Tenant's Work. Except as expressly provided in this Section, Tenant's Work shall not be removed and shall, on the Expiration Date (or such sooner date on which that this lease may terminate) become the property of Landlord. Any Tenant's Property or Tenant's Work that Tenant was required to remove and which is not removed by Tenant by the Expiration Date or sooner termination of this lease shall be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord at Tenant's expense.

**Section 5.11    Tenant Improvement Allowance**. After Tenant has submitted to Landlord the Reimbursement Documents (hereinafter defined) in connection with Tenant's Initial Work Cost, and has installed, in accordance with Tenant's Plans, the exhaust blower, ductwork to the roof of the Building and staircase connecting the first floor and basement of the Premises, Landlord shall become obligated to pay to Tenant the Tenant Improvement Allowance (less the Retainage, as hereinafter defined), provided that no Default (as hereinafter defined) exists then or at the time that any installment, including the Retainage (hereinafter defined), of the Tenant Improvement Allowance is to be paid by Landlord. Landlord shall pay the Tenant Improvement Allowance within thirty (30) days after Landlord shall have received: (a) evidence reasonably satisfactory to Landlord (such as paid invoices or receipted bills that are marked "Paid in Full," or cancelled checks to the contractors that performed such Tenant's Work of the amounts actually paid by Tenant to install or construct the same) that Tenant actually paid for the items for which it is seeking reimbursement, (b) lien waivers or releases from all contractors, subcontractors and materialmen who shall have performed any work to whom Tenant shall have paid such amounts and (c) a certification by Tenant's architect and Tenant that the work for which Tenant is seeking reimbursement has been properly performed in accordance with

Tenant's Plans (items (a) through (c), collectively the "Reimbursement Documents"). Landlord may withhold ten (10%) percent of any portion of the Tenant Improvement Allowance (the "Retainage"). The Retainage shall be disbursed to Tenant thirty (30) days after the last to occur of (i) the completion of Tenant's Work, (ii) Tenant's opening for business with the public in the Premises, and (iii) Tenant's submission to Landlord of all the following items: (d) final lien waivers or releases (in recordable form and form otherwise satisfactory to Landlord) from the architects, contractors, subcontractors and materialmen furnishing labor or materials in connection with Tenant's Work releasing Landlord and Tenant from all liability for all such work, (e) a certificate from Tenant's architect and Tenant certifying that Tenant's Work has been properly performed in accordance with Tenant's Plans and a certificate from Tenant that all such work has been fully paid, (f) a general release from all contractors and subcontractors performing Tenant's Work releasing Landlord and Tenant from all liability for any of Tenant's Work, and (g) all sign-offs, inspection certificates and any permits required to be issued by any Authority(ies), and the certificate of occupancy and/or certificate of completion for the Premises. Notwithstanding anything to the contrary, Landlord shall only be obligated to pay the Tenant Improvement Allowance, including the Retainage, for twelve (12) months following the Tenant's Work Commencement Date. If any portion of the Tenant Improvement Allowance, including the Retainage, is not disbursed on or before the first anniversary of Tenant's Work Commencement Date, Tenant shall not be entitled to receive it or to receive a credit against the Rent for it.

### Article 6. Tax Payments

**Section 6.1    Real Estate Taxes.** The term "Real Estate Taxes" (each, individually, a "Real Estate Tax") shall mean all taxes, payments in lieu of taxes, assessments and special assessments, general or special, ordinary or extraordinary, foreseen or unforeseen, of any kind or nature whatsoever, including without limitation, vault, municipal, school, county, open space taxes and business and special or business improvement district assessments, levied, assessed or imposed at any time by any Authority upon or against the Real Property and/or any part thereof, and any rights or interests appurtenant thereto (hereinafter collectively referred to as the "taxable property"), including any taxes imposed on leasehold improvements. If, due to a future change in the method of taxation or in the taxing Authority, a franchise, license, income, transit, profit or other tax, fee, or governmental imposition, however designated, shall be levied, assessed or imposed against Landlord, the taxable property (or any part thereof) or the rent or profit therefrom in lieu of, in addition to, or as a substitute for, all or any part of the Real Estate Taxes, then such franchise, license, income, transit, profit, or other tax, fee, or governmental imposition shall be deemed to be included within the definition of Real Estate Taxes for the purposes hereof. Real Estate Taxes shall be determined without reference to any abatement or exemption from or credit against Real Estate Taxes applicable to all or part of the taxable property. Notwithstanding the foregoing, except as expressly provided in the previous sentence, Real Estate Taxes shall not include any late fee or interest for late payment of Real Estate Taxes, any corporate tax, any personal property tax, any sales tax, any capital levy tax, any capital stock tax, any excess profits tax, any transfer tax, any succession tax, any inheritance tax, any income tax, franchise tax, estate or gift tax, or any mortgage, recording, stamp or transfer taxes payable in connection with the mortgaging, encumbrancing, transfer, sale or lease of all or part of the taxable property or of any beneficial interest in Landlord, or any portion thereof or interest therein.

**Section 6.2    Tax Year; Comparison Tax Year.** The term "<u>Tax Year</u>" means each twelve (12) month period, whether fiscal or calendar, established by the applicable taxing Authority(ies) for the Real Estate Taxes imposed by such Authority. The term "<u>Comparison Tax Year</u>" means each Tax Year subsequent to the Tax Base Year.

**Section 6.3    Tax Payment.** If in any Comparison Tax Year, Real Estate Taxes shall be greater than Real Estate Taxes for the Tax Base Year for any reason (including but not limited to increase(s) in tax rate, and/or increase(s) in assessed valuation occurring by reason of, among other things, changes in the method of assessment, reassessments occurring in the normal course or outside of the normal course, and increases in assessments by reason of improvements, alterations and additions to the Building made by Tenant, other tenants, and/or Landlord), foreseen or unforeseen, Tenant shall pay Landlord, as Additional Rent, an amount (the "Tax Payment") equal to Tenant's Proportionate Share of such increase. The Tax Payment shall be due and payable within 30 days after Tenant is invoiced for the amount, but Landlord may permit Tenant to make the Tax Payment in monthly installments. If, after Tenant makes its Tax Payment for a specific Comparison Tax Year, the Real Estate Taxes are increased such that the amount of such Tax Payment is less than Tenant's Proportionate Share of such increased Real Estate Taxes, Tenant shall pay the deficiency to Landlord within 30 days following Tenant's receipt of an invoice for such deficiency. If, after Tenant makes its Tax Payment for a specific Comparison Tax Year, the Real Estate Taxes are decreased such that the amount of the Tax Payment paid by Tenant to Landlord is more than Tenant's Proportionate Share of such decreased Real Estate Taxes, Landlord shall credit the excess (after deduction of Tenant's Proportionate Share of Landlord's fees and expenses incurred in connection with such decrease) against Tenant's next Rent payable under this lease or, if any such excess (after such deduction of fees and expenses) is due Tenant at the Expiration Date, Landlord shall promptly pay such excess to Tenant. In no event shall the Fixed Rent or any item of Additional Rent (other than the Tax Payment) be reduced by reason of any decrease in Real Estate Taxes. Real Estate Taxes shall be apportioned between Landlord and Tenant on a *per diem* basis as of the Commencement Date and the Expiration Date, so that Tenant shall pay only the portion of the Real Estate Taxes allocable to the Term. Notwithstanding anything herein to the contrary, from the Fixed Rent Commencement Date, Tenant shall pay Tenant's Proportionate Share of all vault taxes and assessments, whether special or general, and of all business improvement district assessments for each year during the Term, without regard to any Comparison Tax Year and whether or not there are increases in such assessments from those, if any, imposed in the Tax Base Year. If any assessment is payable in installments, Real Estate Taxes shall include only such assessments as would be payable if Landlord elected to pay such assessment over the longest period of time permitted by law and only the installments that become due during any Lease Year shall be included in Real Estate Taxes.

**Section 6.4    Other Taxes.** In addition to the Tax Payments, Tenant shall pay any and all: (a) other taxes, charges or impositions assessed on this lease or the Rent (to the extent such tax, charge or imposition is imposed on owners, landlords or tenants of real estate as such, rather than on taxpayers generally) by any Authority; (b) taxes assessed against any leasehold interest or personal property of any kind that is owned by or placed in, on, or about the Premises by Tenant; and (c) taxes and charges assessed by any Authority for Tenant's connection to or use of utilities.

**Section 6.5    No Exemption**. The Additional Rent payable by Tenant pursuant to this Article shall be paid by Tenant notwithstanding the fact that Tenant may be exempt, in whole or in part, from the payment of any Real Estate Taxes by reason of Tenant's diplomatic, charitable, or otherwise tax exempt status, or for any other reason whatsoever.

**Section 6.6    Certiorari Proceedings**. Only Landlord shall be eligible to institute tax reduction or other proceedings to reduce the assessed valuation of the taxable property. Landlord is under no obligation to institute such proceedings. If the Real Estate Taxes for the Tax Base Year are reduced, then the Real Estate Taxes for the Tax Base Year and the Tax Payments for the subsequent Comparison Years shall be retroactively adjusted. Subject to the preceding sentence, if, after Tenant has paid a Tax Payment, Landlord shall receive a refund of any portion of the Real Estate Taxes paid with respect to the Tax Year for which Tenant made such Tax Payment, Landlord, provided that no Default shall then exist, shall promptly after receiving such refund pay Tenant its Proportionate Share (but not in excess of the amount that Tenant actually paid to Landlord) of the net amount of such refund after deducting from such refund all expenses incurred by Landlord in obtaining such refund (including but not limited to reasonable attorneys' fees, expert's fees and disbursements incurred in connection with any application or proceeding). Alternatively, if Tenant is entitled to any such refund in accordance with the foregoing, Landlord may, at Landlord's option, credit Tenant's Proportionate Share of such net refund against the next succeeding installment(s) of the Rent coming due. If Tenant is entitled to a credit due to an overpayment of Taxes and such credit is not exhausted by the Expiration Date, then Landlord shall pay to Tenant an amount equal to the balance of such credit within ten (10) days after the Expiration Date or earlier termination of this Lease; which obligation shall survive the expiration or sooner termination of this lease.

**Section 6.7    After Term**. The expiration of this lease shall not relieve Tenant of the obligation to make Tax Payments on a pro rata basis for the portion(s) of the applicable Tax Years preceding such expiration.

**Section 6.8    Creation of Condominium.**  Notwithstanding anything in this lease to the contrary, in the event that the Real Property shall become subject to a declaration of condominium, then: (a) Tenant's Proportionate Share shall become equal to a fraction, the numerator of which shall be the square footage of the Premises and the denominator of which shall be the square footage of the condominium unit of which the Premises is a part, as determined and specified by Landlord in writing;  and, (b) the Real Estate Taxes for the Tax Base Year shall be translated to a sum equal to the product of (x) the Real Estate Taxes for the Tax Base Year multiplied by (y) Tenant's original Proportionate Share, and thereafter, that sum shall be used to compute the Tax Payment for Comparison Years subsequent to the creation of the condominium. For example, if the Premises were to become one complete condominium unit, Tenant's Proportionate Share would become 100%, but if the Premises were combined with other space in the Building such that the Premises were equal in square footage to 25% of the new unit, Tenant's Proportionate Share would become 25%. If the Real Estate Taxes for the Tax Base Year were $100, and Tenant's original Proportionate Share were 10%, for purposes of calculation of Tenant's Tax Payment in subsequent Comparison Years, $10 would be used.

**Article 7. Utilities; Services**

**Section 7.1    Utilities.** Landlord shall not be responsible for providing any utility service to the Premises nor for providing meters, submeters or other devices for the measurement of utilities supplied to the Premises, and Tenant shall arrange for the furnishing to the Premises of such utility services as it may require, as well as for the installation of all such meters, submeters or other devices, or Landlord shall, at its sole cost and expense, install such meters, submeters or other devices, in which event, except if and to the extent set forth on the annexed Work Letter, Tenant shall reimburse Landlord for the cost thereof upon demand. Tenant shall be solely responsible for and shall promptly pay, to Landlord or the utility company, as applicable, as and when the same become due and payable, all charges for water, condenser water (at the rate of $550.00 per ton per annum, subject to increase from time to time in proportion to actual increases in its cost to obtain and furnish such condenser water), sewer, electricity, gas, telephone, cable service, internet service, steam, and any other utility or other communication device used or consumed in the Premises and supplied by a public utility or Authority or any other person supplying same. If Landlord has designated any person or persons to provide one or more utility services to the Real Property, Tenant shall use the designated person(s) to obtain the applicable utility services.

**Section 7.2    No Overburdening of Systems.** Tenant shall not overload the electrical system serving the Premises, and shall not at any time overburden or exceed the capacity of the mains, feeders, ducts, conduits, pipes, valves, or other facilities by which electric and other utilities are supplied to, or distributed in, or which serve the Premises. If Tenant desires to install any equipment that shall require additional utility facilities, such installation shall be subject to Landlord's prior approval of Tenant's plans and specifications therefor. If such installation is approved by Landlord and if Landlord provides such additional facilities to accommodate Tenant's installation, Tenant shall pay Landlord, on demand, as Additional Rent, the actual cost for providing such additional utility facilities.

**Section 7.3    No Services Provided by Landlord.** Landlord has no obligation to provide to Tenant or the Premises any services except as expressly set forth in this lease. Without limiting the foregoing, Landlord is not responsible for providing heat, electric, water, gas, air conditioning, steam, sewer service, cleaning service, trash collection, extermination, cable or internet service or ventilation to the Premises. Landlord does not represent or warrant that any utility or other service provided by Landlord, or any utility or other service used or to be used by Tenant at the Premises, (a) shall be adequate for Tenant's particular purposes or (b) shall be free from interruption or reduction.

**Section 7.4    Interruption.** If any utility or other service (a) becomes unavailable from any public utility company, Authority or any other person supplying or distributing same (including Landlord), or (b) is interrupted by reason of Laws, the making of any repairs or improvements, or measures taken to secure the safety of the Real Property, or the safety and welfare of its tenants or occupants, or the public, or by reason of any cause beyond Landlord's reasonable control, (i) Landlord shall not be liable to Tenant for damages or otherwise, (ii) Tenant may not abate the Rent or be relieved of any of its obligations under this lease, and (iii) such lack of availability or interruption shall not constitute an actual or constructive eviction, or a disturbance of Tenant's use or occupancy of the Premises.

Section 7.5    Trash Removal. Tenant shall enter into, and maintain at all times during the Term, a contract for the daily removal of Tenant's trash from the Building, with the carter selected by Tenant and approved by Landlord, which approval shall not be unreasonably withheld, conditioned or delayed, to provide trash removal services to the Building, subject to any applicable Rules.

Section 7.6    Interruption Of Utilities Or Other Service. If, solely due to any negligence or willful misconduct by Landlord or its agents, employees or contractors, any utility or other service to the Premises is interrupted for thirty (30) consecutive days or more and, as a result thereof, Tenant is required to close for business and no longer operate in the Premises, all Fixed Rent shall abate from and after the later to occur of (a) the expiration of such thirty (30) day period or (b) the date that Tenant closes for business in the Premises, until such time as such utility or other service is restored. In the event of any such interruption of any utility or other service to the Premises, Landlord shall use reasonable diligence to restore such service as soon as practicable

## Article 8.  Repairs and Maintenance

Section 8.1    Structural Repair. Landlord shall, at Landlord's expense, make all structural repairs and, if deemed necessary in Landlord's sole discretion, replacements, needed to the exterior walls, structural columns, structural roof, and structural floors that enclose the Premises (excluding all doors, door frames, non-structural portions of the storefronts, windows and glass unless necessitated by the negligence or willful misconduct of Landlord and/or its agents, employees or contractors, and subject to Section 11.4 of this lease) and building systems located outside of the Premises that do not exclusively service the Premises; provided that Tenant gives Landlord notice of the necessity for such repairs. Notwithstanding the foregoing, Tenant shall reimburse Landlord, as Additional Rent, within thirty (30) days of being billed therefor, for all such costs for repairs or replacements that Landlord is required to make under this Section that are necessitated by the negligence or misconduct of Tenant or any subtenant or any of their respective employees, contractors, agents, subtenants, employees, customers and or invitees.

Section 8.2    Sprinklers. If the Premises are sprinklered, Tenant shall be responsible, at Tenant's sole cost and expense, for maintaining, in good order and repair and in compliance with all Laws, those elements of the sprinkler system that are within the Premises, including the repair and replacement of the sprinkler heads and pipes. If the Premises are not sprinklered and a sprinkler system in the Premises is required under applicable Laws for Tenant's Permitted Use or manner of use of the Premises, or Tenant's Work requires the installation of a sprinkler system in the Premises, Tenant shall install such system as part of Tenant's Work, at Tenant's expense. Landlord shall not be responsible for maintenance, repairs or replacement of any element of the sprinkler system within the Premises.

Section 8.3    Premises Repair; HVAC. Subject to Articles 12 and 13 and Section 8.1: Tenant shall make, at Tenant's sole expense, all non-structural repairs and replacements needed to maintain in good condition and order the Premises and all installations, equipment and facilities therein, and all repairs and replacements needed to any plumbing, water, waste, heating, ventilating and air conditioning units ("HVAC Units"), and electric conduits, lines and equipment located outside the Premises that serve only the Premises. Without limiting

20

the foregoing, but subject to Articles 12 and 13 and Section 8.1, Tenant shall make all repairs and replacements required with respect to the HVAC Units, electrical and plumbing systems within the Premises and any rooftop or exterior air conditioning equipment or HVAC Units serving only the Premises, any plumbing fixtures within the Premises (including sinks and toilets), and the plumbing lines, valves, and pipes connected to or running from such fixtures to the point at which such lines, valves and pipes connect with the Building's common plumbing lines, including such plumbing lines or ducts connecting any roof-top or exterior equipment or HVAC Units or other utility or service to the Premises. Tenant shall keep the sidewalks abutting the Premises free of rubbish, snow, ice and other obstructions, and otherwise in a safe and clean condition and shall not put such sidewalks and walkways to any special use (e.g. install any special plates), and Tenant shall make such repairs and replacements to such sidewalks as may be required due to the acts or omissions of Tenant or any subtenant or any of their respective employees, agents or contractors. If Tenant fails to promptly clear snow and ice from the sidewalks and walkways abutting the Premises and keep them clear, Landlord may do so at Tenant's expense, in which event Tenant shall reimburse Landlord for its actual and reasonable out-of-pocket expenses in connection therewith upon Landlord's request. All such repairs and replacements shall be made in compliance with the provisions of this lease (including Article 5). Tenant shall pay and discharge of record any fine or violation imposed on the Real Property by reason of Tenant's failure to perform its obligations under this section within twenty (20) days after notice thereof.

        **Section 8.4**    **HVAC Repair Contract**. Tenant shall enter into and maintain, at Tenant's expense, a service, maintenance and repair contract, in scope reasonably satisfactory to Landlord, with a reputable service company, reasonably satisfactory to Landlord, for the HVAC Units serving the Premises. Tenant shall, from time to time, furnish Landlord with a copy of such service contract, within ten (10) days after request.

        **Section 8.5**    **Damage**. Subject to Section 11.4, Tenant shall reimburse Landlord, as Additional Rent, within thirty (30) days of being billed therefor, for all damage to the Building resulting from any act or omission of Tenant, Tenant's subtenants, or any of Tenant's or subtenants' employees, agents, employees, invitees or contractors.

        **Section 8.6**    **Landlord Repair**. Landlord shall have no liability to Tenant, the Rent shall not be abated, and Tenant shall not be deemed actually or constructively evicted by reason of Landlord or anyone on behalf of Landlord performing any repairs or other work to all or any portion of the Premises and/or the Real Property. Landlord shall endeavor to perform, or cause to be performed such repairs or other work in a manner that reasonably minimizes interference with the conduct of Tenant's business in the Premises and damage to the Premises, Tenant's Work and Tenant's Property, but Landlord is not required to employ overtime labor or incur additional expenses.

### Article 9. Laws; Hazardous Substances

        **Section 9.1**  **Laws**. Tenant shall, at Tenant's expense, comply with all present and future laws, rules, regulations, orders, ordinances, judgments, requirements and (if Landlord adopts same) recommendations (collectively, "Laws") of the United States of America, the State of New York, the city, town, village, municipality and/or county in which the Premises are located, or any present or future subdivision or instrumentality thereof, any court, agency,

department, commission, board, bureau, and any fire insurance rating body (collectively, "Authority" or "Authorities") applicable to the occupancy of the Premises, Tenant's Work, Tenant's Property or the Premises. If, however, compliance requires structural work to the Premises, Tenant shall be required to effect such compliance, at Tenant's expense, only if the obligation to comply arises from Tenant's Work, Tenant's Property, the manner of using the Premises, or any acts or negligence of Tenant or any subtenant or any of their respective employees, contractors, agents, customers or invitees and provided that under all circumstances, notwithstanding anything to the contrary set forth in this lease and without limiting the scope of Tenant's obligations under this Section or any other provision of this lease, Tenant, at its sole expense, shall comply with the requirements of the Americans With Disabilities Act of 1990, and any additions, amendments or modifications thereto and all related regulations and all other Laws pertaining to handicap access. Tenant shall promptly deliver to Landlord a copy of any notice, communication or other materials relating to the Premises, the Real Property (including the Building systems), Tenant's Property, Tenant's Work and/or Hazardous Substances (hereinafter defined) received by Tenant from, or sent by Tenant to, any Authority. Tenant shall have an obligation to remediate any Hazardous Substances pursuant to this Section if the need for such remediation arises from Tenant's Work, the specific manner of use of the Premises, or the actions or omissions of Tenant or any subtenant or any of their respective employees, contractors, agents, customers or invitees. If Tenant is unable to obtain any required permit or approval required by Laws in order to commence Tenant's Initial Work or is unable to open for business in the Premises solely as a result of the existence of any violation issued by any Authority against the Premises or any other portion of the Building and not caused by Tenant or any subtenant of Tenant or any of their respective agents, employees or contractors and not required to be discharged by Tenant pursuant to any other provision of this lease, Tenant shall immediately notify Landlord of any delay in obtaining any such permit or approval or opening for business and Landlord, at its expense, shall use commercially reasonable efforts to cause any such violation to be promptly discharged or to otherwise enable Tenant to lawfully obtain such permit or approval or open for business. Provided that Tenant shall have used commercially reasonable efforts to obtain such permit or approval or to open for business, as the case may be, as Tenant's sole and exclusive right and remedy, the Fixed Rent Commencement Date shall be extended one day for each date of such delay (or, if the Fixed Rent Commencement Date shall have theretofore occurred, Tenant shall be entitled to an additional day of abated Fixed Rent for each day from the date that Tenant shall have notified Landlord of such violation and delay until such time as any such violation shall have been discharged or is otherwise no longer causing any such delay). However, if the Fixed Rent Commencement Date would be extended for more than 365 days by operation of the preceding sentence or if the additional Fixed Rent abatement period set forth above in the preceding sentence extends for more than 365 days, either party shall have the right, at any time after expiration of such 365 day period, to terminate this lease on notice to the other, whereupon the first month's Fixed Rent and Security shall be returned to Tenant and neither party shall have any further obligation or liability under this lease except for any such obligation or liability that expressly survives termination, provided that if Tenant shall have sent such termination notice and if such violation(s) shall be discharged or Tenant is otherwise permitted to open for business within thirty (30) days after Landlord's receipt of Tenant's termination notice, such notice shall be deemed negated and this lease shall remain in full force and effect.

          **Section 9.2**    **Hazardous Substances**. Tenant shall not, and shall not permit any of its subtenants, employees, contractors, agents, or invitees, to introduce into the Premises or the

Real Property, use in the Premises or the Real Property or cause to be released from the Premises or the Real Property any Hazardous Substances. Notwithstanding the preceding sentence, Tenant may use cleaning and office products in accordance with their customary use, provided that Tenant complies with all applicable Laws in connection therewith, and further provided that in no event may Tenant release or discharge such cleaning and/or office products into the plumbing, drainage or sewer system in excessive amounts. If Tenant breaches its obligations hereunder, Tenant, at Tenant's expense, shall immediately take all remedial action necessary to clean up any release, spill or discharge of Hazardous Substances. "Hazardous Substances" mean any flammable or otherwise hazardous material, any explosive and/or radioactive material, hazardous waste, hazardous or toxic substance or related material, asbestos and any material containing asbestos, petroleum and any petroleum derivative, pollutants, contaminants and any other substance or material which is defined as, determined to be, or identified as, a hazardous or toxic material or substance pursuant to any applicable Laws.

Section 9.3    Remediation. If Tenant shall be obligated to remediate any Hazardous Substances, it shall remove and dispose of any such Hazardous Substances in compliance with all applicable Laws. Tenant's remediation plan shall be subject to Landlord's reasonable prior approval and Tenant shall keep Landlord fully apprised of the progress of Tenant's remediation efforts.

Section 9.4    Indemnification. Tenant shall indemnify, defend and hold harmless Landlord, its managing agent, its Superior Landlord, if any, its Mortgagee, if any, and their respective affiliates, members, shareholders, partners, directors, managers, officers, employees, and agents, from and against all claims, liabilities, damages, losses, fines, costs and expenses (including reasonable attorneys' fees and disbursements) resulting or arising from, or incurred in connection with any violation by Tenant of its obligations with respect to Hazardous Substances under this lease or otherwise under any applicable Laws.

Section 9.5    Permits for Auction, Fire Sale, etc. If Tenant conducts any auction, fire sale, going out of business sale, bankruptcy sale, or similar type of sale at the Premises in accordance with the provisions of this lease, Tenant shall obtain, and deliver to Landlord, prior to commencement of such auction or sale, any necessary permits, licenses and/or approvals required by any applicable Laws in connection therewith.

Section 9.6    Licenses and Permits. Tenant shall, at its own cost and expense, secure and maintain throughout the Term, all necessary licenses and permits from such Authorities as shall be necessary for, or incidental to, the conduct of its business in the Premises and shall comply with all Laws relating to the operation of its business. Landlord does not covenant, warrant or make any representation that any Authority license or permit that may be required in connection with the operation of Tenant's business will be granted, or if granted, will be continued in effect or renewed, and any failure to obtain, maintain, or renew such license or permit, or its revocation after issuance, shall not affect Tenant's obligations under this lease.

Section 9.7    Compliance Challenge. Subject to the provisions of this section, provided that Tenant is not in Default, Tenant, at Tenant's expense, may contest by appropriate proceedings prosecuted diligently and in good faith the legality or applicability of any Laws affecting the Premises for which Tenant is responsible for compliance (any such proceedings instituted by Tenant, a "Compliance Challenge"), but only if Tenant's delay in compliance shall

23

not cause (a) Landlord or Tenant to be subject to imprisonment or prosecution for a crime, (b) the Real Property or any part thereof to be condemned or vacated, (c) the certificate of occupancy for the Building or any part thereof to be suspended or cancelled, and/or (d) the use and enjoyment of its space by another lessee or licensee at the Real Property to be adversely affected. Tenant must give Landlord at least ten (10) business days' notice before Tenant initiates a Compliance Challenge, and shall not initiate it if Landlord reasonably objects. At Landlord's request, prior to initiating a Compliance Challenge, Tenant shall furnish Landlord with either cash or a bond from a surety company reasonably satisfactory to Landlord in form and substance, and in an amount equal to 100% of the sum, as reasonably estimated by Landlord, of (i) the cost of such compliance and (ii) the amount of any and all penalties and fines that may accrue by reason of non-compliance and (iii) the amount of any potential Landlord liability to third parties. Tenant shall keep Landlord informed regularly as to the status of any Compliance Challenge.

## Article 10.Subordination; Estoppel Certificates

**Section 10.1 Subordination**. This lease, and the rights of Tenant under this lease, are subject and subordinate in all respects to all present and future underlying leases of the Real Property or any portion thereof, in connection with a financing of the Real Property or otherwise, including all modifications, extensions and replacements thereof ("Superior Leases") and all present and future mortgages on any Superior Lease or on the Building and/or the Real Property or any portion thereof including all increases, renewals, modifications, extensions, supplements, consolidations and replacements thereof ("Mortgages"), and all advances under any Mortgage. This Section is self-operative and no further instrument of subordination is required. Tenant shall, within fifteen (15) days following receipt of Landlord's request, sign, acknowledge and deliver any instrument that Landlord, any landlord under a Superior Lease ("Superior Landlord") or any mortgagee under a Mortgage ("Mortgagee") may request to evidence such subordination. Concurrently with the execution of this lease, Tenant has executed a Subordination Attornment and Non-Disturbance Agreement ("SNDA") with the present Mortgagee. Landlord shall request that the Mortgagee under any Mortgage hereafter placed against the Building enter into an SNDA with Tenant in such Mortgagee's standard form but if any such Mortgagee shall be unwilling to enter into such an Agreement with Tenant, this lease shall remain subject and subordinate to such Mortgage and Landlord shall have no liability to Tenant and Tenant's obligations and liabilities under this lease shall not be diminished in any manner.

**Section 10.2 Attornment**. Subject to the terms of any SNDA then in effect, if any Mortgagee or any Superior Landlord or any successor or assignee thereof or any purchaser at a foreclosure sale or by deed in lieu of foreclosure succeeds to the rights of Landlord under this lease, then at the request of same, Tenant shall attorn to such Mortgagee, Superior Landlord, successor, assignee or purchaser as Tenant's landlord under this lease; provided, however, that such successor landlord shall not be bound by: (x) any payment of Fixed Rent or Additional Rent for more than one (1) month in advance; (y) any obligation to perform any Landlord's work or make any payment to Tenant; or (z) any amendment or modification of this lease unless such amendment or modification is made in accordance with its terms or has been expressly approved in writing by the Superior Landlord or the Mortgagee through, or by reason of, which the successor landlord shall have succeeded to the rights of Landlord under this lease. Tenant shall, within twenty (20) days following request by such Mortgagee, Superior Landlord, successor or

assignee, sign, acknowledge and deliver any instrument that such Mortgagee, Superior Landlord, successor, assignee, or purchaser reasonably requests to evidence the attornment.

**Section 10.3 Modification**. If any Mortgagee or Superior Landlord requires any modifications of this lease, Tenant shall, within twenty (20) days following Tenant's receipt of a request, sign, acknowledge and deliver to Landlord instruments in form and substance reasonably requested by Landlord providing for those modifications (provided they do not affect or increase the obligations of Tenant under this lease, except for sending additional notices and other obligations that are not reasonable and immaterial).

**Section 10.4 Consent**. Notwithstanding any provision in this lease to the contrary, if any Mortgage or Superior Lease requires Landlord to obtain such Mortgagee's or Superior Landlord's consent to, or approval of, any matter, it shall not be unreasonable if Landlord delays or withholds its consent or approval until it has received same from such Mortgagee and/or Superior Landlord, provided that Landlord is diligently and expeditiously and without delay, pursuing such consent or approval. Landlord's receipt of such consent or approval from such Mortgagee or Superior Landlord does not obligate Landlord to consent to, or approve, the matter.

**Section 10.5 Estoppel Certificates**. Landlord and Tenant shall, at any time and from time to time, within twenty (20) days following its receipt of a request from the other party, sign, acknowledge and deliver to the requesting party or any other person designated by that party a certification (a) that this lease is in full force and effect and has not been modified (or, if modified, setting forth all modifications), (b) stating the date to which the Rent has been paid, (c) stating whether or not, to its actual knowledge, the other party is in default of its obligations under this lease and if so, describing the default, including any event that has occurred which, with the serving of notice or the passage of time, or both, would give rise to a default, and (d) stating to its actual knowledge, any other factual matters reasonably requested by the other party or any person designated by the other party. Any certification delivered pursuant to this Section may be relied upon by the third party for whom the certification is requested but shall not, as between Landlord and Tenant, affect their respective rights.

### Article 11.Insurance

**Section 11.1 Insurance**. Tenant shall, at Tenant's expense, maintain at all times during the Term and at all times when Tenant is in possession of the Premises such insurance as shall be required by Landlord, including: (a) commercial general liability insurance (or successor form of insurance designated by Landlord) (including products, completed operations and contractual liability), covering bodily injury and property damage liability, personal injury and advertising liability and fire and legal liability, in respect of the Premises and the sidewalk adjacent to the Premises, on an occurrence basis, with a combined single limit (annually and per occurrence and location) of not less than ten million dollars ($10,000,000) naming as additional insureds Landlord, its managing agent, Mortgagee, Superior Landlord and any other person designated by Landlord (b) property insurance in an amount equal to one hundred (100%) percent of full replacement value (with a deductible not exceeding five thousand ($5,000) dollars) covering Tenant's Work (including improvements and betterments, whether or not the improvements and betterments are restored), Tenant's Property and the property of third parties located in the Premises, against fire and other risks included in the standard New York form of

property insurance, including business interruption insurance covering a period of twelve (12) months, (c) workers' compensation and employer's liability insurance providing statutory benefits for Tenant's employees at the Premises and (d) such other insurance as Landlord may reasonably require from time to time. Landlord shall have the right at any time and from time to time to require Tenant to increase the amount of the commercial general liability insurance required to be maintained by Tenant under this lease provided the amount shall not exceed the amount then generally required of tenants entering into leases for similar Permitted Uses in similar buildings in the general vicinity of the Real Property.

Section 11.2 Delivery. Tenant shall deliver to Landlord and each additional insured (a) certificates in form acceptable to Landlord evidencing the insurance required by this lease to be maintained by Tenant before the Commencement Date (and with respect to any insurance required pursuant to Article 5, before the commencement of any Tenant's Work), and at least fifteen (15) days before the expiration of any such insurance, and (b) upon request, a copy of each insurance policy. All required insurance (including insurance required pursuant to Article 5) shall be primary and non-contributory (as shown on endorsement), issued by companies permitted to do business in New York State and rated in Best's Insurance Guide as having a general policyholder rating of "A-" and a financial rating of at least "X" and that are otherwise reasonably satisfactory to Landlord, and such insurance policy(ies) shall contain a provision whereby it (they) cannot be canceled unless Landlord and all additional insureds are given at least thirty (30) days' prior written notice of the cancellation. Tenant may carry any required insurance under a blanket policy if that policy complies with the requirements of this lease and provided that Tenant's insurance for the Premises is on a "per location basis" and that the coverage of such insurance will not be reduced by payments made with respect to any other locations.

Section 11.3 Prohibited Actions. Tenant shall not do or permit to be done any act which shall invalidate or be in conflict with Landlord's insurance policies, or increase the rates of insurance applicable to the Real Property. If, as the result of a Default, Tenant's occupancy of the Premises (whether or not such occupancy is a Permitted Use), and/or specific hazards attributable to Tenant's occupancy, the insurance rates for the Real Property or Building increase, Tenant shall reimburse Landlord for one hundred (100%) percent of such increase in premium(s), but only to the extent that such increase resulted from any such Default, occupancy or hazards, within fifteen (15) days after Tenant is billed therefor (together with reasonably detailed back-up documentation). Landlord has been advised that, under the insurance policy presently in effect for the Building, Tenant's use of the Premises for the Permitted Use in accordance with the terms of this lease would not, in and of itself, result in an increase in such insurance rates.

Section 11.4 Waiver of Subrogation. Provided its right of full recovery under its insurance policy is not adversely affected, Landlord and Tenant each hereby releases the other (and the other's agents and employees) with respect to any claim (including a claim for negligence) it may have against the other for damage or loss covered by its property insurance (including business interruption and loss of rent). Landlord and Tenant shall each procure a clause in, or endorsement on, any property insurance carried by it, pursuant to which the insurance company waives its right of subrogation against the other party to this lease and its agents and employees or consents to a waiver of the right of recovery against the other party to this lease and its agents and employees.

26

**Section 11.5 Subtenant, Occupant Compliance.** Any subtenant or other occupant of the Premises shall be obligated to comply with the provisions of this Article.

### Article 12. Casualty

**Section 12.1 Damage; Repair; Abatement.** If (a) the Premises are damaged by fire or other casualty, or (b) the Building (including any Building system) is damaged by fire or other casualty so that Tenant is deprived of reasonable access to or egress from the Premises or so that the Premises or any part of the Premises is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises, Tenant shall give prompt notice to Landlord. Subject to the provisions of this Article (i) Landlord shall, at Landlord's sole cost and expense, repair or cause to be repaired the damage to the Premises, excluding the damage to Tenant's Work or Tenant's Property and (ii) Tenant shall, at Tenant's sole cost and expense, promptly remove Tenant's Property from the Premises to the extent reasonably required by Landlord in connection with Landlord's repair of the damage and shall, promptly after Landlord's Substantial Completion of the repair to the Premises, commence to diligently work to repair Tenant's Work and Tenant's Property in order to resume its normal business in the Premises. Until the repairs to be performed by Landlord are Substantially Completed, the Rent shall be reduced in proportion to the area of the Premises to which Tenant shall not have reasonable access or egress from or which is unusable by Tenant for the reasonable conduct of Tenant's normal business in the Premises and which Tenant does not actually use.

**Section 12.2 Termination.** If (a) the Premises are rendered wholly untenantable, or (b) cost of repairing the Building after a casualty exceeds the available proceeds of Landlord's insurance, or (c) the Premises are damaged in whole or in part during the last Lease Year of the Term, or (d) the cost of repairing any damage to the Building by fire or other casualty exceeds fifty percent (50%) of the replacement cost thereof, as reasonably estimated by a reputable contractor, architect or engineer reasonably selected by Landlord, Landlord shall have the right, by notice given to Tenant within sixty (60) days following the date of the damage, to terminate this lease. If this lease is terminated pursuant to this Section, the Term shall expire on the fifteenth (15th) day after the notice is given as fully and completely as if such date were the stated Expiration Date. Tenant shall have the right to terminate this lease on notice to Landlord (a) if the Premises are materially damaged by fire or other casualty during the last two (2) Lease Years of the Term, other than damage due to negligence or misconduct of Tenant or any subtenant or any of their respective agents, employees or contractors, and Landlord's architect or engineer reasonably estimates that the time to repair or restore such damage will exceed ninety (90) days (such notice to be sent within thirty (30) days after Tenant's receipt of such estimate) or (b) if, after a fire or other casualty that was not caused by the negligence or misconduct of Tenant or any subtenant of Tenant or any of their respective agents, employees or contractors but that did not result in Landlord's termination of this lease, Landlord shall have not substantially completed the repairs of such damage within 365 days after the date of such fire or other casualty, Tenant shall have the right to terminate this lease on sixty (60) days' prior notice to Landlord, provided that if Landlord substantially completes such repairs within such sixty (60) day period, such termination notice shall be of no force or effect and this lease shall continue in effect accordance with its terms.

**Section 12.3 Express Agreement.** This Article constitutes an express agreement governing any damage to or destruction of the Premises or the Building by fire or

other casualty, and Section 227 of the Real Property Law of the State of New York, and any other similar Laws shall have no application to a fire or other casualty.

## Article 13. Condemnation

**Section 13.1    Taking; Claims.** If as the result of a taking by condemnation or similar legal action of an Authority or a taking by an Authority effected in any other manner (a) all of the Premises, or so much thereof as renders the Premises wholly unusable by Tenant (as reasonably determined by Tenant), is taken, (b) Tenant no longer has reasonable access to or egress from or use of the Premises, (c) all or substantially all of the Building is taken or (d) a portion of the Building is taken resulting in Landlord's determination to demolish the Building, the Term shall expire on the date of the vesting of title as fully and completely as if such date were the stated Expiration Date. In the event of any such taking of all or any part of the Premises or the Real Property, Landlord shall be entitled to receive the entire award. Tenant shall have no claim against Landlord or any Authority for the value of the unexpired portion of the Term or Tenant's Work, and Tenant hereby assigns to Landlord all of its right in and to any such award. Tenant may, however, at Tenant's expense, make a separate claim to the appropriate Authority for the value of Tenant's Property and for moving expenses, provided such claim and award, if any, do not result in a reduction of the award which would otherwise be paid to Landlord. If a taking does not result in the termination of this lease (i) Landlord shall, at Landlord's sole cost and expense, as soon as practicable, restore that part of the Premises or the Real Property not taken to the extent reasonably practicable, so that the Premises are usable, and (ii) from and after the date of the vesting of title, the Rent shall be reduced in the same proportion as the area of the Premises, if any, which was taken.

## Article 14. Assignment and Subletting

**Section 14.1    No Assignment or Sublease.** Except as provided in this Article, Tenant shall not, without Landlord's prior consent, assign, encumber or otherwise transfer this lease or any interest in this lease, by operation of law or otherwise, or sublet or permit others to occupy all or any part of the Premises, or license concessions or lease departments in the Premises, and any assignment, encumbrance, transfer, sublet, occupancy agreement, license or department lease shall be void ab initio if not in accordance with this Article. The transfer or issuance (by one or more related or unrelated transactions) of ownership interests of Tenant or any entity that has a direct or indirect ownership interest in Tenant which results in 50 percent or more of the ownership interests of Tenant or any such other entity being held by person(s) who did not hold 50 percent or more of those ownership interests on the date of this lease shall be considered an assignment of this lease which requires Landlord's consent, unless such ownership interests are publicly traded on a national stock exchange or over-the-counter market. Tenant shall not permit any advertising or circulars regarding availability of the Premises for sublease or assignment to publicize an asking price that is equal to or less than Landlord's then current asking price.

**Section 14.2    Recapture.** If Tenant desires to assign this lease or to sublet the Premises, Tenant must so notify Landlord ("Assignment/Sublease Notice"). The Assignment/Sublease Notice shall be accompanied by (a) the name and address of the proposed subtenant or assignee, (b) the nature and character of the business of the proposed subtenant or assignee, (c) current bank, financial and other credit information on the proposed subtenant or

assignee, and (d) a copy of the proposed assignment or sublease, fully executed, which assignment or sublease shall be in compliance with the requirements of this Article (items (a) through (d), collectively, the "A/S Documents"). Tenant shall promptly supply Landlord with such additional information as Landlord may reasonably request (the "Supplemental A/S Documents"). Upon Landlord's receipt of the Assignment/Sublease Notice, together with the A/S Documents and the Supplemental A/S Documents (if any), Landlord may, at its option, except with respect to a Permitted Transaction (as hereinafter defined), elect to terminate this lease by notice given to Tenant, which notice shall specify a date for the termination of this lease (the "Recapture Termination Date"). Such option shall be exercised by giving Tenant notice of exercise within sixty (60) days after the date on which Landlord has received the Assignment/Sublease Notice together with the A/S Documents and the Supplemental A/S Documents (if any). The Recapture Termination Date shall be a date no earlier than two (2) months and no later than four (4) months after the date the Assignment/Sublease Notice and such supplemental documents and information are delivered to Landlord. Upon the Recapture Termination Date, this lease and the term thereof shall end and expire as fully and completely as if such date were the date set forth herein as the stated Expiration Date. Tenant shall thereupon quit, surrender and vacate the Premises, without prejudice, however, to Landlord's rights and remedies against Tenant under the lease provisions in effect prior to the Recapture Termination Date or with respect to periods prior to the Recapture Termination Date, and any Rent owing shall be paid up to such date and any payments of Rent made by Tenant which were on account of any period subsequent to such date shall be returned to Tenant. If Landlord so terminates this lease, Landlord may, at its option and without liability to Tenant, lease the Premises to any person or entity that was negotiating with Tenant or that signed a lease, sublease or assignment agreement with Tenant for the Premises.

**Section 14.3    Permitted Transactions.** Notwithstanding any provision of this lease to the contrary, provided that: (a) Tenant shall not be in Default at the time of each such transaction; (b) Landlord shall have received the Assignment/Sublease Notice no less than thirty-five (35) days' prior to the date on which Tenant intends to consummate each such transaction; and (c) each such transaction is for a good business purpose and not principally for the purpose of transferring the leasehold estate created by this lease, then, Landlord's consent shall not be required (but all of the other requirements and conditions of this Article 14 (other than Section 14.2) shall be applicable) with respect to the following transactions: (i) a merger, or consolidation of Tenant, at the time that Tenant owns all right, title and interest in and to the "Artisanal" brand name, with another entity that has no less than ten (10) years' experience in operating restaurants in Manhattan and is operating at least two (2) other restaurants in Manhattan at the time of the proposed merger or consolidation) (and provided that the resulting entity has a tangible net worth at least equal to or in excess of the tangible net worth of Tenant as of the date of this lease or as of the date immediately prior to such merger or consolidation, in each case, as set forth in a certified financial statement prepared by a certified public accountant, or $25,000,000.00, whichever is greatest); and (ii) an assignment of this lease, at the time that Tenant owns all right, title and interest in and to and the sole right to use the "Artisanal" brand name, to an entity that has no less than ten (10) years' experience in operating restaurants in Manhattan and is operating at least two (2) other restaurants in Manhattan at the time of the proposed assignment), to an entity in connection with such entity's purchase of all or substantially all of Tenant's assets, provided that the assignee has a tangible net worth at least equal to or in excess of the tangible net worth of Tenant as of the date of this lease or as of the date immediately prior to such transfer, in each case, as set forth in a certified financial statement

prepared by a certified public accountant, or $25,000,000.00, whichever is greatest; and (iii) an assignment of this lease or a sublease of all of the Premises, at the time that Tenant owns all right, title and interest in and to and the sole right to use the "Artisanal" brand name, to an entity that is controlled by, in control of, or under common control with, Tenant, and remains under such control for the remainder of the Term, provided such assignee or subtenant has a tangible net worth at least equal to or in excess of the tangible net worth of Tenant as of the date of this lease or as of the date immediately prior to such assignment or sublease, as they case may be, in each case, as set forth in a certified financial statement prepared by a certified public accountant, or $25,000,000.00, whichever is greatest. For purposes of the preceding sentence, "control" means ownership of at least 75% of the shares, membership interests or other ownership interests of the entity in question. Notwithstanding the foregoing provisions of this Section but without diminishing the scope of any of the requirements set forth in this Section for a transaction to qualify as a Permitted Transaction, in order for any transaction to constitute a Permitted Transaction, the assignee, successor or subtenant, as the case may be, must (a) acquire, upon closing of such transaction, all right, title and interest in and to and the sole right to use the "Artisanal" brand name and (b) confirm in writing to Landlord that it shall continue to operate the Premises under the Trade Name.

    **Section 14.4 Conditions**. Tenant acknowledges that the character and nature of the stores, store management and operations within the Building are important to Landlord and to the success of the Building. Subject to Tenant's compliance with the applicable provisions of this Article, if Landlord has not elected to terminate this lease pursuant to Section 14.2, Landlord agrees not to unreasonably withhold, delay or condition its consent to a proposed assignment of this lease or sublease of the entire Premises provided all the following conditions are met:

    (a) Such assignee or subtenant shall use and occupy the Premises only for the Permitted Use.

    (b) Such assignment or sublease shall not, in Landlord's reasonable judgment, adversely affect the quality and type of business operation which Tenant has conducted theretofore at the Premises in compliance with the provisions of this lease.

    (c) The principal(s) of such assignee or subtenant shall possess qualifications for operating Tenant's business that are substantially equivalent to Tenant's qualifications, and have reasonably demonstrated recognized experience in successfully operating such a business.

    (d) Intentionally Omitted

    (e) At the time such assignment or sublet is to become effective, there is no Default.

    (f) Tenant reimburses Landlord on demand for any actual and reasonable out-of-pocket costs incurred by Landlord in connection with said assignment or sublease, including the costs of investigating the proposed assignee or subtenant and Landlord's reasonable legal costs.

    (g) If Tenant assigns this lease, Tenant delivers to Landlord a fully executed assignment and assumption agreement, duly acknowledged, in form and substance reasonably satisfactory to Landlord.

(h)     If Tenant subleases the Premises, Tenant delivers to Landlord a fully executed sublease, in form reasonably satisfactory to Landlord, that, among other things, provides that: (i) the sublease is subject and subordinate to this lease and to the matters to which this lease is or shall be subject and subordinate; (ii) the subtenant shall not, without Landlord's prior consent or approval, take any action, which, if to be taken by Tenant, would require Landlord's consent or approval; (iii) the subtenant shall, upon notice from Landlord that Tenant is then in default of this lease, pay the rent under the sublease directly to Landlord, to be applied to the Rent under this lease (and Tenant hereby consents to that payment and agrees that any such payment shall be credited against the subtenant's rent obligation under the sublease); (iv) the subtenant shall carry the insurance, and furnish to Landlord the evidence thereof, required by this lease to be carried and furnished by Tenant, and shall name Landlord and any other party designated by Landlord as additional insureds on its commercial general liability insurance, and (v) in the event of any termination, re-entry or dispossess by Landlord under this lease, the subtenant shall, at Landlord's option, vacate the Premises or attorn to Landlord pursuant to the then executory provisions of the sublease, except that Landlord shall not be (A) liable for any previous act or omission of Tenant under the sublease, (B) subject to any offset not expressly provided in the sublease, (C) be required to pay any construction allowance or other monetary payment due or payable from or by Tenant as sublandlord, or (D) bound by any change or extension of the sublease or prepayment of more than one (1) month's rent to which Landlord did not consent in writing.

(i)     Consent has been obtained from any Mortgagee that has the right to consent to such assignment or sublease.

(j)     Any Guarantor delivers to Landlord such agreements as Landlord may reasonably require confirming Guarantor's continuing liability under its guaranty of this lease, but no failure to execute or deliver such documents shall impair such Guarantor's continuing liability under such guaranty in accordance with the terms of such guaranty. In the case of a proposed assignment, Landlord may require that principals and/or affiliates of the assignee deliver guaranties in substantially the same form as have been delivered with this lease.

**Section 14.5   Increased Fixed Rent; Profit.** If Tenant assigns this lease or sublets the Premises in accordance with the provisions of this lease:  (a) the Fixed Rent stated in Exhibit A shall be increased by twelve and one-half percent (12-1/2%) per annum from the date on which such sublease or assignment is effective to and including the Expiration Date; and, (b) Tenant shall pay Landlord, within fifteen (15) days following payment to Tenant, one hundred (100%) percent of:  (i) all sums and other consideration paid in connection with an assignment (including key money, bonus money, and any payments for assets, inventory, fixtures, furniture and equipment transferred by Tenant to the assignee); and (ii) the excess, if any, of the rents, additional charges and/or other consideration paid in connection with a sublease over the Rent accruing during the term of that sublease, less Transaction Costs (as defined herein). For purposes hereof, the term "Transaction Costs" shall mean Tenant's commercially reasonable and actual out-of-pocket costs for bona fide brokerage commissions, transfer taxes, legal fees, architect fees and design fees, all of which are reflected in paid invoices or other documentation that is reasonably satisfactory to Landlord. Notwithstanding the foregoing, in the event of a Permitted Transaction, the provisions of subsection (b) above shall not be applicable.

**Section 14.6  Liability Continued.** If this lease is assigned or the Premises are sublet, Tenant shall remain liable for the performance of all of the terms, covenants and conditions of this lease on the part of Tenant to be performed or observed and any Guarantor shall continue to remain liable under the terms of its guaranty of this lease.  Tenant's liability hereunder shall not be affected by any modification of this lease or agreement made between Landlord and any assignee or subtenant, or by reason of any delay or failure on Landlord's part to enforce any of its rights under this lease; provided that if any such modification or agreement increases the obligation of the assignee under this lease, the liability of the assignor-Tenant under this lease shall continue to be no greater than if such modification or agreement had not been made unless such assignee is a person or entity that directly or indirectly controls, is controlled by or is under common control with Tenant, except, however, if no Default shall have occurred or shall then be existing at the time of any permitted assignment of this lease (except for an assignment under Section 14.3(iii)), the Guarantor under the Guaranty in effect on the date of such assignment (except for an assignment under Section 14.3(iii)) shall be released from any liability first accruing after the date of such assignment provided that a Guaranty in the same form of the Guaranty executed concurrently with this lease is executed and delivered to Landlord by an individual or up to three individuals who own, alone or in the aggregate, no less than 51% of the shares or other ownership interests of the assignee and provided that such individual or, if more than one (but no more than three) has a tangible net worth of no less than $10,000,000, alone (if one guarantor) or in the aggregate (if more than one (but not more than three)) as of the date of such assignment, as shown on an audited financial statement delivered to Landlord and provided further that such individual (a) has never filed for bankruptcy or had a bankruptcy petition filed against him or her, (b) has never been convicted of a crime, (c) has never owned interests in any entity that has been evicted from its premises or been named as a defendant in any action or proceeding seeking such eviction, (d) has a credit rating that is among the top 5% of the ratings issued by the credit rating agency from whom Landlord obtains the credit report, (e) is not listed as a SDN (as defined in Section 23.2 hereof), (f) has never been and is not then an owner of interests in any entity that has ever been an adverse party in any action or proceeding against Landlord or any entity in which any direct or indirect owner of interests in Landlord owned an interest, and (g) does not have a controversial or disreputable moral character.

**Section 14.7  Future Transactions.** The consent by Landlord to any assignment, transfer, sublet, occupancy, encumbrance or other transaction described in Section 14.1, shall not in any way be deemed to relieve Tenant from obtaining the express consent of Landlord prior to any further such transaction or any proposed assignment of sublease or sub-sublease, which consent may be granted or denied at Landlord's sole discretion.

**Section 14.8  Acceptance of Rent.** The acceptance by Landlord of Rent following any assignment, sublease, encumbrance, license, occupancy, or other transaction in violation of this Article, shall not be deemed a consent by Landlord to such transaction, nor a waiver of any right or remedy of Landlord hereunder.

### Article 15. Access; Changes in Building and Real Property

**Section 15.1  Access.** Landlord reserves the right to (a) place, maintain, repair and replace (and thereafter have access to) concealed ducts, pipes and conduits through the Premises (with no greater than a de minimus reduction or reconfiguration of the useable area of

the Premises), and (b) enter the Premises at reasonable times on reasonable prior notice, which may be oral (but prior notice shall not be required in an emergency), to inspect the Premises, to show the Premises to others (but Landlord agrees that it shall not show the Premises to prospective tenants prior to the last Lease Year of the Term) or to perform any work or make any improvement Landlord deems necessary or desirable to the Premises or the Building or for the purpose of complying with Laws. If Tenant is not present when Landlord desires to enter the Premises (and provided that, other than in the event of an emergency, Landlord shall have given Tenant reasonable advance notice of its intention to enter the Premises), Landlord or Landlord's contractors may enter the Premises (by force, in the event of an emergency) without liability to Tenant.

**Section 15.2 Changes.** Landlord reserves the right at any time and from time to time to (a) make changes or revisions in the Real Property, including but not limited to the Building areas, walkways, or other common space, (b) construct improvements in the Real Property, (c) construct additions to, or additional stories on, the Building (which right includes the right to make use of structural elements of the Premises, including without limitation columns and footings, for such construction, provided such use does not materially encroach on the interior of the Premises), and (d) change the name, number or designation by which the Real Property and/or Building is known.

**Section 15.3 Excavation.** If there is to be any excavation or construction adjacent to the Building, Tenant shall permit Landlord and/or any other person to enter the Premises to perform such work as Landlord or that person deems necessary to protect the Building, without any abatement of the Rent or liability to Tenant.

**Section 15.4 Scaffolds.** Landlord shall have the exclusive right to use all or any part of the roof and any other portions of the Building for any purpose, and to erect temporary scaffolds and other aids to construction on the exterior of the Premises in connection with alterations, repairs, improvements, and/or additions Landlord may make to the Building, provided that access to the Premises shall not be denied. Landlord may make any use it desires of the side exterior walls or rear walls of the Building. Landlord shall use commercially reasonable efforts to install double height scaffolding, sidewalk bridges and other aids to construction, if and to the extent lawfully permitted. Landlord, upon Tenant's request, at Landlord's expense, shall install temporary signage, solely identifying the business conducted at the Premises, on a portion of the scaffolding directly in front of the Premises, subject to obtaining Landlord's prior consent with respect to such temporary signage, which consent shall not be unreasonably withheld, delayed or conditioned. If, on the Opening Date, scaffolds or other aids to construction shall be installed so as to obstruct the visibility of the entire Premises, Fixed Rent shall abate from the Opening Date until the date that such scaffolds or other aids of construction are removed so as to no longer obstruct the visibility of the entire Premises, but in no event shall such abatement continue beyond ninety (90) days from the Opening Date. Upon the earlier to occur of (a) the date that such scaffolds or other aids of construction are removed so as to no longer obstruct the visibility of the entire Premises or (b) ninety (90) days from the Opening Date, Fixed Rent shall become due and payable in accordance with this lease. Except as expressly set forth in the immediately preceding sentence, Landlord shall have no liability to Tenant and Tenant shall not be relieved of any of its obligations under this lease if scaffolds or other aids of construction are erected in front of the Premises or in any other location at any time.

**Section 15.5 Minimize Interference**. Landlord shall use commercially reasonable efforts to exercise Landlord's rights under this Article in a manner which reasonably minimizes interference with the conduct of Tenant's business in the Premises and damage to the Premises, Tenant's Work and Tenant's Property (all of which shall promptly be repaired by Landlord, at its expense, subject to Section 11.4 hereof), but Landlord is not required to employ overtime labor or incur additional expenses.

## Article 16.Default

**Section 16.1 Default**. Each of the following (a "Default") is a material default by Tenant under this lease:

(a) Tenant fails to pay when due any Rent and the failure continues for seven (7) days following Landlord's notice. If, however, Landlord gives such a notice of failure to pay Rent three times in any twelve (12) month period, any additional failure to pay any Rent when due within that twelve (12) month period shall be considered a Default, without the requirement of any notice by Landlord.

(b) Tenant fails to comply with Article 14 or makes any misrepresentation under Section 23.2.

(c) Tenant fails to comply with any other term of this lease and the failure continues for twenty (20) days following Landlord's notice. If, however, compliance cannot, with diligence, reasonably be fully accomplished within that twenty (20) day period, Tenant shall have an additional period not to exceed forty-five (45) days to fully comply, provided Tenant notifies Landlord of its intention to comply and commences compliance within that twenty (20) day period, and thereafter pursues compliance to completion with diligence and provides Landlord with status updates on the progress at least every twenty (20) days. The preceding sentence shall not require Landlord to give additional notice to Tenant after the initial twenty (20) day notice.

(d) A third party institutes against Tenant or Guarantor, if any, any legal action seeking any relief from its debts under any applicable bankruptcy or insolvency Laws which is not dismissed within ninety (90) days, or Tenant or Guarantor, if any, institutes any legal action seeking such relief, and/or a receiver, trustee, custodian or other similar official is appointed for Tenant or Guarantor, if any, or for all or a substantial portion of its assets, or Tenant or Guarantor, if any, commits any other act indicating insolvency, such as making an assignment for the benefit of its creditors.

(e) Except as otherwise expressly permitted under this lease, Tenant ceases to use the Premises for the Permitted Use or abandons the Premises prior to the Expiration Date.

(f) Guarantor, if any, shall be in breach of its obligations under its guaranty of Tenant's obligations under this lease.

**Section 16.2 Conditional Limitation**. If a Default occurs, this lease is subject to the conditional limitation that Landlord may, at any time, give notice to Tenant that this lease shall terminate on the date specified in that notice, which date shall not be less than five (5) days after Landlord gives such notice to Tenant. If Landlord gives that notice, this lease and the Term

shall expire and come to an end on the date set forth in that notice as if said date were the date originally fixed in this lease as the Expiration Date and Tenant shall quit and surrender the Premises to Landlord (but Tenant shall remain liable as provided in this lease).

**Section 16.3 Application of Payments.** If Tenant is in arrears in the payment of Rent, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Landlord may apply any payments made by Tenant to such items as Landlord sees fit.

## Article 17. Remedies

**Section 17.1 Remedies.** If this lease is terminated pursuant to Article 16 and/or Landlord reenters or obtains possession of the Premises by summary proceedings or any other legal action or otherwise (which Landlord may do without further notice and without liability or obligation to Tenant or any occupant of the Premises), all of the provisions of this Section shall apply (in addition to any other applicable provisions of this lease).

(a) Tenant, and all other occupants, shall vacate and surrender to Landlord the Premises in accordance with this lease.

(b) Landlord, at Landlord's option, may (i) relet the Premises, or any portion of the Premises, from time to time, in the name of Landlord, Tenant or otherwise, as determined by Landlord, to any person and on any terms, but Landlord shall have no obligation to relet the Premises, or any portion of the Premises, or to collect any rent (and the failure to relet the Premises, or any portion of the Premises, or to collect any rent shall not impose any liability or obligation on Landlord or relieve Tenant of any obligation or liability under this lease), and (ii) make any changes to the Premises as Landlord, in Landlord's reasonable judgment, considers advisable or necessary in connection with a reletting, without imposing any liability or obligation on Landlord or relieving Tenant of any obligation or liability under this lease.

(c) Tenant shall pay Landlord all Rent payable to the date on which this lease is terminated or Landlord re-enters or obtains possession of the Premises which shall also include the unamortized portion (from the date of the Default to the original Expiration Date) of the amortized (on a straight-line basis from the Rent Commencement Date through the original Expiration Date): (i) brokerage commission attributable to this lease paid by Landlord, (ii) Fixed Rent that would have been payable from the Commencement Date to the Fixed Rent Commencement Date but for Landlord's concession, and (iii) credits or payments to Tenant for Tenant's Work, if any given by Landlord (clauses (i) through (iii), the "Default Additional Rent").

(d) Tenant shall also pay to Landlord, as damages, any deficiency between (i) the aggregate Rent (including the Default Additional Rent) for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the monthly Additional Rent for each year thereof to be $1/12^{th}$ of Additional Rent that was payable for the year immediately preceding the termination, re-entry or obtaining of possession) and (ii) the rents, if any, applicable to that period collected under any reletting of all or any portion of the Premises. Tenant shall pay any deficiency in monthly installments on the days specified in this lease for payment of installments of the Fixed Rent, and Landlord shall be entitled to recover from Tenant each monthly deficiency as the same arises. No suit to collect the deficiency for

any month shall prejudice Landlord's right to collect the deficiency for any subsequent month. Tenant shall not be entitled to any rents payable (whether or not collected) under any reletting, whether or not those rents exceed the Rent (including the Default Additional Rent). If Landlord relets the Premises, or any portion of the Premises, together with other space in the Building, the rents collected under the reletting and the expenses of the reletting shall be equitably apportioned for the purposes of this Article.

(e)     Landlord may recover from Tenant, and Tenant shall pay Landlord, on request, in lieu of any further deficiency pursuant to the preceding paragraph of this Section (as liquidated damages for such deficiency) the unpaid Rent (including Default Additional Rent) for the period which otherwise would have constituted the unexpired portion of the Term (conclusively presuming the Additional Rent for each year thereof to be the same as was payable for the year immediately preceding the termination, re-entry or obtaining of possession) less the then fair market rental value of the Premises for the unexpired portion of the Term, as reasonably determined by Landlord (such determination, if based on an appraisal prepared by an appraiser selected by Landlord who is a Member of the Appraisal Institute, shall be deemed conclusive), discounted to present value at an annual rate of interest equal to two (2%) percent.

(f)     Tenant shall also pay Landlord, as additional damages, any reasonable expenses incurred by Landlord in connection with the termination, reentry or obtaining of possession, and the reletting of the Premises, including all reasonable repossession costs, brokerage commissions, reasonable attorneys' fees and disbursements, alteration costs and other reasonable expenses of preparing the Premises for reletting.

(g)     Nothing contained in this lease shall be considered to limit or preclude the recovery by Landlord from Tenant of the maximum amount allowed to be obtained as damages or otherwise by any Laws; provided, however, that Landlord shall not have the right to recover from Tenant any such amounts to the extent such amounts are duplicative of and identical in all respects to other amounts previously recovered by Landlord.

(h)     The termination of this lease after Default, and the taking of possession and/or reletting of the Premises, or any part thereof, by Landlord, shall not relieve Tenant of its liabilities and obligations under this lease, all of which survive such termination, repossession and/or reletting.

(i)     Landlord's receipt of monies from Tenant after the termination of this lease (or after giving any notice of termination) shall not reinstate, continue or extend the Term nor operate as a waiver of Landlord's right to recover possession of the Premises.

**Section 17.2     Waiver; Re-Entry; Remedies Cumulative; No Preclusion.** Tenant hereby waives (a) the service of any notice of intention to re-enter or obtain possession of the Premises or to institute any legal action in connection therewith and (b) on its own behalf and on behalf of all persons claiming under Tenant, including all creditors, any rights Tenant and all such persons might otherwise have under any Laws to redeem the Premises, to re-enter or repossess the Premises, or to restore this lease, after (i) Tenant is dispossessed pursuant to any Laws or by any Authority, (ii) Landlord reenters or obtains possession of the Premises, or (iii) the Expiration Date. The words "re-enter," and "re-entry" as used in this lease shall not be considered to be restricted to their technical legal meanings. Landlord shall have the right to

enjoin any Default and the right to invoke any remedy allowed by any Laws in addition to any remedies provided in this lease. All remedies provided in this lease are cumulative and Landlord's right to invoke, or the invocation of, any remedy shall not preclude Landlord from invoking any other remedy under this lease or under any and all Laws; provided, however, that Landlord shall not have the right to recover from Tenant any such amounts to the extent such amounts are duplicative of and identical in all respects to other amounts previously recovered by Landlord.

**Section 17.3   Jury Trial.** Landlord and Tenant each hereby waive trial by jury in any legal action brought by either party against the other in connection with this lease. If Landlord commences any summary proceeding against Tenant, Tenant shall not interpose any counterclaim in that proceeding (unless the failure to impose the counterclaim would preclude Tenant from asserting in a separate legal action the claim which is the subject of the counterclaim), and shall not seek to consolidate the proceeding with any other legal action.

**Section 17.4   Landlord Right to Cure.** If Tenant fails to comply with any of its obligations under this lease within seven (7) days after notice (or without notice in an emergency), Landlord may, at its option, cure such breach of this lease. All of Landlord's actual and reasonable out-of-pocket costs and expenses, including reasonable attorneys' fees and disbursements, incurred by Landlord to cure such breach, shall be paid by Tenant to Landlord as Additional Rent when Tenant within thirty (30) days after Tenant is billed therefor.

**Section 17.5   Reimbursement.** Tenant shall reimburse Landlord within ten (10) days after demand for all costs and expenses  (including attorneys' fees and disbursements, whether paid to retained counsel or to employees of Landlord or an affiliate of Landlord) incurred by Landlord to enforce its rights under this lease and/or in connection with a default by Tenant, including instituting, prosecuting and/or defending any legal action by or against Tenant whether a non-payment or holdover proceeding, or other proceeding, if Landlord prevails in such legal action, together with interest thereon at the Default Rate (hereinafter defined) from the date incurred until reimbursement is made by Tenant. Landlord's right to reimbursement shall include, without limitation, reimbursement of Landlord's costs and expenses incurred to obtain such reimbursement. Landlord shall reimburse Tenant within ten (10) days after demand for all reasonable attorneys' fees and disbursements incurred by Tenant in the event that Tenant commences any legal action or proceeding against Landlord to enforce its rights under this lease and if Tenant prevails in such action or proceeding.

**Section 17.6   No Waiver.** The failure of Landlord to seek redress for a Default, or of Landlord or Tenant to insist upon the strict performance of any term of this lease, shall not prevent Landlord from redressing a subsequent Default or Landlord or Tenant from thereafter insisting on strict performance. The receipt by Landlord of the Rent with knowledge of a Default or Tenant's failure to strictly perform under this lease shall not be deemed a waiver of the Default or failure. No term of this lease shall be considered waived by Landlord or Tenant unless the waiver is in a writing signed by the waiving party. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent shall be considered other than on account of the next installment of the Rent, or as Landlord may elect to apply same. No endorsement or statement on any check or letter accompanying any check or payment shall prevent Landlord from cashing the check or otherwise accepting the payment, without prejudice to Landlord's right to recover the balance of the Rent or pursue any other remedy.

Section 17.7 **Late Fees**. If Tenant fails to pay any installment of the Fixed Rent or any Additional Rent within ten (10) days after the due date thereof, in addition to any other right or remedy of Landlord, Tenant shall pay to Landlord when Tenant is billed therefor (a) a late charge equal to the greater of one hundred ($100.00) dollars and five (5%) percent of the amount unpaid and (b) interest at the rate (the "Default Rate") of twelve (12%) percent per annum on the amount unpaid, from the date the payment was first due to and including the date paid and, (c) and a charge of $200.00 for the return of any Tenant's check.

Section 17.8 **New York Law**. All legal actions relating to this lease shall be adjudicated in the courts of the State of New York having jurisdiction in the county in which the Building is located. Tenant irrevocably consents to the personal and subject matter jurisdiction of those courts in any legal action relating to this lease or any guaranty of Tenant's obligations under this lease, and Tenant shall not assert, by way of motion, as a defense or otherwise, any objection to any such court being the venue of such legal action or claim that such venue is an inconvenient forum for Tenant or any principal of Tenant.

### Article 18. Security

Section 18.1 **Cash**. Tenant has deposited with Landlord, as security for Tenant's compliance with this lease, the Security, in cash. If Tenant defaults in performing any of its obligations under this lease, Landlord may use all or any portion of the Security to cure such breach or for the payment of any other amount due and payable from Tenant to Landlord in accordance with this lease. If Tenant shall, during any twelve (12) month period, four (4) times be in breach of its obligation to pay Rent on the first of the month, Tenant shall, within twenty (20) days after Landlord's request, remit to Landlord an amount equal to two (2) months of the amount of the monthly installment of Fixed Rent in the last year of the Term, which sum shall be added to and become part of the Security under this lease. If Landlord uses all or any part of the Security, Tenant shall, within fifteen (15) days following Landlord's notice, deposit with Landlord an amount sufficient to restore the full amount of the Security. Landlord shall not, unless required by any Laws, pay interest to Tenant on the Security, and if Landlord is required to maintain the Security in an interest bearing account or pay any interest to Tenant, Landlord shall retain the maximum amount of interest permitted under any Laws (which Landlord may withdraw and retain annually or at any other times). Tenant shall not assign (other than to a permitted assignee of this lease) or encumber the Security, and no prohibited assignment or encumbrance by Tenant of the Security shall bind Landlord. Landlord shall not be required to exhaust its remedies against Tenant or the Security before having recourse to Tenant, any Guarantor, the Security or any other security held by Landlord, or before exercising any right or remedy, and recourse by Landlord to any one of them, or the exercise of any right or remedy, shall not affect Landlord's right to pursue any other right or remedy or Landlord's right to proceed against the others. If there is then no uncured breach, the Security and any accrued and unpaid interest thereon, or any balance, shall be paid or delivered to Tenant promptly after the Expiration Date and Tenant's vacating of the Premises in accordance with this lease. If Landlord's interest in the Premises is sold or leased, Landlord shall transfer the Security and any accrued and unpaid interest thereon, or any balance, to the new Landlord and, upon such transfer, the transferor shall thereupon be automatically released by Tenant from all liability for the return of the Security or any interest (and Tenant agrees to look solely to the assignee for the return of the Security or any interest). Provided that no Default shall have occurred during the first thirty-six (36) months after the Fixed Rent Commencement Date, the amount of Security shall be

reduced to $324,999.00 (plus the amount by which the Security was previously increased pursuant to the terms of this lease, if any), in which event Landlord shall return $216,667.67 to Tenant or credit such amount against Tenant's future Rent within thirty (30) days thereafter.

**Letter of Credit after Cash.** Notwithstanding any other provision of this lease to the contrary, Tenant may, at any time except if a Default has occurred, substitute for the cash Security an irrevocable, unconditional, "clean", "evergreen" (i.e. automatic renewal) letter of credit in form and substance acceptable to Landlord, issued by a federally insured bank with a Standard & Poor's credit rating of at least AA, whose office for the presentation of a letter of credit to be drawn upon is in the Borough of Manhattan in New York City and is acceptable to Landlord. Tenant shall keep any such letter of credit, including without limitation, such amendments or replacements as are necessary to increase the amount of the letter of credit as the amount of the required Security increases and after Landlord has drawn on the letter of credit, in full force and effect for not less than ninety (90) days after the Expiration Date of the Term. Any such amendments or replacements shall be delivered to Landlord within fifteen (15) days after Landlord's notice to Tenant. Landlord may draw upon the letter of credit in whole or in part, and apply the proceeds for the same reasons, and in the same manner, as the cash Security. In addition, Landlord may draw upon the letter of credit if (a) Tenant has not supplied an amendment or replacement at least ninety (90) days prior to (i) the expiry date, if any, or (ii) the date on which the amount of the letter of credit is required to be increased; (b) Landlord asks the letter of credit issuer to confirm the current expiry date and the issuer does not do so within ten (10) days after Landlord's request; (c) Tenant fails to pay any bank charges with respect to any Landlord transfer of the letter of credit; (d) the issuer ceases, or announces that it will cease, to maintain an office in New York City where Landlord may present draw requests; or (e) the letter of credit issuer has a credit rating by Standard & Poor's of less than AA and, within thirty (30) days following Landlord's notification to Tenant that the letter of credit issuer's Standard & Poor's credit rating is less than AA, Tenant has not provided Landlord with a replacement letter of credit from an issuer with a Standard & Poor's credit rating of at least AA. Tenant shall not seek to enjoin, prevent or otherwise interfere with Landlord's draw against the letter of credit. Tenant acknowledges that the only effect of an erroneous draw would be to substitute cash Security for the letter of credit, which would not cause Tenant any legally recognizable damage. The letter of credit shall provide that the letter of credit is freely transferable by Landlord and its successors and assigns as its beneficiary without payment by Landlord (or any subsequent transferee) of any fee or other consideration for such transfer. If Landlord transfers its interest in the Premises, after such transfer the transferor shall be relieved of any responsibility to return the letter of credit to Tenant and Tenant shall, at Tenant's expense, within ten (10) days after receipt of Landlord's request, deliver to Landlord or its transferee, an amendment to the letter of credit naming Landlord's transferee as substitute beneficiary of the letter of credit. If Tenant shall, during any twelve (12) month period, on four (4) occasions, be in breach of its obligation to pay Rent on the first of the month, Tenant shall within twenty (20) days after Landlord's request, deliver to Landlord an endorsement to, or a replacement of, the letter of credit to increase its amount by a sum equal to two (2) months of the amount of the monthly installment of Fixed Rent in the last year of the Term. Provided that no Default shall have occurred during the first thirty-six (36) months after the Fixed Rent Commencement Date, the amount of Security shall be reduced to $324,999.00 (plus the amount by which the Security was previously increased pursuant to the terms of this lease, if any). If the amount of the Security is subject to reduction pursuant to the preceding sentence, Tenant shall deliver to Landlord an amendment to the Letter of Credit (which amendment must be reasonably acceptable to Landlord in all respects), reducing

the amount of the Letter of Credit by the amount of the permitted reduction, and Landlord shall execute the amendment and such other documents as are reasonably necessary to reduce the amount of the Letter of Credit in accordance with the terms hereof.

### Article 19. Broker

**Section 19.1 Broker**. Landlord and Tenant each represents that it has dealt with no broker in connection with this lease other than the Broker. Tenant shall indemnify, defend and hold harmless Landlord from and against any claims for any brokerage commissions or other compensation which are made by any broker (other than the Broker) alleging to have dealt with Tenant or anyone acting or purporting to act on behalf of Tenant in connection with this lease, and all actual and reasonable out-of-pocket costs, expenses, liabilities and damages in connection therewith, including reasonable attorneys' fees and expenses. Landlord shall indemnify, defend and hold harmless Tenant from and against any claims for any brokerage commissions or other compensation which are made by any broker alleging to have dealt with Landlord in connection with this lease, and all actual and reasonable out-of-pocket costs, expenses, liabilities and damages in connection therewith, including reasonable attorneys' fees and expenses. If this lease is signed and delivered by the parties and the term of this lease commences, Landlord shall pay any commission due the Broker pursuant to a separate agreement between Landlord and the Broker. Landlord shall pay any commission due to Winick Realty ("Winick") pursuant to a separate agreement between Landlord and Winick and Winick shall pay a portion of such commission to Savills Studley, pursuant to a separate agreement between them.

### Article 20. Notices; Consents and Approvals

**Section 20.1 Notices**. Except as may be provided in this lease, all notices and other communications under this lease must be in writing and sent by nationally recognized overnight courier service (for next business day delivery), or registered or certified mail (return receipt requested), addressed to Landlord or Tenant at its Notice Address. Either party may, by notice given in accordance with this Article, designate a different Notice Address, which address change shall become effective upon receipt, the date rejected or the date of attempted delivery (if the receiving party is not present).

**Section 20.2 Effectiveness**. Any notice or other communication sent as provided in this Article shall be effective (a) on the date received, the date rejected, or the date of attempted delivery (if the receiving party is not present) if sent by overnight courier service, or (b) three (3) business days after mailing by registered or certified mail.

**Section 20.3 Consent in Writing**. If any provision of this lease requires Landlord's consent or approval, such consent or approval shall be effective only if given in writing.

**Section 20.4 Notice Given by Landlord**. Any notice or other communication given by Landlord to Tenant in accordance with this Article may be signed and given by Landlord's managing agent or its lawyers, if any, with the same force and effect as if signed and given by Landlord. Any notice or other communication given by Tenant to Landlord in accordance with this Article may be signed and given by Tenant's lawyers, if any, with the same force and effect as if signed and given by Tenant.

**Section 20.5 Multiple Entities Comprising Tenant**. If more than one individual or entity comprises Tenant under this lease, each such individual or entity is deemed to have designated the entity shown in the Notice Address as the individual or entity who is the agent of the other(s) to receive notice from Landlord and to give notice to Landlord. Landlord shall be deemed to have sent any and all notices to all the individuals or entities comprising Tenant if it sends such notice(s) only to the individual or entity listed in the Notice Address. Any notice received by Landlord from such individual or entity, whether or not signed by any of the other individuals or entities comprising Tenant, may be relied upon by Landlord and shall be binding on all the individuals or entities comprising Tenant.

## Article 21. No Representations; Liability; Tenant Indemnity

**Section 21.1 No Representations**. Neither Landlord nor Landlord's managing agent, if any, has made any warranties, representations, statements or promises with respect to the Premises, the Real Property, the Building systems, any Additional Rent, any Laws or any other matter, unless expressly set forth in this lease. This lease contains the entire agreement between Landlord and Tenant with respect to the subject matter of this lease, and any previous agreements between Landlord and Tenant are merged in this lease, which alone expresses their agreement. Tenant is entering into this lease after full investigation, and is not relying on any warranties, representations, statements or promises made by Landlord or any other person not expressly set forth in this lease, and is not acquiring any rights of any nature, by implication or otherwise, except as expressly set forth in this lease.

**Section 21.2 Employees**. Any employee of Landlord, Landlord's managing agent, if any, or the Real Property to whom any property is entrusted by or on behalf of Tenant shall be deemed to be acting as Tenant's agent with respect to that property and neither Landlord nor Landlord's managing agent, if any, shall be liable for any damages to or loss of property of Tenant or others entrusted to employees, agents or contractors of Landlord, Landlord's managing agent, if any, or the Real Property.

**Section 21.3 No Liability**. Neither Landlord nor Landlord's managing agent, if any, shall be liable for any injury, damage or loss to Tenant, Tenant's Property, Tenant's Work, Tenant's business or to any other person or property resulting from any cause, except to the extent caused by the negligence or willful misconduct of Landlord, Landlord's managing agent, if any, or their respective employees, agents or contractors, subject to Section 11.4.

**Section 21.4 Building/Superior Lease Transfer**. In the event of a transfer of the Building or Landlord's interest in any Superior Lease or lease of the entire Building (a) the transferor or lessor shall be and hereby is relieved of all obligations and liabilities of Landlord under this lease whether accruing prior to or after the effective date of the transfer or lease, and (b) the transferee or lessee shall be deemed to have assumed all of Landlord's obligations and liabilities under this lease effective from and after the effective date of the transfer or lease.

**Section 21.5 No Personal Liability; No Consequential Damages**. In no event shall Landlord, its affiliates, agents, partners, members, managers, shareholders, officers, directors and principals, disclosed or undisclosed, be liable for incidental or consequential damages or have any personal liability under or in connection with this lease. Tenant shall look only to Landlord's interest in the Real Property for the satisfaction of Tenant's remedies or to

41

collect any judgment requiring the payment of money by Landlord under or in connection with this lease, and no other assets of Landlord or such persons shall be subject to lien, levy, execution or other enforcement procedure for the satisfaction of Tenant's remedies or the collection of any judgment under or in connection with this lease. If Tenant acquires a lien on such other property or assets by judgment or otherwise, Tenant shall promptly release that lien by signing, acknowledging and delivering to Landlord any instrument, prepared by Landlord, required for the lien to be released.

    **Section 21.6 Specific Performance or Injunction.** If Tenant requests Landlord's consent or approval and Landlord delays, fails or refuses to give such consent or approval, Tenant shall not be entitled to any damages for any withholding by Landlord of its consent or approval, it being intended that Tenant's sole remedy shall be an action for specific performance or injunction or expedited arbitration, and that such remedy shall be available only in those cases where Landlord has expressly agreed in writing not to unreasonably withhold its consent. Any arbitration proceeding under this Section shall be brought before the American Arbitration Association in Manhattan, using the most expedited arbitration process then offered thereby. The arbitrator shall have no right to award damages and shall only be authorized to determine whether Landlord shall have been unreasonable. The prevailing party in any such proceeding shall pay the cost of the arbitrator.

    **Section 21.7 Obligations Separate.** This lease and the obligations of Tenant to pay the Rent and perform Tenant's other obligations under this lease are separate, distinct and independent of Landlord's obligations under this lease.

    **Section 21.8 Landlord's Force Majeure.** Tenant's obligations shall not be waived, delayed or otherwise affected in any manner, and Landlord shall have no liability, if Landlord is unable to comply with, or is delayed in complying with, any of Landlord's obligations under this lease by reason of any strike, labor trouble, accident, war, government action, Laws or other cause beyond Landlord's control.

    **Section 21.9 Indemnification.** Tenant shall not perform or permit to be performed any act which may subject Landlord, its managing agent, its Superior Landlord, if any, its Mortgagee, if any, and their respective affiliates, members, shareholders, partners, principals, directors, managers, officers, employees, and agents to any liability. Tenant shall, to the extent not caused by the negligence or willful misconduct of Landlord or its contractors or agents, indemnify, defend and hold harmless Landlord and Landlord's managing agent, if any, from and against all (a) claims arising from any act or omission of Tenant, its subtenants, contractors, agents, employees, invitees or visitors, (b) claims arising from any accident, injury or damage to any person or property in the Premises or any adjacent walkway during the Term or when Tenant is in possession of the Premises, and (c) Tenant's failure to comply with Tenant's obligations under this lease (whether or not a Default) including any legal, equitable, judicial, administrative or arbitration proceeding concerning Tenant in which Landlord is directly or indirectly a party or a party in interest, and all liabilities, damages, losses, fines, reasonable costs and expenses (including reasonable attorneys' fees and disbursements) incurred in connection with any such claim or failure. Landlord and/or Landlord's managing agent shall each be entitled to approve counsel to be retained by Tenant or its insurance carrier to defend Landlord and its managing agent, or, if Landlord and/or its managing agent so choose, to retain its/their own attorneys, whose reasonable fees and disbursements shall, at Landlord's option, be paid by

Tenant directly to the attorneys retained directly by Landlord and/or its managing agent, or reimbursed to Landlord as Additional Rent.

## Article 22. End of Term

**Section 22.1 Premises Condition**. On the Expiration Date (a) Tenant (and all other occupants) shall vacate and surrender the Premises, leaving the Premises vacant, broom clean and in good order and condition, except for ordinary wear and tear and damage for which Tenant is not responsible under this lease, and otherwise as may be required by this lease, and (b) Tenant shall remove all of Tenant's Property and any Tenant's Work required to be removed pursuant to this lease including, without limitation, Article 5. If the last day of the Term is not a business day, this lease shall expire on the immediately preceding business day. Tenant waives, for itself and for any person claiming under Tenant, any right which Tenant or any such person may have under Section 2201 of the New York Civil Practice Law and Rules or under any similar Laws.

**Section 22.2 Hold-Over**. If the Premises are not vacated and surrendered in accordance with this lease (whether by Tenant or any occupant related to Tenant), on the date required by this lease, Tenant shall indemnify and hold harmless Landlord against all losses, costs, liabilities, claims, damages and expenses incurred by Landlord in connection therewith, including reasonable attorneys' fees and disbursements whether in an action by or against Tenant or a third party, and including claims and liabilities of Landlord made by any succeeding tenant(s) or other third party. In addition, Tenant shall be liable to Landlord for per diem use and occupancy in respect of the Premises at a rate equal to three times the Rent payable under this lease for the last year of the Term (which Landlord and Tenant agree is the Rent that is contemplated by them as being fair and reasonable under such circumstances and is not a penalty). In no event, however, shall this Section be construed as permitting Tenant (and all other occupants) to remain in possession of the Premises after the Expiration Date.

**Section 22.3 Intentionally Omitted**

**Section 22.4 After Expiration Date**. Unless otherwise specifically provided: (a) any obligation of Landlord or Tenant under this lease which by its nature or under the circumstances can only be, or by the terms of this lease may be, performed after the Expiration Date; (b) any liability for a payment with respect to any period ending on or before the Expiration Date; and (c) all indemnity and hold harmless provisions in this lease, shall survive the Expiration Date.

## Article 23. Miscellaneous

**Section 23.1 Guaranty.** If a Guarantor of this lease is identified in Article 1 of this lease, the following shall apply: At the time this lease is executed and delivered, Tenant shall deliver to Landlord, concurrently with this lease, a guaranty executed by the Guarantor, and properly acknowledged, in the form annexed hereto as Exhibit F. Tenant represents and acknowledges that Guarantor is the sole owner of all of the ownership interests of Tenant.

**Section 23.2 Patriot Act.** Tenant certifies and represents, both on the date of execution and delivery of this lease and during the entire Term, that neither Tenant nor any subtenant of Tenant nor any person or entity that owns any direct or indirect beneficial interest in

Tenant or such subtenant is, or is acting directly or indirectly for or on behalf of, any group, entity, or nation, named by any Executive Order of the President of the United States or the United States Treasury Department as a terrorist or other "Specially Designated National and Blocked Person," or other person, entity, nation or transaction banned or blocked pursuant to any law, order, rule or regulation that is enforced or administered by the United States Office of Foreign Assets Control or any successor entity, agency or department (an "SDN"). If Tenant is a privately owned entity, the persons listed on Exhibit G annexed hereto constitute all of the officers, directors, general partners, and persons and/or entities owning one hundred percent (100%) of the shares, membership interests, or partnership interests (as the case may be) of Tenant (collectively, the "Principals") as of the date of execution and delivery of this lease. If Tenant is comprised of more than one person or entity, the foregoing certification is made as to each person and entity comprising Tenant. Any renewal right contained in this lease is void and of no force or effect if Tenant, or any of the persons and/or entities comprising Tenant (if Tenant is comprised of more than one person or entity), or any of the Principals of Tenant, are listed as an SDN at the date of renewal. If Tenant is a privately owned entity, Tenant shall, whenever the identity of any of the Principals is changed, furnish Landlord with a current list of Principals.

Section 23.3  **Financial Statements.**  Within thirty (30) days after Landlord's request (which request may be made no more than once during any calendar year), Tenant shall deliver to Landlord Tenant's and each Guarantor's financial statements, in form and scope reasonably satisfactory to Landlord, for Tenant's and each Guarantor's most recent fiscal year (or the preceding fiscal year, if the most recent fiscal year ended only within the last 90 days before Landlord's request). The financial statements Tenant delivers to Landlord shall be audited only if such financial statements are audited for any other purpose, and if not audited, shall be certified as true and complete by Tenant's chief operating officer or chief financial officer. Tenant shall promptly notify Landlord of any material event or occurrence that relates to Tenant's or any Guarantor's creditworthiness.

Section 23.4  **General.** (a) Subject to the provisions of this lease, this lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns. No one is intended to be a third party beneficiary to this lease.

(b)  This lease may not be changed or terminated, in whole or in part, except in a writing signed by Landlord and Tenant.

(c)  Notwithstanding any provision of this lease, or any Laws, to the contrary, or the execution of this lease by Tenant, this lease shall not bind or benefit Landlord or Tenant, unless and until this lease is signed and delivered by both Landlord and Tenant.

(d)  No act or omission of Landlord or Tenant, or their respective employees, agents or contractors, including the delivery or acceptance of keys, shall be deemed an acceptance of a surrender of the Premises, and no agreement to accept such surrender shall be valid unless it is in a writing signed by Landlord.

(e)  The captions in this lease are for reference only and do not define the scope of this lease or the intent of any term. All Article and Section references in this lease

shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this lease.

(f)     If any provision of this lease, or the application thereof to any person or circumstance, is invalid or unenforceable, then in each such event the remainder of this lease or the application of such provision to any other person or any other circumstance (other than those as to which it is invalid or unenforceable) shall not be affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by all applicable Laws.

(g)     There shall be no presumption against Landlord because Landlord drafted this lease or for any other reason.

(h)     If there is then no Default, Tenant may peaceably and quietly enjoy the Premises without hindrance by Landlord or any person lawfully claiming under Landlord, subject however, to the terms of this lease and to any matters affecting title to the Real Property or any portion thereof.

(i)     Tenant hereby waives any rights Tenant may have in connection with any zoning lot merger, zoning application, or subdivision or transfer of development rights with respect to the Real Property or any part thereof, including any rights Tenant may have to be a party to or to execute or contest any instrument providing for such merger, subdivision or transfer.

(j)     If Tenant is comprised of two or more persons, the liability of those persons under this lease shall be joint and several. Wherever appropriate in this lease, personal pronouns shall be considered to include the other gender and the singular to include the plural.

(k)     Tenant shall not record this lease or any memorandum of this lease.

(l)     Tenant's obligations under this lease shall survive the termination or expiration of this lease. In the event of a permitted sublease, any act or omission by the subtenant that would, if taken or omitted to be taken by Tenant, constitute a default by Tenant under this lease, shall be deemed a default by Tenant.

(m)     This lease shall be governed by, and construed in accordance with, the Laws of the State of New York, without regard for principles of conflicts of Laws.

(n)     Landlord and Tenant represent to each other that it is a duly formed and validly existing entity that is qualified to do business in the State of New York, that it has the right and authority to execute, deliver and fulfill its obligations under this lease, and that the person(s) executing this lease on its behalf is authorized to do so.

### Article 24.Right of First Offer

**Section 24.1.** The parties acknowledge that the retail space located on the first floor of the Building that is contiguous to the Premises (the "Contiguous Space") is presently vacant and

that Landlord intends to enter into a lease for the Contiguous Space (the "First Contiguous Space Lease"). Tenant shall have a right of first offer to lease the Contiguous Space if Landlord, in its sole discretion, wishes to lease the Contiguous Space after expiration or termination of the First Contiguous Space Lease, subject to the following terms and conditions:

(A) If Landlord is prepared to offer the Contiguous Space for lease after expiration or termination of the First Contiguous Space Lease, it shall deliver to Tenant a notice setting forth the rent, term, escalations and other terms that Landlord, in its sole discretion, deems material with respect to such proposed lease (the "Contiguous Space Availability Notice").

(B) In order to exercise its rights under this Section, Tenant must give Landlord notice of its election to accept the offer (the "Contiguous Space Acceptance Notice") within ten (10) days after receiving the Contiguous Space Availability Notice.

(C) If Tenant sends the Contiguous Space Acceptance Notice to Landlord within the time period set forth in subsection (B) above, then Landlord and Tenant shall enter into a lease for the Contiguous Space substantially in the form of this Lease, except for changes that reflect the rent, term, escalations and other terms and conditions set forth in the Contiguous Space Availability Notice. If Landlord and Tenant, for any reason whatsoever, shall have not executed and delivered to each other such new lease within twenty (20) days after Landlord's receipt of the Contiguous Space Acceptance Notice, Landlord may proceed with any lease for the Contiguous Space with any other person or entity on such terms and conditions as Landlord, in its sole discretion, may determine, and Tenant shall have no right or claim with respect thereto or to such Space.

(D). The right of first offer set forth in this Section is granted only to the initially named Tenant hereunder and shall not be applicable to or exercisable by any assignee of Tenant. In addition, if Tenant shall have sublet all or any portion of the Premises at the time that Landlord would otherwise be required to send the Contiguous Space Availability Notice to Tenant, Landlord shall not be required to send such Notice and Tenant shall have no rights under this Section.

(E) If Tenant fails to send the Contiguous Space Acceptance Notice to Landlord within the time period set forth in subsection (B) above, or if at the time Tenant sends such Notice or at the time Tenant's lease of the Contiguous Space becomes effective a Default under this Lease is then occurring, then Tenant's rights under this Section shall be automatically terminated and of no further force or effect, and Landlord shall have the right to lease the Contiguous Space to any person or entity and upon such terms and conditions as Landlord may determine, in its sole discretion.

(F) Tenant shall indemnify and hold harmless Landlord from any liabilities, damages (including, without limitation, any consequential or other damages arising from the loss of any prospective lease transaction), claims or expenses (including, without limitation, reasonable attorneys' fees) arising in the event that Tenant asserts any rights to lease any space under this Section and it is determined, by a court of competent jurisdiction, that Tenant was not entitled to lease such space under this Section.

(G) Time shall be of the essence with respect to each of the deadlines set forth in this Section.

**In Witness Whereof,** Landlord and Tenant have executed this lease on the date of this lease.

Landlord

**387 PARK SOUTH L.L.C.**

By: _____
    Name: Kristin E. Scoffer
    Title: Senior Vice President

Tenant

**ARTISANAL 2015, LLC, D/B/A ARTISANAL FROMAGERIE & BISTRO**

By: _____
    Name:
    Title:

Tenant Acknowledgment

STATE OF NEW YORK      )
                       :      ss.:
COUNTY OF NEW YORK     )

On _Oct 26_ , 2015 before me, the undersigned, personally appeared _Savid Drom_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity (ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

CHRISTINE BERTI
NOTARY PUBLIC, STATE OF NEW YORK
REGISTRATION # 01BE6137973
QUALIFIED IN NASSAU COUNTY
MY COMMISSION EXPIRES DEC. 5, 20 17

48

# Exhibit A

## Fixed Rent

| LEASE YEAR | ANNUAL RENT | MONTHLY RENT |
|---|---|---|
| 1st Year | $1,300,000.00 | $108,333.33 |
| 2nd Year | $1,339,000.00 | $111,583.33 |
| 3rd Year | $1,379,170.00 | $114,930.83 |
| 4th Year | $1,420,545.10 | $118,378.76 |
| 5th Year | $1,463,161.45 | $121,930.12 |
| 6th Year | $1,507,056.30 | $125,588.02 |
| 7th Year | $1,567,338.55 | $130,611.55 |
| 8th Year | $1,614,358.70 | $134,529.89 |
| 9th Year | $1,662,789.47 | $138,565.79 |
| 10th Year | $1,712,673.15 | $142,722.76 |
| 11th Year | $1,764,053.34 | $147,004.45 |
| 12th Year | $1,852,256.01 | $154,354.67 |
| 13th Year | $1,907,823.69 | $158,985.31 |
| 14th Year | $1,965,058.40 | $163,754.87 |
| 15th Year through the Expiration Date | $2,024,010.15 | $168,667.51 |

## Exhibit B

## Landlord's Work

Delivery of Premises in broom clean condition,
Install new floor to ceiling glass storefronts, and
furnish an ACP-5 to Tenant.

**Exhibit B**
**WORK LETTER**

**Electrical**

Within ten (10) business days after the date of this lease, Tenant will supply an Electric Load Letter for approval to Con Edison (with a copy to Landlord). After receipt of Con Ed's Service Layout, Landlord will install a meter pan and disconnect switch in the Building's main switchboard room on the first floor level. Appropriately sized wire shall be installed in conduit from the switchboard room to the Premises by Landlord. The wire shall be left coiled in a pull box within the Premises at a location determined by Landlord. Tenant shall be responsible for its own circuit panels, distribution panels and other equipment, devices, wiring, conduit and facilities.

Tenant shall apply directly to Con Ed and make arrangements for installation of the required electric meter. Electric service requested shall be as follows: One (1) 120/208 volt / 3 phase / 1000 amps service.

**Plumbing – Sanitary**
Tenant shall core drill floor slab and make connections at capped tees at the cellar level for sanitary waste. All work must be coordinated with building management and connections existing systems shall be done at times that minimize disruption to the existing tenants, subject to Landlord's prior approval.

Landlord shall provide one separate capped outlet at the Premises for vent lines only. All branch piping to individual fixtures or drains will be performed by Tenant.

**Plumbing – Domestic**
One (1) **2"** cold water connection at a location determined by Landlord.
Submeter to be installed by Landlord.

**HVAC**
Tenant will provide multi-split type air cooled heat pumps for heating and cooling on 2nd floor setback in an area determined by Landlord.

**Gas**
Within ten (10) business days after the date of this lease, Tenant will supply a Gas Load Letter to Landlord for filing with Con Edison to obtain required gas service. Within ten (10) business days after Con Edison's written approval of Load Letter, Tenants engineer will provide a drawing showing required gas service.

Tenant's drawings shall include piping from the gas meter room to the Premises and shall be filed with the Department of Buildings with the balance of Tenants plumbing drawings.

Tenants plumbing contractor shall pressure test and obtain "Blue Card" from DOB for ll gas piping from gas meter room to and including all the piping for the Premises. Upon DOB issuance of the 'Blue Card" / gas authorization, Tenant shall make arrangements with Con Ed to have gas meter installed in a location approved by Landlord.

**Fire Protection**

Landlord shall provide at least one (1) _3_" sprinkler main and shut off valve to the Premises at a location determined by Landlord.

## Fire Alarm
Fire alarm system within the Premises to be designed, furnished, and installed by Tenant. Tenant's system must be separately monitored by Tenant and tied to the Building's central fire alarm system in a manner approved by Landlord. Tenant's system equipment and devices shall be compatible with the Building's system. Tenant's system must annunciate fire, smoke, water flow, and trouble to the Building's system. All installation costs for integration with the Building's system are the responsibility of Tenant. Tenant must contract with Landlord's Fire Alarm Subcontractor for system tie-in. Tenant shall run all wire necessary to connect Tenant's system to the Building's central system.

Landlord shall provide (one) _1"_ conduit from the Premises to the Building's fire alarm panel.
Landlord shall provide (one) _1"_ conduit from the Premises to Building's electric room.

## Telecommunication Service
Landlord shall provide one _1 ½"_ empty conduit from the Building's main telephone room to the Premises. Tenant shall be responsible for all wire, final connections and all other costs and installations.

## Demising Wall
Landlord to install 2 -hour fire rated demising wall at location noted in Exhibit C of this lease.

# Exhibit C
## Premises

(not drawn to scale)





*boddewyn gaynor*
ARCHITECTS, llc.

120 broadway new york new york 10271

LEASING PLAN - CELLAR
387 Park Avenue
New York, N.Y.

08.25.15    L-1

**Exhibit C-1**
**The Outdoor Seating Area**

## Exhibit C-1
## The Outdoor Seating Area



DIAGRAM SCHEME A
GROUND LEVEL

This Exhibit is annexed solely for purposes of depicting the Outdoor Seating Area and shall otherwise be of no force or effect. In no event shall Landlord be deemed to have approved anything set forth on this Exhibit other than the Outdoor Seating Area.

<u>**Exhibit D**</u>

**COMMENCEMENT DATE AGREEMENT**

THIS COMMENCEMENT DATE AGREEMENT made as of the _____ day of _____, 2015, between **387 PARK SOUTH L.L.C.** ("<u>Landlord</u>") and **ARTISANAL 2015, LLC, D/B/A ARTISANAL FROMAGERIE & BISTRO** ("<u>Tenant</u>").

RECITALS

A. Landlord and Tenant are landlord and tenant under that certain lease dated as of _____ ___, 2015, (the "<u>Lease</u>") pursuant to which Landlord has leased certain premises more particularly described therein to Tenant (the "<u>Premises</u>"). (Capitalized terms not described herein are described in the Lease.)

B. The Commencement Date has occurred, the Fixed Rent Commencement Date and the Expiration Date are now known and Landlord and Tenant wish to confirm the dates.

NOW, THEREFORE, Landlord and Tenant hereby agree as follows:

1. The Commencement Date is _____.

2. The Fixed Rent Commencement Date is _____.

3. The Expiration Date is _____.

4. This Commencement Date Agreement is the document that Landlord and Tenant intended to execute pursuant to the Lease.

5. Landlord and Tenant hereby ratify and confirm the terms and provisions of the Lease.

IN WITNESS WHEREOF, Landlord and Tenant have executed this instrument as of the date above written.

**387 PARK SOUTH L.L.C.**, Landlord

By: _____
          _____, Authorized Signatory


**ARTISANAL 2015, LLC, D/B/A ARTISANAL FROMAGERIE & BISTRO**
Tenant


By:_____
          _____, Authorized Signatory

## Exhibit E
## Rules

The following are the Rules adopted by Landlord, as of the date of the lease to which these Rules are attached, with respect to the Building and neighboring buildings. A violation of any of the following Rules shall be deemed a material breach of the lease.

1. Tenant shall not engage in any conduct which will unreasonably interfere with the business, use and occupancy of any other tenant at the Building or neighboring buildings and shall in no event take any action that is designed to prevent any such other tenant from obtaining any permits or licenses.

2. Tenant shall not make or permit to be made any unseemly or disturbing noises or disturb or interfere with the occupants of the Building or neighboring buildings or premises or those having business with them, whether by the use of any musical instrument, radio, television, bullhorn or other amplifying device, noise, or in any other way which can be heard from outside of the interior of the Premises.

3. Tenant shall only perform construction work on Monday through Friday, between 8:30 a.m. to 5:00 p.m. (except that Cosmetic Alterations that do not in result in noise emanating outside of the Premises shall be permitted until midnight on those days), and shall coordinate all such work with both the Building managing agent and on-site Building personnel.

4. Tenant shall not store any materials or objects outside of the Premises. Tenant shall dispose of trash through its own carter and shall not mix Tenant's trash to trash collected by the Building personnel or by any other tenant.

5. Tenant shall not drill holes into the exterior walls or roof of the Building, nor will Tenant attach wires or other devices to the exterior walls or roof without the prior written consent of the Landlord.

6. Tenant shall not use any portion of the Building intended for use by the residential tenants of the Building, including without limitation, any amenities such as the building lobbies, passenger elevators, building staff restrooms, office tenant bicycle room and any meeting rooms.

7. Tenant shall not use the bathrooms or other Building systems or any plumbing fixtures for any purpose or in any manner other than for the purposes and in the manner they were intended to be used, and no rubbish, rags, paper towels or other inappropriate materials shall be thrown therein. Tenant shall keep the interior heat in the Premises at such a level that pipes will not freeze in the winter months. Any and all damage resulting from any failure to comply with the foregoing requirements shall be borne by the tenant who, or whose agents, employees, contractors, visitors, or licensees have, caused such damage.

8. Tenant shall not bring into, or permit in, the Premises any animals (except service animals for the disabled).

9. Tenant shall not obstruct, or permit its employees, contractors, or invitees to obstruct, any walkway or sidewalk adjacent to the Premises or to the Building's loading docks, if any (provided that this provision shall not be deemed to prevent Tenant from maintaining the Outdoor Seating Area, if and to the extent permitted under this lease).

**EXHIBIT E-1**

**ADDITIONAL RULES**

**USE OF FREIGHT ELEVATOR**

The freight elevator is operated during Building Hours: Monday - Friday   8:00am - 12:00pm; 1:00pm - 5:00pm.  All tenants in the building share the use of the freight elevator during Building Hours.  Freight elevator use is subject to the provisions below entitled "Freight Elevator Hours."

Regular Deliveries, such as daily and periodic deliveries by hand and hand trucks of restaurant supplies, food, and beverages.

During Building Hours, Regular Deliveries may be taken to Tenant's Cellar Premises via the freight elevator on a non-exclusive, "first come first serve" basis with all other deliveries occurring in the building at that time.

Extraordinary Deliveries, such as occasional equipment deliveries or removal, and any other delivery entailing multiple truckloads of food/supplies requiring exclusive use of the freight for an extended period of time.

All Extraordinary Deliveries must be done during non-Building Hours, as referenced below.  Tenant must reserve the freight elevator with at least 5-days advance notice and pay overtime charges pursuant to Building Rules.

Trash Removal

Tenant must retain its garbage at all times within its Premises in a cold storage room.  Trash must be neatly bagged and placed in front of its Premises on 27th Street.  Tenant shall contract with a reputable third-party garbage carting service.

Monday through Friday, Tenant may remove its trash via its Premises or via the freight elevator between 10:00pm and 11:00pm as long as Tenant arranges same with Landlord in advance.  At all other hours including Saturday and Sunday, Tenant must remove its trash via its Premises.

Freight Elevator Hours

| | | |
|---|---|---|
| Monday - Friday* | 8:00am-12:00pm; 1:00pm-5:00pm | Freight is available for non-exclusive use for Regular Deliveries at no charge to Tenant. |
| Monday - Friday* | 5:00pm-11:00pm | Freight is available for Extraordinary Deliveries if Tenant reserves 5-days in advance and pays overtime charges (calculating from 5:00pm to end time needed by Tenant) |

| Monday - Friday* | 10:00pm - 11:00pm | Freight is available for Trash Removal if reserved 24 hours in advance at no extra charge to Tenant. |
| Monday - Friday | 11:00pm - 8:00am | All Deliveries and Trash Removal must be made through Premises. |
| *Except on Building Union Holidays | | All Deliveries and Trash Removal must be made through Premises. |
| Saturday - Sunday | 8am - 10pm | All Deliveries and Trash Removal must be made through Premises. Freight may be available if Tenant reserves 5-days in advance and pays overtime charges (8-hour minimum). |
| Saturday - Sunday | 10pm - 8am | All Deliveries and Trash Removal must be made through Premises. |

**USE OF COMMON AREAS**

Tenant is responsible for cleaning up any debris or mess resulting from its use of the common areas, if and to the extent Landlord permits any such use of the common areas. If Tenant does not clean up after itself, Landlord shall do so and bill Tenant for those services. At no time can deliveries of any type be staged in corridors, lobbies, cellar or freight/service areas.

EXHIBIT F – GOOD GUY GUARANTY

Landlord:     387 PARK SOUTH L.L.C., its grantees, successors, and assigns.

Tenant:     ARTISANAL 2015, LLC, D/B/A ARTISANAL FROMAGERIE & BISTRO, its successors and assigns.

Lease:     Lease, dated October , ____, 2015, between 387 PARK SOUTH L.L.C., as Landlord, and ARTISANAL 2015, LLC, D/B/A ARTISANAL FROMAGERIE & BISTRO, as Tenant, for certain premises in the Building known as 387 Park Avenue South, in New York County, State of New York (as such lease may be amended and/or extended from time to time) (Capitalized terms not defined in this Guaranty are defined in the Lease.)

Premises:     The premises leased to Tenant under the Lease, including any additional or substitute space leased by Tenant pursuant to the Lease.

Guarantor:     The signatories to this Guaranty.

To induce Landlord to lease the Premises to Tenant pursuant to the Lease and intending to be legally bound, Guarantor has executed and delivered this Guaranty to Landlord. Each person signing this Guaranty represents that he is a principal of Tenant.

Guarantor hereby unconditionally and absolutely guarantees to Landlord all of the following obligations:

1.     The full, prompt, and complete payment of all rent and additional rent due under the Lease, without reference to any acceleration of rent, through and including the Vacate Date (hereinafter defined), together with the unamortized portion (from the Vacate Date to the original Expiration Date of the Lease) of the amortized (on a straight-line basis from the Fixed Rent Commencement Date through the original Expiration Date): (i) brokerage commission attributable to this lease paid by Landlord, (ii) Fixed Rent that would have been payable from the Commencement Date to the Fixed Rent Commencement Date but for Landlord's concession, and (iii) credits or payments to Tenant for Tenant's Work, if any given by Landlord; provided, however, that if no Default shall have occurred during the first seven (7) Lease Years of the Term, Guarantor shall have no further obligation for the costs referred to in subdivisions (i)-(iii) above; and,

2.     The full, prompt, and complete payment of all monetary obligations of Tenant to Landlord, after the termination or expiration of the Lease term, by reason of Tenant's continued occupancy of the Premises (or the continued occupancy of the Premises by anyone holding under or through Tenant), including but not limited to "use and occupancy" and any payments due in connection with any month-to-month tenancy, if any, that may arise, through and including the Vacate Date; and,

3. That if any mechanic's lien is filed against the Real Property (whether before or after the Vacate Date) for work claimed to have been done for or materials furnished to Tenant, its principals, agents or subtenants, the same shall be discharged within the time required under the Lease by filing the bond required by law or otherwise.

Guarantor further agrees to save Landlord harmless and to indemnify Landlord against any liabilities, costs, and expenses, including attorneys' fees, disbursements and court costs, incurred by Landlord (whether before or after the Vacate Date) (i) relating to Tenant's failure to complete Tenant's Work (including, without limitation, Tenant's Initial Work) in the time and manner required in the Lease, including without limitation, obtaining sign-offs, letters of completion, approvals and certificates of any Authority required upon the completion of Tenant's Work (including, without limitation, Tenant's Initial Work) and Tenant's failure to discharge any mechanic's liens within the time period required by the Lease, including, without limitation any sums spent by Landlord to obtain such sign-offs, letters of completion, approvals and certificates and/or to cause the removal of such lien(s) or to otherwise exercise its rights under the Lease; (ii) in connection with any violation filed or issued against the building or real property in which the Premises are located, arising from Tenant's or any subtenant's failure to comply with applicable laws; (iii) in connection with Tenant's failure to vacate the Premises on the date specified in Tenant's notice to Landlord under the immediately succeeding paragraph, notifying Landlord of Tenant's intention to vacate the Premises prior to the Expiration Date; and (iv) to enforce Guarantor's obligations under this Guaranty, including, without limitation, a legal action against Guarantor. All amounts due under this paragraph shall be paid within ten (10) days after Guarantor is billed therefor.

The "Vacate Date" is the date that Tenant, after giving Landlord at least 120 days' notice of its intention to vacate the Premises (provided that Tenant is not otherwise in default under the Lease), surrenders the Premises to Landlord broom clean and vacant, free of all subtenants and other occupants and otherwise in the condition required by the Lease, and delivers to Landlord a key to the Premises.

Landlord is not obligated to give Guarantor notice of any default by Tenant under the Lease or any termination notice, and Guarantor hereby waives such notices. Guarantor waives all other notices required or permitted to be given under the Lease or otherwise. Guarantor also waives acceptance and notice of acceptance of this Guaranty, and all demands for payment or performance.

Guarantor waives all defenses other than payment in full.

Guarantor's liability under this Guaranty shall not be affected or impaired by any delay by or failure of Landlord in enforcing any of its rights or remedies under the Lease or at law, or by any deferral, waiver, settlement or release of Tenant's obligations under the Lease or any accord and satisfaction or any forbearance by Landlord in exercising any of its rights and remedies or by any other action, inaction, or omission by Landlord.

This Guaranty is independent of any security or remedies which Landlord has under the law. Landlord may proceed against Guarantor at any time, either independently of or concurrently with or in lieu of Landlord's application of any security held by Landlord or Landlord's exercise of any remedies Landlord may have against Tenant. Landlord is not required

to resort to any security deposit or other collateral it may hold and is not required to pursue any remedies it may have against the Tenant. No application of any security held by Landlord shall be credited, offset or applied against any liability of Guarantor under this Guaranty. Nothing contained in this Guaranty shall be deemed to affect or limit any of Landlord's remedies against Tenant under the Lease or the law.

Guarantor's obligations under this Guaranty shall be unaffected by any discharge or release of the Tenant, its successors or assigns, or any of their debts, in connection with any bankruptcy, reorganization, or other insolvency proceeding or assignment for the benefit of creditors, any rejection or disaffirmation of the Lease in any bankruptcy, reorganization, or other insolvency proceeding or assignment for the benefit of creditors, or any reduction, modification, impairment or limitation of the liability of the Tenant, its successors or assigns, or of Landlord's remedies under the Lease, in connection with any bankruptcy, reorganization or other insolvency proceeding or any assignment for the benefit of creditors. In addition, if Landlord is required to disgorge or pay back to the Tenant's estate any payments made by the Tenant under the Lease in connection with any bankruptcy, reorganization or insolvency proceeding, Guarantor's obligations as to such payments shall be reinstated.

The liability of Guarantor shall continue during the entire term of the Lease and any renewals or extensions thereof, whether or not such renewals or extensions are entered into pursuant to any right or option contained in the Lease (subject to the termination of Guarantor's obligations as of the Vacate Date, as provided above). Guarantor's liability shall continue even if the Lease is assigned or the Premises are sublet. Guarantor's liability shall not be affected or impaired by reason of any modification or amendment of the Lease, whether or not such modification or amendment is pursuant to any right or option contained in the Lease (subject to the termination of Guarantor's obligations as of the Vacate Date, as provided above). Notwithstanding the foregoing, if Landlord and any assignee of the Lease (unless such assignee is controlled by, controls, or is under common control with, Tenant or Guarantor) enter into a modification of the Lease and such modification increases the obligation of the lessee under the Lease, the liability of Guarantor shall continue, but shall be no greater than if such modification had not been made.

Guarantor waives all right to trial by jury in any action or proceeding to which Landlord and Guarantor are party, with respect to any claim, counterclaim, cross-claim, or defense raised with respect to this Guaranty or the Lease.

Until all obligations of Tenant that are guaranteed under this Guaranty are fully performed and the Lease has expired or terminated, all claims Guarantor may have against Tenant (including but not limited to any claim Guarantor has against Tenant for reimbursement of any payments made or costs incurred by Guarantor pursuant to this Guaranty) are subordinated to Landlord's claims against Tenant. Further, Guarantor shall not assert any claim Guarantor may have against Tenant (including but not limited to any claim Guarantor has against Tenant for reimbursement of any payments made or costs incurred by Guarantor pursuant to this Guaranty), until all obligations of Tenant that are guaranteed under this Guaranty are fully performed.

If more than one person has signed this Guaranty, the term "Guarantor" shall be read as "Guarantors." The unenforceability of this Guaranty against any of the persons comprising Guarantor due to bankruptcy or any other reason shall not release or otherwise

diminish the obligations or liabilities of each of the other persons comprising Guarantor. The use of the singular shall be deemed to refer to the plural whenever the context so requires. The use of the masculine, feminine, or neuter genders shall be deemed to refer to another gender wherever the context so requires.

If more than one person or entity has signed this Guaranty, each of the undersigned shall be jointly and severally liable for all of the obligations hereunder. Any notice by the Landlord to any one of the undersigned Guarantors shall be deemed given to all of the Guarantors and shall have the same force and effect as though given to all persons constituting the Guarantor.

Guarantor agrees that it shall (or if more than one person or entity has signed this Guaranty, then each shall, with respect to his/her/its obligations under this Guaranty), at any time and from time to time, within ten (10) business days following written request by Landlord, execute, acknowledge and deliver to Landlord a statement certifying that this Guaranty is unmodified and in full force and effect (or if there has been any modification, that the same is in full force and effect as modified and stating such modification) and containing such other information as the Landlord may request. Guarantor agrees that such certificate may be relied on by anyone holding or proposing to acquire any interest in the Premises (as defined in the Lease) from or through Landlord or by any mortgagee or prospective mortgagee of the Premises of any interest therein. Guarantor shall indemnify and hold harmless Landlord from any liability, damage or expense (including, without limitation, reasonable attorneys' fees) that Landlord may incur arising from Guarantor's failure to comply with its obligations under this paragraph.

Guarantor represents and warrants that neither Guarantor nor, if Guarantor is other than an individual, any person owning, directly or indirectly, 25% or more of an interest in Guarantor, it is an "SDN". For purposes of this Guaranty, an "SDN" is someone [1] who is on the list of "Specially Designated Nationals and Blocked Persons" promulgated by the Office of Foreign Assets Control of the U.S. Department of the Treasury pursuant to 31 C.F.R. Part 500 or [2] with whom Landlord is prohibited or restricted from doing business with pursuant to the United States Patriot Act or any other law, rule, regulation, order or governmental action (collectively, "Anti-Terrorism Law"). Guarantor shall, upon request of Landlord, provide (and cause each principal to provide) such information (including without limitation certification) as may be required to enable Landlord to comply with Anti-Terrorism Law.

This Guaranty shall be binding upon Guarantor and Guarantor's heirs, successors and legal representatives, and shall inure to the benefit of Landlord, its successors, grantees, legal representatives and assigns.

This Guaranty shall be governed by and construed in accordance with the laws of the State of New York. All legal actions or proceedings related to this Guaranty shall be adjudicated in the state courts of the State of New York in the county in which the premises demised under the Lease are located. Guarantor irrevocably consents to the personal and subject matter jurisdiction of those courts in any legal action or proceeding relating to this Guaranty. This consent to jurisdiction is self-operative and no further instrument or legal action, other than service of process in any manner permitted by law, is necessary in order to confer jurisdiction upon the person of Guarantor and the subject matter in question in any such court. All communications to each of the persons comprising Guarantor shall be sent, and service in any legal action relating to this Guaranty may be made by delivery of the summons and complaint, to

each of the persons comprising Guarantor at the address shown below for each such person or to such other address or in such manner as Landlord may deem appropriate if lawfully permitted to effect service.

IN WITNESS WHEREOF, the undersigned has executed this Guaranty this ____ day of October, 2015.

Name: Stephanie Schulman
Home Address:
Social Security No.:

Name: Sarid Drory
Home Address:
Social Security No.:

## INDIVIDUAL ACKNOWLEDGMENTS

STATE OF NEW YORK)
               ) ss.:
COUNTY OF NEW YORK)

On the ____ day of October in the year 2015 before me, the undersigned, a Notary Public in and for said State, personally appeared **Stephanie Schulman**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

STATE OF NEW YORK )
               ) ss.:
COUNTY OF NEW YORK)

On the ____ day of October in the year 2015 before me, the undersigned, a Notary Public in and for said State, personally appeared **Sarid Drory**, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is(are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

Notary Public

## Exhibit G

## Principals (owning 100% interest in Tenant)

Stephanie Schulman – 50%
Sarid Drory – 50%

## EXHIBIT H
### List of Approved Contractors and Subcontractors

Contractor:
Shawmut Design and Construction
560 Harrison Avenue
Boston, MA 02118
617.622.7670

## EXTENSION OPTION RIDER

Tenant may, at its option, extend the Term, for a period of five years, commencing on the day immediately after the Expiration Date of the initial term (the "Extension Commencement Date") and ending five (5) years following the last day of the calendar month immediately preceding the month in which the Extension Commencement Date occurs (the "Extension Term"), provided all of the following conditions are met:

1.     At least 12 months, but not more than 18 months, prior to the originally scheduled Expiration Date, Tenant gives Landlord notice of Tenant's exercise of its option to extend the Term ("Extension Notice"), together with audited financials evidencing Tenant's and Guarantor's tangible net worth, and an amount equal to the sum required to increase the Security to an amount equal to five (5) times (or if the Security Deposit has been reduced pursuant to Section 18.1, three (3) times) 103% of monthly Fixed Rent at the end of the Extension Term (subject to further increase pursuant to this lease), TIME BEING OF THE ESSENCE; and

2.     This lease is in full force and effect at the time the Extension Notice is given and thereafter through the commencement of the Extension Term; and

3.     Tenant is not in Default either at the time the Extension Notice is given or at the commencement of the Extension Term; (if Tenant is in Default at either time, the Extension Notice shall be deemed to be null and void ab initio and the Term shall expire on the original Expiration Date or earlier, in accordance with this lease); and

4.     Tenant and Guarantor shall have submitted their most recent financial statements evidencing Tenant's and Guarantor's tangible net worth of at least respectively $5,000,000.00 and $5,000,000.00 as of the date that is three months preceding the commencement of the Extension Term; and

5.     Tenant shall be open to the public and operating its business in accordance with the Permitted Use in the Premises at the time the Extension Notice is given or and upon the date that the Extension Term would commence.

Such extension shall be upon all of the terms and conditions of this lease except that:

a. The Fixed Rent to be paid by Tenant for the first year of the Extension Term shall be the greater of (i) one hundred three per cent (103%) of the Fixed Rent during the last year of the original Term and (ii) the fair market rent for comparably sized space in comparable buildings in the neighborhood of the Building i.e., Midtown South, for retail leases with a term equal to the Extension Term, without regard to rent concessions, any landlord contribution to tenant improvements or landlord work and considering all relevant factors relating to rental value (the "Fair Market Rent"). Within sixty (60) days after receipt of Tenant's Extension Notice, Landlord shall notify Tenant of Landlord's calculation of Fair Market Rent. Tenant shall be deemed to have accepted Landlord's calculation of Fair Market Rent unless, within thirty (30) days after Tenant's receipt of Landlord's calculation of Fair Market Rent, Tenant notifies Landlord that it disputes Landlord's calculated Fair Market Rent and provides its calculated Fair Market Rent. If Landlord and Tenant have not come to agreement on the Fair Market Rent within thirty (30) days after Landlord's receipt of such notice of dispute, Tenant shall notify Landlord that either (x) Tenant is rescinding its Extension Notice, so that the Term shall end on the original Expiration Date, or (y) Tenant has appointed an Appraiser (hereinafter defined) to determine Fair Market Rent. Tenant's failure to timely send either notice referenced in the preceding sentence shall be deemed to extend the Term with Landlord's calculation of Fair Market Rent. Within fifteen (15)

days after Landlord's receipt of notice of the appointment of Tenant's Appraiser, Landlord shall notify Tenant of the appointment of Landlord's Appraiser. If, within thirty (30) days after the appointment of Landlord's Appraiser, the two Appraisers are unable to agree on Fair Market Rent, they shall together appoint a third Appraiser, who, within ten (10) days after appointment, using the so-called "baseball arbitration" method, shall determine Fair Market Rent to be the Fair Market Rent calculated by either Appraiser. If the two Appraisers cannot agree on the third Appraiser within five (5) days after such thirty (30) day period, Landlord shall contact the American Arbitration Association to arrange for the appointment of a third Appraiser, who shall render a decision within ten (10) days after appointment. The determination of the two Appraisers, or if applicable, the third Appraiser, shall be binding on Landlord and Tenant. Landlord and Tenant shall each pay the cost of their respective Appraiser and shall equally share the cost of the third Appraiser. An "Appraiser" shall be an independent real estate appraiser with at least ten (10) years of experience in evaluating retail leaseholds in the neighborhood of the Building who is a member of the American Institute of Appraisers and shall not be affiliated with either Landlord or Tenant.

b. The Fixed Rent for each Lease Year of the Extension Term (commencing with the second Lease Year of such Term) shall increase by three percent (3%) per annum over and above the Fixed Rent payable for the immediately preceding Lease Year.

c. If this lease provides for a rent concession, rent abatement or free rent, Tenant's Improvement Allowance or other work allowance, or Landlord's Work, such provisions shall not apply to the Extension Term.

d. This lease shall not be subject to further extension of the Term pursuant to this Rider.

# FOOD USE RIDER

If the Permitted Use is a restaurant use or otherwise involves the sale of food or beverage, the following shall apply:

1. Tenant shall keep any garbage, trash, rubbish or other refuse in vermin-proof refrigerated containers within the interior of the Premises that are kept closed until removed.
2. Using diligent efforts in accordance with sound restaurant operations and practice and as frequently as required in accordance with such operations and practices, Tenant shall clean all hood grease filters and clean all grease traps and grease interceptors by physically removing the grease and cleaning with a chemical degreasing agent. Tenant shall periodically clean all Smog-Hog equipment as suggested by its manufacturer. Tenant shall maintain cleaning records for periodic inspection by Landlord.
3. Tenant shall, using diligent efforts in accordance with sound restaurant operations and practice and as frequently as required in accordance with such operations and practices,, steam clean ventilation hoods, clean exhaust fans and roof vents. Tenant shall maintain records of such cleaning for periodic inspection by Landlord.
4. As part of Tenant's Work, Tenant shall perform the following work in accordance with the provisions of this lease: (a) sound proof the Premises so that Tenant's use of the Premises shall not disturb other tenants in the Building, (b) install screens and traps in sinks to prevent food and grease from clogging the waste line(s) serving the Premises and any waste line(s) serving other areas of the Real Property; (c) install ventilation equipment including, without limitation, Smog-Hogs, hoods and exhaust fans within the Premises, of adequate quality, capacity and size to keep the Premises free of smoke, mist, odors, vapors and fumes and to prevent the same from escaping the Premises; (d) install a separate hot water system.
5. If Tenant serves alcoholic beverages in the Premises, the following shall apply: Tenant shall at all times comply with all requirements, rules, restrictions, and regulations promulgated by the New York State Liquor Authority and the Alcoholic Beverage Control Board, and any other Authority having jurisdiction over the sale of alcoholic beverages; and Landlord shall, at Tenant's request, but at no cost to Landlord, cooperate with Tenant's efforts to obtain a liquor license for the sale of alcoholic beverages in the Premises. Service of liquor (if permitted under this lease) shall be conducted in an orderly and responsible manner and in compliance with all applicable Laws.
6. Landlord does not warrant that the Premises may be lawfully used for the business to be conducted by Tenant in the Premises; nor that any governmental certificate, license or permit which may be required for the business to be conducted by Tenant in the Premises, will be granted, or if granted, will be continued in effect or renewed. Tenant shall, upon Landlord's request, promptly deliver to Landlord duplicate copies of any governmental certificate, license or permit required for the lawful conduct of Tenant's business. Tenant shall at all times comply with the terms and conditions of each such certificate, license or permit. It is understood and agreed that Tenant's obligations under this lease shall in no way be affected or impaired by reason of Tenant's inability to secure and/or maintain such certificates, licenses or permits.
7. If the Premises are located in New York City: Tenant shall continuously maintain during the term of this Lease a public assembly permit for the Premises if such permit is required by applicable Law.
8. Tenant shall maintain, in addition to the insurance required by Article 11, (a) personal

injury liability including, without limitation, coverage for libel, slander, false arrest and malicious prosecution, (b) check room liability, and (c) if Tenant sells alcoholic beverages at the Premises, liquor sales and dram shop liability coverage in such amounts as Landlord reasonably requires.

9.  The Premises shall not be used for a dance hall, cabaret or discotheque and no music, dancing or live entertainment of any type shall be permitted in the Premises that can be heard outside of the interior of the Premises.

## PERCENTAGE RENT RIDER

Obligation to Pay. Commencing on the Fixed Rent Commencement Date and thereafter, in addition to Fixed Rent, Tenant shall pay to Landlord, as Additional Rent, Percentage Rent as determined in accordance with this Section. At such time as the Gross Revenue (as hereinafter defined) for any Lease Year exceeds $10,000,000.00 (as same may be reduced under the immediately succeeding paragraph hereof) (the "Annual Breakpoint") or exceeds the Partial Year Annual Breakpoint (as hereinafter defined), Tenant shall pay to Landlord, within twenty (20) days after the end of the month in which the Annual Breakpoint (as same may be reduced under the immediately succeeding paragraph hereof) or the Partial Year Annual Breakpoint (as hereinafter defined) is attained and after the end of each month during such Lease Year, the Percentage Rent due, without notice or demand. Said payments of Percentage Rent shall be made concurrently with the submission of Tenant's statement of Gross Revenue to Landlord as set forth below.

i. *Percentage Rent.* Percentage Rent is equal to 5% of Gross Revenue in excess of the Annual Breakpoint (or, if applicable, the Partial Year Annual Breakpoint, as hereinafter defined). The term "Partial Year Annual Breakpoint" shall mean an amount equal to the Annual Breakpoint multiplied by a fraction, the numerator of which is the number of days in the Lease Year, and the denominator of which is 365. In addition, for any day during any Lease Year that the Premises are not open for business on any day other than a Federal or New York State holiday, the Annual Breakpoint shall be reduced to an amount equal to $10,000,000.00 multiplied by a fraction, the numerator of which shall be equal to 365 less the number of days in such Lease Year that the Premises are not open for business (other than Federal or New York State holidays) and the denominator of which shall be 365. By way of example, if the Premises were closed for business for 30 days during a Lease Year, the Annual Breakpoint would be reduced to $9,178,082.19 (i.e., 335/365 x $10,000,000.00).

ii. *Gross Revenue.* The term "Gross Revenue" shall mean the gross dollar aggregate of (a) the entire price charged for all food and beverages, goods, wares and merchandise sold, leased, licensed or delivered and all charges for services sold or performed from all business conducted at, upon or from the Premises (including, without limitation, any outdoor sales area if and to the extent that such outdoor sales are permitted in accordance with the terms of this lease), by Tenant or its subtenants, licensees or concessionaires, whether made for cash, by check, on credit or charge accounts or otherwise, without reservation or deduction for inability or failure to collect the same, including but not limited to transactions: (i) where the sales or orders therefor originate from or are accepted at the Premises, but delivery of performance or collection thereof is made from or at any other place; (ii) resulting from orders solicited outside the Premises if such solicitation is conducted by personnel operating from or reporting to or

under the control or supervision of personnel stationed at the Premises; (iii) pursuant to mail, telephone, catalog, internet or other electronic or similar device whereby orders are received at, shipped from, or billed from the Premises; (iv) effected by means of mechanical or other vending devices in the Premises; and (v) originating from whatever source, and which Tenant or its subtenants, licensees or concessionaires in the normal and customary course of its operations would credit or attribute to its business conducted in the Premises; and (b) all monies or other things of value received by Tenant or its subtenants, licensees or concessionaires from its operations at, upon or from the Premises, which are neither included in nor excluded from Gross Revenue by the other provisions of this definition, but without any duplication, including, without limitation, finance charges, cost of gift or merchandise certificates and all deposits not refunded to customers. Each charge or sale upon installment or credit shall be treated as a sale for the full price in the month during which such charge or sale is made, irrespective of the time when Tenant or its subtenants, licensees or concessionaires shall receive payment (whether full or partial) therefor. No deduction shall be allowed from Gross Revenue for uncollectible credit accounts.

iii. *Exclusion from Gross Revenue.* Notwithstanding the foregoing, "Gross Revenue" shall not include:

1. Sales of merchandise returned by customers up to the amount of cash refunded, credit given, or discounts and allowance granted or exchanges made, provided that the sale price of said items has been originally included in Gross Revenue;

2. the exchange of merchandise between stores of Tenant or its subsidiaries where such exchanges are made solely for the convenient operation of Tenant's business and not for the purpose of consummating a sale which has been made at, upon or from the Premises;

3. sales of trade fixtures (provided Tenant has the right to remove the same pursuant to Article 5 hereof) after use thereof, which are not part of Tenant's stock-in-trade and not sold in the regular course of Tenant's business;

4. complimentary food, wine, liquor and other beverages provided to customers at no cost, promotional discounts (to the extent of the discount), non-charges resulting from returns by patrons, waiter mistakes, customer complaints and the like, and food and beverages provided to food and beverage critics, public relations agents and other promotional guests and employees at no charge and discounted sales to employees up to the amount of the discount;

5. internet or catalogue sales in either case to the extent that (a) payment or delivery for the items purchased does not occur at the Premises and the products are not shipped from the Premises, and (b) any such sale is properly accounted for in the ordinary course of business as having occurred at a location other than the Premises;

6. returns of merchandise, the sale of which was previously included in Gross Revenues, shall be deducted from Gross Revenues to the extent of the amount therefor previously included in Gross Revenues;

7. Interest, service, finance or sales carrying charges for merchandise sold to customers at the Premises where payment is not due at the time of the sale;

8. Sales discounts (to the extent of the discount) of merchandise to nonprofit, charitable or religious organizations;

9. Shipping charges of merchandise sold from the Premises, at Tenant's actual cost;

10. Merchandise rewards or promotional certificates based on customers' prior purchases (so long as said prior purchases were included in Gross Revenue and only to the extent such prior purchases were included therein);

11. returned internet or catalogue purchased goods that were previously included in Gross Revenues may be deducted from Gross Revenues (but only to the extent included therein) where either (a) the inventory remains available for sale in the store or (b) store credit is given;

12. Tips or gratuities actually paid to waiters or waitresses; and

13. The amount of any sales, use or gross receipts tax, or excise tax, imposed by any governmental authority directly on sales and collected from the customers, provided the amount of said tax is recorded and added to the sales price.

iv. *Reporting.*

1. During each Lease Year, Tenant shall submit to Landlord, on or before the 15th day of each month during the Lease Year (and, with respect to the last month of each Lease Year, within 15 days after the end of each Lease Year), an unaudited statement signed by Tenant's chief financial officer, other executive officer or certified public accounting firm, certified as true and correct, showing Gross Revenue for the preceding

calendar month and any deductions and exclusions taken therefrom.

2. On or before 45 days following the end of each Lease Year, Tenant shall furnish to Landlord a statement, prepared in accordance with generally accepted accounting principles and certified by an independent certified public accounting firm reasonably acceptable to Landlord, of the Gross Revenue from the Premises during the Lease Year and all deductions and exclusions taken therefrom.

3. If Tenant does not timely submit any such monthly or annual statement, Tenant shall pay, on demand, as Additional Rent, a late reporting fee of $250 per day for each day beyond said deadline that Tenant does not submit any such statement until the date that Tenant submits such statement, but in no event shall the payment of such per diem charge waive Landlord's right to declare a default by Tenant arising from its failure to have timely submitted such statement, limit any of Landlord's rights or remedies arising under this lease or relieve Tenant from its obligation to pay Percentage Rent for the period covered by such statement or for any other period.

4. Tenant shall record each sale at the time of the transaction on either a cash register having a sealed, continuous, cash register tape with cumulative totals, which numbers, records and duplicates each transaction entered into the register (in any event such cash register must have a non-resettable grand total) or on serially prenumbered sales slips. In the event Tenant chooses to record each sale by using a cash register, the continuous, cash register tape will be sealed or locked in such a manner that it is not accessible to the person operating the cash register. If Tenant chooses to record each sale on individual sales slips, Tenant shall retain said sales slips (including those canceled, voided, or not used) in numerical sequence.

5. If Tenant shall fail to prepare and deliver any statement of Gross Revenue required herein, and Tenant shall fail to cure such default within twenty (20) days of written demand therefor, Landlord shall have the right to do any or all of the following: (i) elect to treat Tenant's failure to report as a Default; and/or (ii) elect to make or cause an accounting firm selected by Landlord to make an audit of all books and records of Tenant or any permitted subtenants, licensees or concessionaires, at Tenant's sole cost and expense, which in any way pertain to or show Gross Revenue and to prepare the statement or statements which Tenant has failed to prepare and deliver. The statement or statements so prepared shall be

conclusively deemed to be correct, and Tenant shall pay on demand, as Additional Rent, all reasonable expenses of such audit and of the preparation of any such statements and all sums as may be shown by such audit to be due as Percentage Rent.

6.  If Gross Revenue is required to be reported on any federal, state or local sales tax or similar tax return and Gross Revenue as so reported on any of said returns shall exceed the Gross Revenue as reported by Tenant to Landlord, then the Gross Revenue shall be deemed to be the highest figure as so reported. If any governmental authority shall increase the Gross Revenue reported by Tenant on any such tax return, after audit for any Lease Year, then Tenant shall notify Landlord promptly of such increase, furnish to Landlord a true copy of such audit, and pay at that time (as Additional Rent) any additional Percentage Rent due as a result thereof.

v.  *Books and Records.*

1.  Tenant shall keep on the Premises (or at Tenant's corporate headquarters, provided that such headquarters are in New York City, Nassau, Suffolk or Westchester Counties), accurate books and records of all business conducted at the Premises necessary or appropriate in order to determine Gross Revenue in accordance with generally accepted accounting principles. Such books and records shall be open for examination to Landlord, or Landlord's representative, during business hours upon not less than twenty (20) days' prior notice to Tenant, for the purpose of ascertaining or verifying the Gross Revenue. All records referred to in this Section shall be retained by Tenant for examination by Landlord for a period of at least 5 years following the end of the Expiration Date. Landlord shall cause such examination to be performed in a manner that minimizes, to the extent reasonably practicable, interference with Tenant's business operations at the location where such examination shall occur.

2.  In the event an examination of the books and record required to be maintained under Subdivision 1 of this Subsection (v)s of Gross Revenue shall disclose a deficiency in the payment of Percentage Rent made by Tenant (a) Landlord shall have the right, at Tenant's sole cost and expense, to audit the books and records; and (b) any additional Percentage Rent found due and owing as a result of said audit shall be immediately paid by Tenant to Landlord upon demand, together with interest thereon at the rate of ten percent (10%) per annum (the "Default Rate"), computed from the date such Percentage Rent should have been paid (had Tenant not understated its

Gross Revenue) to the date of Tenant's actual payment to Landlord, (c) in the event such examination discloses a deficiency in excess of three (3%) percent of the Gross Revenue reported for said year, Tenant shall pay to Landlord, as Additional Rent, immediately upon demand, the reasonable costs and expenses of such audit, and (d) in the event any such audit discloses a deficiency in excess of five percent (5%), such understatement shall be deemed a material default by Tenant and Landlord shall have the right, at its option, to terminate this lease on notice to Tenant and Tenant shall remain liable to Landlord in accordance with Section 17 of this lease.

Tenant's obligations under this Percentage Rent Rider shall survive expiration or earlier termination of the lease.

Form of Letter of Credit

**[ISSUING BANK]**

[Date]

[Landlord's Address]

_____

_____

_____

     Re:    Irrevocable Letter of Credit No. _____
             Applicant: [Tenant]
             Beneficiary: [Landlord]

Gentlemen:

By order of our client, [Tenant], [address of Tenant], we hereby open in your favor our clean irrevocable Letter of Credit No. _____ for the aggregate sum of _____ effective immediately and expiring at our [address of Bank] New York Office on _____ or any automatically extended date.

Funds under this Letter of Credit are available to you against presentation of your sight draft(s) drawn on us marked "drawn under Irrevocable Letter of Credit No. _____ date [date of Letter of Credit]".

It is a condition of this Letter of Credit that it shall be deemed automatically extended without amendment for one year from the present or any future expiration date hereof, unless ninety (90) days prior to any such date we shall notify you by registered mail that we elect not to consider this Letter of Credit renewed for any such additional period. Upon receipt by you of such notice, you may draw hereunder by means of your draft on us at sight, accompanied by the original Letter of Credit.

We shall, immediately after each presentation of the Letter of Credit for a partial drawing, return this Letter of Credit to you, marking this Letter of Credit to show the amount paid by us and the date of such payment.

This Letter of Credit is transferable and may be transferred one or more times without cost to you upon presentation to us of a duly completed transfer instruction in the form annexed to this Letter of Credit and the original Letter of Credit. We shall look solely to applicant for payment of the transfer fee.

We shall, upon receipt of your request, amend this Letter of Credit to change your address. Such amendment shall not require applicant's consent. We shall look solely to applicant for payment of any fee in connection with such amendment.

If we receive your sight draft as mentioned above, in accordance with the terms and conditions of this credit, here at our [address], New York Office we will promptly honor the same.

This Letter of Credit is subject to the Uniform Customs and Practice for Documentary Credits (2007 Revision) International Chamber of Commerce Publication No. 600, shall be deemed to be a contract made under, and as to matters not governed by the UCP, shall be governed by and construed in accordance with the laws of the State of New York and applicable U.S. Federal Law.

[Name of Bank]

By: _____
      Authorized Signature
      Title:

# EXHIBIT B

# NOTICE OF MECHANIC'S LIEN LAW

To the Clerk of the County of New York          and all others whom it may concern:

## Please Take Notice, that *AC Penguin Prestige Corp* .

As lienor(s) have and claim a lien on the real property hereinafter described as follows:

(1)The names and residences for the lienor(s) are     **AC Penguin Prestige Corp.**
**681 East 136th Street**
**Bronx NY 10454**

Being a Corporation duly organized and existing under and by virtue of the laws of the State of New York

Whose business Address is at :  *681 East 136th Street, Bronx NY 10454*
And whose principal place of business is at *681 East 136th Street, Bronx NY 10454*

(1a)      The name and address of the lienor's attorney, if any: *NA*

(2)      The owner of the real property is *387 Park South LLC.*
and the interest of the owner as far as known to the lienor(s) is *Fee Simple*

Block
883

(3)The Name of the person by whom the lienor(s) was/were employed is *2015 Artisinal LLC*
The Name of the person to whom the lienor(s) furnished or is/are to furnish materials of for whom  The
lienor(s) performed or is/are to perform professional service is *2015 Artisinal LLC*

Lot
1

The name of the person with whom the contact was made is *2015 Artisinal LLC*
The name of the for whom professional services was rendered is *NA*

(4)The labor performed and        *Supplied Labor and Materials to Fabricate HVAC*
Material furnished were        *Ductwork that was Installed in Building*

The materials actually manufactured for but not delivered to the real property are *NA*

The agreed price and value of the labor
Performed and value of the material furnished is          *$220,500.00*
The agreed price and value of the material actually mfd. for but not delivered to the real prop is     *NA*
Total agreed price and value *$220,500.00*

(5)The amount unpaid to the lienor(s) for said labor
performed and said material furnished is          *$220,500.00*
The amount unpaid to lienor(s) for material actually mfd. for but not delivered to the real prop. Is     *NA*
Total amount unpaid     *$220,500.00*

The total amount claimed for which this lien is filed is          *$220,500.00*
(6)The time when the first item of work was performed was          *5/04/2017*
The time when the first item of material was furnished was          *5/04/2017*
The time when the last item of work was performed was          *7/21/2017*
The time when the last item of material was furnished was          *7/21/2017*

(7)The property subject to the lien is situated in *New York, County of New York, State of New York*
**KNOWN AS:**    *387 Park Avenue South, New York NY 10016*

That Said labor and materials were performed and furnished for and used, and that the professional services
rendered were used , in the improvement of the real property herein before described. That 8 months( 4 months
if a single family dwelling) have not elapsed dating from the last item of work performed, or from the last items
of materials furnished, or since the completion of the contract, or since the final performance of the work, or since
the final furnishing of the materials for which the lien is claimed.

Dated 11 September 2017                    the name signed must be printed beneath
Addison LeMay, Agent for AC Penguin Prestige Corp

# EXHIBIT C

## NOTICE OF MECHANIC'S LIEN LAW

To the Clerk of the County of New York     and all others whom it may concern:

# Please Take Notice, *that AC Penguin Prestige Corp* .

As lienor(s) have and claim a lien on the real property hereinafter described as follows:

(1) The names and residences for the lienor(s) are   **AC Penguin Prestige Corp.**
**681 East 136th Street**
**Bronx NY 10454**

Being a Corporation duly organized and existing under and by virtue of the laws of the State of New York

Whose business Address is at : *681 East 136th Street, Bronx NY 10454*
And whose principal place of business is at *681 East 136th Street, Bronx NY 10454*

(1a)     The name and address of the lienor's attorney, if any: *NA*

(2)     The owner of the real property is *387 Park South LLC*
and the interest of the owner as far as known to the lienor(s) is *Fee Simple*

(3) The Name of the person by whom the lienor(s) was/were employed is *2015Artisanal LLC.*
The Name of the person to whom the lienor(s) furnished or is/are to furnish materials of for whom The lienor(s) performed or is/are to perform professional service is *2015Artisanal LLC.*

The name of the person with whom the contact was made is *2015Artisanal LLC.*

The name of the for whom professional services was rendered is *NA*

(4) The labor performed and     ***Supplied Labor and Materials to Fabricate Ductwork for HVAC***
Material furnished were     ***System that was Installed in Building***

The materials actually manufactured for but not delivered to the real property are *NA*

The agreed price and value of the labor
Performed and value of the material furnished is     ***$315,000.00***
The agreed price and value of the material actually mfd. for but not delivered to the real prop is   *NA*
     Total agreed price and value *$315,000.00*

(5) The amount unpaid to the lienor(s) for said labor
performed and said material furnished is     ***$104,520.00***
The amount unpaid to lienor(s) for material actually mfd. for but not delivered to the real prop. Is   *NA*
     Total amount unpaid   ***$104,520.00***

The total amount claimed for which this lien is filed is     ***$104,520.00***

(6) The time when the first item of work was performed was   ***5/04/2017***
The time when the first item of material was furnished was   ***5/04/2017***
The time when the last item of work was performed was   ***5/09/2017***
The time when the last item of material was furnished was   ***5/09/2017***

(7) The property subject to the lien is situated in *New York, County of New York, State of New York*

### KNOWN AS: *387 Park Avenue South, New York NY 10016*

That Said labor and materials were performed and furnished for and used, and that the professional services rendered were used , in the improvement of the real property herein before described. That 8 months( 4 months if a single family dwelling) have not elapsed dating from the last item of work performed, or from the last items of materials furnished, or since the completion of the contract, or since the final performance of the work, or since the final furnishing of the materials for which the lien is claimed.

Dated 10 May 2017

the name signed must be printed beneath
Addison LeMay, Agent for AC Penguin Prestige Corp

# EXHIBIT D

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**

Index No:   **155359/2017**

---

**2015 ARTISANAL, LLC**

**PLAINTIFF,**

-AGAINST-

**AC PENGUIN PRESTIGE CORP.**
**681 EAST 136TH STREET**
**BRONX, NEW YORK 10454**

**DEFENDANT,**

---

**Property Address:**
387 Park Avenue South
New York, New York 10016
(New York County; Block 883, Lot 1)

**APPLICATION TO DISCHARGE A**
**NOTICE OF MECHANIC LIEN**
**PURSUANT TO NEW YORK LIEN**
**LAW § 19(6)**

**\*\*AMENDED \*\***

TO:   **THE SUPREME COURT OF THE STATE OF NEW YORK**
      **COUNTY OF NEW YORK**

On the basis of information and belief, the Plaintiff, 2015 ARTISANAL, LLC, by its attorney SALVATORE J. LIGA, hereby moves the court,  pursuant to § 19(6) of the Lien Law, to vacate and cancel the _Notice of Mechanic's Lien_ filed by the Defendant, on the following grounds:

1. The Plaintiff, 2015 ARTISANAL, LLC, is New York limited liability company which currently leases space in the building commonly known as 387 Park Avenue South, New York, NY 10016 (the "project site").

2. 387 PARK SOUTH LLC is the Plaintiff's landlord.

3. The Defendant, AC PENGUIN PRESTIGE CORP., is a New York corporation and is believed to be a HVAC contractor.

4. The Plaintiff is currently building a restaurant on the project site.

5. The project site is raw space, meaning it consist of bare walls, floors and ceilings.

6. The Plaintiff has been paying rent for the project site for close to one year at a rate that exceeds $100,000 per month in rent and carrying charges, while the restaurant is being designed and permits are being obtained.

Page **1** of **5**

7.  The Defendant met with a representative to discuss bidding on the HVAC work on May 4, 2017.

8.  On May 5, 2017, the same representative notified the Defendant that it <u>would not</u> be considering the Defendant to do the work.

9.  As of the May 4, 2017, no final designs for the restaurant were completed; no final engineering specifications or drawings for the HVAC system were prepared or ready.

10. On May 10, 2017, the Defendant final a Notice of Mechanic Lien.  **(Exhibit A)**

11. <u>On May 17, 2017, the Plaintiff's landlord served the Plaintiff with a Notice to Cure, in response to the lien.   The lien is to be discharged on or before June 26, 2017.</u>

12. As of May 4, 2017, the Plaintiff never supplied anyone, including the Defendant with any engineering drawings, shop drawings or final engineering specifications for the HVAC system. *(This was only recently completed, in June 2017)*

13. The Plaintiff <u>never</u> signed a contract with the Defendant.

14. The Plaintiff <u>never</u> ordered anything from the Defendant to be manufactured;

15. The Plaintiff <u>never</u> agreed upon a price for any labor to be performed or materials to supplied;

16. *Neither the Plaintiff, nor his landlord  ever approved of the Defendant to perform any work at the project site, nor was any supplies or material ever ordered from the Defendant*;

17. *No HVAC system was ever installed on the project site*;

18. *No ductwork, HVAC equipment or any materials was ever delivered to the project site*;

19. The Defendant never demanded payment for anything from the Plaintiff;

20. The Defendant did not perform any work or supply the Plaintiff with anything, at any time;

21. No building permits for any work was issued and no one provided any insurance to the landlord, as required.

22. The Plaintiff does not owe the Defendant anything;

Page **2** of **5**

23. THERE IS ABSOLUTELY NO GROUNDS WHATSOEVER FOR THE DEFENDANT TO ASSERT A CLAIM AGAINST THE PLAINTIFF, NOR IS THERE ANY GROUNDS FOR A MECHANIC LIEN.

24. The Plaintiff contends that Defendant has filed the *Notice of Mechanic's Lien* fraudulently in an attempt to pressure the Plaintiff to give him the HVAC work.

25. The filing of the Notice of lien is doing irreparable to the Plaintiff; Said lien is a default under the terms of the Plaintiff's lease and if said lien is not discharged quickly the Plaintiff is at risk of losing its lease and the $1,000,000+ it has invested to date in the restaurant venture.

26. The Notice of Mechanic Lien is defective on its face in a number of ways:

    a. Paragraph 3 of the lien states the Defendant was employed by *2015 ARTISANAL LLC*. This is a false statement.

    b. Paragraph 3 of the lien states the name of the person with whom contact was made is 2015 ARTISANAL LLC.   This is false, and it makes no sense. There is only one person would can authorize any work for the Plaintiff and that is Sarid Drory, and Sarid Drory did not order or authorize anything from the Defendant.

    c. Paragraph 4 of the lien states the labor and material furnished were "Supplied Labor and Materials to Fabricate Ductwork for HVAC System that was Installed in Building". This statement is false. There is no HVAC system installed on the project site. There was no work done on the project site. There were not materials or equipment delivered on the project site.

    d. Paragraph 4 of the lien states, "The materials actually manufactured for but not delivered to the real property are N/A." This statement is false. This statement implies that materials manufactured for the Plaintiff were delivered to the real property. NOTHING WAS EVER DELIVERED OR EVER BROUGHT TO THE PROJECT SITE.

    e. Paragraph 5 of the lien states, "The amount unpaid to the lienor(s) for said labor performed and value of the materials furnished is $315,000.00" This is false. THE PLAINTIFF NEVER ORDERED ANYTHING FROM THE DEFENDANT. NO CONTRACT WAS SIGNED. NO WORK WAS PERFORMED. NO MATERIALS WERE DELIVERED. NO DRAWINGS OR ENGINEERING SPECIFICATIONS

Page 3 of 5

<u>WERE PROVIDED. THIS FIGURE IS FICTIOUS AND THERE IS ABSOLUTELY
NO BASIS UPON WHICH IT IS STATED.</u>

    f.    Paragraph 6 of the lien states, that the worked was first performed and materials were first supplied on May 4, 2017, and last performed and upplied on May 9, 2017. Furthermore, the Defendant claims he is owed $104,520. <u>This is a false statement. NO WORK WAS PERFORMED. NO MATERIALS WERE SUPPLIED. The very idea that $104,520 worth of work and materials were supplied in 5 days is completely ridiculous. This is fraudulent statement based upon nothing. No part of the HVAC system was installed in May 2017, in fact, the final design and engineering for the HVAC system was not completed until June 2017.</u>

27. Virtually every operative fact stated within the _Notice of Mechanic Lien_ is false. There is no factual basis for any claim whatsoever. The Plaintiff had no business dealings with the Defendant. The Defedant has no valid claims of any kind against he Plaintiff. The Plaintiff contends that the sole purpose behind the Defendant's decision to file said lien was to pressure and bully the Plaintiff into awarding the contract for the HVAC work to his company.

WHEREFORE, the Plaintiff prays the Court:

    a.    Issues an order vacating and cancelling said _Notice of Mechanic Lien_ of record;
    b.    For such other relief as the court deems just and equitable.

DATED:    June 12, 2017
White Plains, New York

SALVATORE LIGA & COMPANY, PLLC

By SALVATORE J. LIGA, ESQ.
777 Westchester Avenue, Suite 101
White Plains, New York 10604
(877) 725-5442
(917) 591-8818 Fax
sliga@ligalaw.com
Attorneys for the Plaintiff

Page **4** of **5**

## ATTORNEY VERIFICATION

STATE OF NEW YORK        )
COUNTY OF WESTCHESTER     )    .:ss

SALVATORE J. LIGA, an attorney duly admitted to practice before the courts of the State of New York, affirms the following under penalties of perjury:

1. I am the principal of SALVATORE LIGA & COMPANY, PLLC, attorneys for the Plaintiff in the within action.

2. I have read the foregoing *APPLICATION TO DISCHARGE A NOTICE OF MECHANIC'S LIEN*
3. *PURSUANT TO NEW YORK LIEN LAW § 19(6)* and know the contents thereof.

4. The same is true to my own knowledge, except as to matters stated therein to be alleged on information and belief, and as to those matters, I believe them to be true.

5. The grounds of my belief as to all matters stated upon my knowledge are based my review of documentation and extensive discussions with STEPHANIE SCHULMAN and SAIRD DRORY, the principals of the Defendant, 2016 ARTISANAL, LLC.

6. That I make this verification in place and instead of the Defendant and/or its principals in that they reside in a county different from my office.

**DATE:**     June 12, 2017
            White Plains, New York

SALVATORE LIGA & COMPANY, PLLC
BY: SALVATORE J. LIGA, ESQ.

Page **5** of **5**

# EXHIBIT A

## NOTICE OF MECHANIC'S LIEN LAW

To the Clerk of the County of New York          and all others whom it may concern:

# Please Take Notice, that *AC Penguin Prestige Corp* .

As lienor(s) have and claim a lien on the real property hereinafter described as follows:

(1)The names and residences for the lienor(s) are      **AC Penguin Prestige Corp.**
**681 East 136th Street**
**Bronx NY 10454**

Being a Corporation duly organized and existing under and by virtue of the laws of the State of New York

Whose business Address is at : *681 East 136th Street, Bronx NY 10454*
And whose principal place of business is at *681 East 136th Street, Bronx NY 10454*

(1a)        The name and address of the lienor's attorney, if any: *NA*

(2)        The owner of the real property is *387 Park South LLC*
and the interest of the owner as far as known to the lienor(s) is *Fee Simple*

lock          (3)The Name of the person by whom the lienor(s) was/were employed is *2015Artisanal LLC.*
:83             The Name of the person to whom the lienor(s) furnished or is/are to furnish materials of for whom  The
lienor(s) performed or is/are to perform professional service is *2015Artisanal LLC.*

ot             The name of the person with whom the contact was made is *2015Artisanal LLC.*
1              The name of the for whom professional services was rendered is *NA*

(4)The labor performed and          ***Supplied Labor and Materials to Fabricate Ductwork for HVAC***
Material furnished were          ***System that was Installed in Building***

The materials actually manufactured for but not delivered to the real property are *NA*

The agreed price and value of the labor
Performed and value of the material furnished is          **$315,000.00**
The agreed price and value of the material actually mfd. for but not delivered to the real prop is      *NA*
Total agreed price and value *$315,000.00*

(5)The amount unpaid to the lienor(s) for said labor
performed and said material furnished is          **$104,520.00**
The amount unpaid to lienor(s) for material actually mfd. for but not delivered to the real prop. Is      *NA*
Total amount unpaid      **$104,520.00**
The total amount claimed for which this lien is filed is          **$104,520.00**

(6)The time when the first item of work was performed was          *5/04/2017*
The time when the first item of material was furnished was          *5/04/2017*
The time when the last item of work was performed was          *5/09/2017*
The time when the last item of material was furnished was          *5/09/2017*

(7)The property subject to the lien is situated in *New York, County of New York, State of New York*
**KNOWN AS:  *387 Park Avenue South, New York NY 10016***

That Said labor and materials were performed and furnished for and used, and that the professional services
rendered were used , in the improvement of the real property herein before described. That 8 months( 4 months
if a single family dwelling) have not elapsed dating from the last item of work performed, or from the last items
of materials furnished, or since the completion of the contract, or since the final performance of the work, or since
the final furnishing of the materials for which the lien is claimed.

Dated 10 May 2017

the name signed must be printed beneath
Addison LeMay, Agent for AC Penguin Prestige Corp

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
...............................................

2015 ARTISANAL, LLC

PLAINTIFF,

-AGAINST-

A C PENGUIN PRESTIGE CORP.
681 EAST 136TH STREET
BRONX, NEW YORK 10454

DEFENDANT,

...............................................

Index No:   155359/2017

**Property Address:**
387 Park Avenue South
New York, New York 10016
(New York County; Block 883, Lot 1)

**APPLICATION TO DISCHARGE A
NOTICE OF MECHANIC'S LIEN
PURSUANT TO NEW YORK LIEN
LAW § 19(6)**

*** AMENDED ***

---

## APPLICATION TO DISCHARGE A NOTICE OF MECHANIC'S LIEN PURSUANT TO NEW YORK LIEN LAW § 19(6)

---

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of the New York, certifies that upon information and belief and reasonable inquiry, the contentions contained herein are not frivolous.*

DATE:  June 12, 2017

SALVATORE J. LIGA, ESQ.

---

SALVATORE J. LIGA, ESQ.
**SALVATORE LIGA & COMPANY, PLLC**
**777 Westchester Avenue, Suite 101**
**White Plains, New York 10604**
**(877) 725-5442**
**(917) 591-8818 Fax**
sliga@ligalaw.com
*Attorney For Plaintiff*

# **EXHIBIT E**

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

PRESENT: HON. KATHRYN FREED
~~JUSTICE OF SUPREME COURT~~

_____
_Justice_

PART 2

2015 ARTISANAL, LLC

INDEX NO. _____ 155359-17

-v-

MOTION DATE _____

AC Penguin Prestige Corp.

MOTION SEQ. NO. ___1___

The following papers, numbered 1 to _____ , were read on this motion to/for _____

Notice of Motion/Order to Show Cause — Affidavits — Exhibits _____ | No(s)._____

Answering Affidavits — Exhibits _____ | No(s). _____

Replying Affidavits _____ | No(s). _____

Upon the foregoing papers, it is ordered that this motion is

Resolved per stip
of settlement

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Dated: June 27 2017 _____

_____, J.S.C.

1. CHECK ONE: ................................................ ☒ CASE DISPOSED      ☐ NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: ..........................MOTION IS: ☐ GRANTED   ☐ DENIED   ☐ GRANTED IN PART   ☐ OTHER

3. CHECK IF APPROPRIATE: ................................................ ☐ SETTLE ORDER      ☐ SUBMIT ORDER

☐ DO NOT POST   ☐ FIDUCIARY APPOINTMENT   ☐ REFERENCE

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

Index No:   **155359/2017**

**Property Address:**
387 Park Avenue South
New York, New York 10016
(New York County; Block 883, Lot 1)

**2015 ARTISANAL, LLC**

**PLAINTIFF,**

-AGAINST-

**AC PENGUIN PRESTIGE CORP.**
**681 EAST 136TH STREET**
**BRONX, NEW YORK 10454**

**STIPLUATION**
**OF SETTLEMENT**

**DEFENDANT,**

It is hereby agreed that the mechanic's lien that was filed by respondent, A C Penguin Prestige Corp., on or about May 10, 2017, has been discharged of record pursuant to the parties' release, a copy of which is annexed hereto as Exhibit 1, effective today's date, June 26, 2017.

**DATED:**    June 26, 2017
          White Plains, New York

SALVATORE LIGA & COMPANY, PLLC

By: SALVATORE J. LIGA, ESQ.
777 Westchester Avenue, Suite 101
White Plains, New York 10604
(877) 725-5442
(917) 591-8818 Fax
sliga@ligalaw.com
*Attorneys for the Petitioner*

GOLD LAW P.C.

ELIE B. GOLD, ESQ.
200 Mamaroneck Ave. Suite 500
White Plains, NY 10601
Tel.: (607) 342-1507
*Attorneys for Respondent*

**SO ORDERED:**

HONORABLE _____

HON. KATHRYN FREED
JUSTICE OF SUPREME COURT

Page 1 of 1

## PRELEASE OF MECHANIC'S LIEN WITHOUT SATISFACTION

TO THE CLERK OF THE COUNTY OF NEW YORK, STATE OF NEW YORK,
AND ALL OTHERS WHOM IT MAY CONCERN:

PLEASE TAKE NOTICE, that A C PENGUIN PRESTIGE CORP., Lienor, a New York corporation having its principal place of business at 681 East 136th Street, Bronx, New York, 10454, had and claimed a Mechanic's Lien pursuant to the Lien Law of the State of New York, which Lien was filed in the Office of the Clerk of the County of New York on May 10, 2017, in favor of A C PENGUIN PRESTIGE CORP., and against property situated in the County of New York, State of New York, known and described as 387 Park Avenue South, New York, NY, 10016, said property being situated in Block 883, Lot 1 as shown on the Land and Tax Map for the County of New York, and against 387 PARK SOUTH LLC, as Owner and 2015 ARTISANAL LLC, as lienee, and A C PENGUIN PRESTIGE CORP., as Contractor, in the sum of $104,520.00, a copy of which is annexed hereto;

PLEASE TAKE FURTHER NOTICE, that A C PENGUIN PRESTIGE CORP., Lienor, hereby consents to the release and discharge of the aforesaid Mechanic's Lien without satisfaction and with leave to renew, and directs that the Clerk of the County of New York discharge said Mechanic's Lien of Record.

Dated: New York, NY
June 26, 2017

A C PENGUIN PRESTIGE CORP.

By:_____
Arik Aflalo, President

[373755/1]

1

**ACKNOWLEDGMENT**

**STATE OF NEW YORK**  )
                      ) ss:
**COUNTY OF NEW YORK** )

On June 26, 2017, before me, the undersigned, a Notary Public in and for the State of New York, personally appeared Arik Aflalo, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity as President of A C PENGUIN PRESTIGE CORP., and that by his signature on the instrument, the individual, or the corporation upon behalf of which the individual acted, executed this instrument.

_____
Notary Public

**WILLIAM RICIGLIANO**
Notary Public, State of New York
No. 02RI6071546
Qualified in New York County
Commission Expires March 18, 20___

[373755/1]

2

# <u>EXHIBIT F</u>

# DEMAND PURSUANT TO SECTION 38 OF THE LIEN LAW

(VIA CERTIFIED MAIL, RETURN RECEIPT REQUESTED)

**TO:**   **AC Penguin Prestige Corp.**
**681 East 136th Street**
**Bronx, NY 10454**

**PLEASE TAKE NOTICE,** that Artisanal 2015, LLC, by its attorneys, Robinson Brog Leinwand Greene Genovese & Gluck, P.C., hereby demands pursuant to Section 38 of the New York Lien Law, that within five (5) days hereof, you furnish the undersigned with a verified statement in writing setting forth the items of labor and/or material and the value thereof which make up the amount for which you claim a mechanic's lien against the real property situated in the City of New York, County of New York, State of New York, at 387 Park Avenue South, New York, New York, Block 883, Lot 1, represented by a Notice Under Mechanic's Lien Law filed on or about September 11, 2017 with the New York County Clerk, in the amount of $220,500.00; and,

**PLEASE TAKE FURTHER NOTICE**, that the verified statement demanded herein must also set forth the terms of the contract under which the items were supplied, furnished or performed, and must identify by name and title, all of the principal owners and shareholders, officers or directors who are authorized to enter into and execute such a contract on behalf of the lienor corporation.

Dated:  New York, New York
September 26, 2017

ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK, P.C.
*Attorneys for Artisanal 2015, LLC*

By: _____
Steven B. Eichel
875 Third Avenue, Ninth Floor
New York, New York 10022
(212) 603-6300